IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| Blue Spike, LLC, | § § § § § § § § § § § | |
| *Plaintiff,* | | Case No. 6:12-cv-499-MHS |
| v. | | Lead Case |
| Texas Instruments, Inc., et al., | | Jury Trial Demanded |
| *Defendants.* | | |

**PLAINTIFF'S OPPOSITION TO SOUNDMOUSE'S MOTION TO DISMISS [DKT. 648]**

Plaintiff Blue Spike, LLC opposes Defendant Soundmouse, Ltd.'s Motion to Dismiss Complaint for Lack of Personal Jurisdiction or, in the Alternative, Motion to Transfer. Soundmouse's motion to dismiss fails because Soundmouse uses its products and services extensively in Texas on behalf of its Texas clients and because Soundmouse necessarily uses its contacts with Texas to accomplish the alleged infringement. Further, it would be improper to dismiss the case before allowing jurisdictional discovery.

The alternative transfer motion fails because Soundmouse fails to show that the Southern District of New York is "clearly more convenient." This case has been consolidated with dozens of others that share common questions of law and fact, and Blue Spike's CEO and inventor—an essential witness—suffers from a serious medical condition that precludes transfer.

**Factual Background**

Blue Spike's four patents-in-suit teach bedrock principles and pioneering advancements essential to the digital-fingerprinting industry. Most of today's digital-fingerprinting providers—including Soundmouse—built their companies by infringing Blue Spike's patents.

A basic understanding of digital fingerprinting helps explain why Soundmouse necessarily uses Texas sources to infringe those patents. Broadly speaking, digital fingerprinting is a means to identify digital material—including video, audio, and text—based on unique digital markers within the material itself. At its most basic, digital fingerprinting involves at least three steps: (1) cataloging a digital work's identifying characteristics, (2) putting an abstract of the digital work into a database, and (3) scanning the Internet, radio stations, television stations, and other media sources to see whether the digital content from those sources has the same "digital fingerprint" as the abstracted digital work in the database. By finding matches between what's found out in the world and what's found in a database of protected digital content, the digital-fingerprinting process is able to detect the use of protected works.

Soundmouse uses digital fingerprinting to create "cue sheets" for its customers.[1] Cue sheets are text-based documents that describe each piece of music used in a broadcast, including the piece's composer, writer, title, duration, and

---

[1] *See* Ex. 1 (Soundmouse executive explaining how Soundmouse's services work); Ex. 2 at 3 (describing Soundmouse's use of dirty audio-fingerprinting technology). "*Dirty* audio-fingerprinting technology" attempts to identify the digital markers of a song when there is other audio interference, such as background music in a crowded room.

usage type. Broadcasters and producers must create cue sheets for all public broadcasts—such as television and radio programs and commercials—and then report the cue sheets to performing-rights organizations, which represent large bodies of musicians and helps protect their work by using the reports to ensure that musicians are compensated. Soundmouse creates cue sheets for ABC, Discovery Communications, FOX News and Sports, Disney ABC Television, ESPN, Sony Pictures Television, and NBC Universal.[2] *See* Exs. 3-4. Acting as an intermediary between its customers (broadcasters and producers) and performing-rights groups, Soundmouse reports the cue sheets to Broadcast Music, Inc. (BMI), The American Society of Composers, Authors and Publishers (ASCAP), and SESAC. *See* Ex. 3.

Soundmouse has numerous contacts with Texas. For example, Texas musicians wishing to protect their work will affiliate themselves with a performing-rights organization, which will then include the Texas-created works in Soundmouse's reference database. *See, e.g.*, Ex. 5. Soundmouse then contracts with broadcasters, producers, and distributors—many with large operations in Texas and with large amounts of content created in Texas—to review their content and create cue sheets for the performing-rights organizations. *See* Exs. 3-4 and 6-8.

**LEGAL STANDARDS**

*Motions to Dismiss for Lack of Personal jurisdiction*

In ruling on a motion to dismiss for lack of personal jurisdiction, a trial court must accept plaintiff's uncontroverted, nonconclusory factual allegations as true

---

[2] NBC Universal network includes public cable channels like Bravo, E, SyFy, Telemundo, USA, The Weather Channel, MSNBC, and NBC Sports. NBC Universal also owns and operates the Internet television provider Hulu. *See* www.nbcuni.com (viewed 5/1/13).

3

and resolve all controverted allegations in the plaintiff's favor. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001). If the plaintiff presents a prima facie case supporting jurisdiction, dismissal is improper. *Id*; *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990).

*Motions to Transfer Venue*

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. §1404(a). The threshold inquiry in determining eligibility for transfer is "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagen AG*, 371 F.3d 201, 203 (5th Cir. 2004) ("*Volkswagen I*"). If that threshold inquiry is met, the Court then balances the private interests of the litigants and the public's interest in the fair and efficient administration of justice. *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1198 (Fed. Cir. 2009); *In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008).[3] The party seeking transfer must show good cause for transfer and also show that the transferee venue is "clearly more convenient" than the transferor venue. *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 315 (5th Cir. 2008) (en banc) ("*Volkswagen II*"); *TS Tech*, 551 F.3d at 1319.

---

[3] Private-interest factors include (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; (4) all other practical problems that make trial of a case easy, expeditious, and inexpensive. *In re Nintendo*, 589 F.3d at 1198. Public-interest factors include (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws or in the application of foreign law. *Id*. These factors are not exhaustive or exclusive, and no single factor is dispositive. *Id*.

**ARGUMENT**

I.   **Soundmouse's Contacts with Texas Establish Personal Jurisdiction.**

   A.   **Soundmouse's Business and Customers Indicate Continuous and Systematic Contacts with Texas.**

Soundmouse's claim that it lacks "minimum contacts" with Texas is simply not credible given Soundmouse's business, its customers, and the way it uses Texas contacts and sources to accomplish the alleged infringement. Soundmouse's primary goal is to monitor its clients' broadcasts and create cue sheets. Its website—as well as other sources—state that (1) Soundmouse collects, manages, and distributes cue sheets for 450 of the world's leading media organizations; (2) Soundmouse reports those cue sheets to the world's leading performing-rights organizations; (3) Soundmouse alleges that its services are the "broadcast industry standard"; and (4) Soundmouse uses infringing digital-fingerprinting technology to create its cue sheets. *See* Exs. 1-3 (showing the relationship between Soundmouse's products and services and the music industry).

Soundmouse provides its services to Texas musicians through organizations like BMI, ASCAP, and SESAC. *See* Exs. 3, 6 (showing some of the Texas musicians and businesses that work with or are associated with Soundmouse's clients BMI, ASCAP, and SESAC). Soundmouse also represents ABC, Discovery Communications, FOX News, FOX Sports, Disney, ESPN Television, NBC Universal, and Sony Pictures Television. *See* Ex. 4. This who's-who customer base ensures that Soundmouse's infringing products are used continuously and systematically throughout Texas. Each of Soundmouse's clients represents Texas

5

musicians. *See* Ex. 6. Each of its network clients broadcasts programming into Tyler, Texas. *See, e.g.*, Exs. 7-8 (showing screenshots of Tyler, Texas TV listings of programming offered by ESPN Television, FOX, ABC, and NBC). But those clients do not merely broadcast *into* the Eastern District of Texas. Instead, those clients, through their local affiliates, produce work and broadcast programming *out* of Tyler, Texas. *See, e.g.*, KFXK FOX 51, KYZS (ESPN), KLTV (ABC), KETK (NBC). Soundmouse—working for these world-leading media organizations—targets programming broadcasted into Texas and broadcasted out of Texas. After all, America's most successful movie studios, TV networks, video-sharing websites, and file-hosting services are indisputably responsible for massive amounts of content published, stored, streamed, or transmitted in Texas.

As a middleman between these media broadcasters and performing-rights organizations, Soundmouse *must* employ its infringing technology in Texas. First, Soundmouse receives and processes data created in Texas from performing-rights organizations that operate in Texas. *See* Ex. 6. Second, Soundmouse analyzes, compares, and extracts music data from public television, Internet, and radio broadcasts on behalf of Texas networks and producers. *See* Ex. 7-8. Third, this Texas data from broadcasts on Texas networks is reported back to the performing rights organizations in order to compensate Texas musicians. See Ex. 3.

This explanation is consistent with Soundmouse's claim to be the "broadcast industry standard" for the collection, management, and distribution of "music usage data." *See* Ex. 1. Soundmouse's business requires extensive contacts with Texas.

6

Soundmouse cannot adequately service its clients without fingerprinting songs created in Texas. Nor can Soundmouse service those clients without providing cue sheets generated from Texas broadcasts.

This makes it not merely foreseeable, but unavoidable, that Soundmouse's infringing products harm Blue Spike in Texas—and that Soundmouse has used content from Texas to infringe Blue Spike's patents. This ground—by itself— supports exercising personal jurisdiction over Soundmouse. *See Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1280 (Fed. Cir. 2005) ("[I]n patent litigation the injury occurs at the place where the infringing activity directly impacts on the interests of the patentee."); *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th Cir. 2008) ("[T]he foreseeable effects of a tort" are "part of the analysis of the defendant's relevant contacts with the forum.").

### B. Soundmouse Actively Solicits Business In Texas.

Soundmouse claims that it has never solicited business or advertised in Texas. Dkt. 648 at 9. This is inaccurate. Soundmouse uses its website to solicit registration of broadcasters, producers, and distributors. *See* Ex. 3. Soundmouse's potential clients—including Texas clients—can go to Soundmouse's website and fill out a form to receive Soundmouse's services. *See* Ex. 9. Musicians—including those in Texas—are also invited on the website to email Soundmouse in order to register their musical work. *See* Ex. 10. This provides another stand-alone ground for asserting personal jurisdiction *See AdvanceMe, Inc. v. Rapidpay LLC*, 450 F. Supp.

7

2d 669, 673 (E.D. Tex. 2006) (holding that personal jurisdiction exists over company whose "potential customers" in Texas can "fill out an online form and apply for [the company's] services through its website").[4]

Soundmouse even acknowledges that it has directed business activity to the State of Texas. Soundmouse attempted to negotiate a sale of products and services in Texas, even sending technicians and equipment to Texas. *Id.* at 8. The failure of that sale does not prove that Soundmouse has no contacts with the forum. Rather, it demonstrates that Soundmouse has actively sought clientele and business relationships in Texas. Soundmouse's activities—including the promotion of its audio-recognition technology and digital fingerprinting—are directly related to the patents-in-suit. Because Soundmouse has sent technicians and equipment to Texas to avail itself of Texas media markets, it is reasonable that Soundmouse should expect to be haled into court here for infringing the patents-in-suit.[5]

### C. It Would Be Improper to Dismiss the Case Before Allowing Jurisdictional Discovery.

Even if Blue Spike's arguments on personal jurisdiction were somehow defective, the proper response would be to allow jurisdictional discovery. The showing required to warrant jurisdictional discovery "is less than a prima facie

---

[4] Besides its own website, Soundmouse has also used outside sources to directly generate leads to increase its clientele and music database. *See* Ex. 1 (showing attempt by Soundmouse executive to solicit business from an individual composer on a public forum); *see also* Ex. 4 (showing an add for Soundmouse on ZoomInfo.com). Soundmouse has also participated in at least one copyright conference in North America dealing with the impacts and efficient use of digital-recognition technology in the music industry. *See* Ex. 11 (listing Mark Vermaat as a keynote speaker in the California Copyright Conference). These tools demonstrate not only that Soundmouse has a very broad customer base outside of the UK but also that Soundmouse is actively soliciting new business in a global marketplace, and more specifically North America and Texas.
[5] Soundmouse has also purchased a software license from a Texas-based business. Dkt. 648 at 9.

showing." *Royal Ten Cate USA, Inc. v. TTAH Trust Co. Ltd.*, No. A-11-CA-1057 LY, 2012 WL 2376282, at *2 (W.D. Tex. June 22, 2012); *see also Orchid Biosciences, Inc. v. St. Louis Univ.*, 198 F.R.D. 670, 673 (S.D. Cal. 2001) (holding that it would be "counterintuitive to require a plaintiff, *prior* to conducting discovery," to make a prima facie showing). Blue Spike has met that threshold. *See Nuance Commc'ns, Inc. v. Abbyy Software House*, 626 F.3d 1222, 1234-35 (Fed. Cir. 2010) (holding that "proffered documents may be insufficient in themselves to establish a prima facie case" but that "this incomplete record nevertheless supports the need for additional discovery to determine the merits of personal jurisdiction").

II. **The Paramount Interest in Judicial Economy, the Health Condition of Blue Spike's CEO and Inventor, and the Other Interest Factors Weigh Heavily Against Transfer.**

   A. **The Paramount Federal Interest of Judicial Economy—by itself—Precludes Transfer of this Consolidated Case.**

"Courts have consistently held that judicial economy plays a paramount role in trying to maintain an orderly, effective administration of justice, and having one trial court decide all of these claims clearly furthers that objective." *In re Google*, 412 Fed. App'x 295, 296 (Fed. Cir. 2011). Judicial economy is so important that it represents a sufficient basis to *deny* transfer "even when *all* of the convenience factors clearly favor transfer." *In re Vistaprint Ltd.*, 628 F.3d 1342, 1345-47 (Fed. Cir. 2010) (emphasis added); *see also Centre One v. Vonage Holdings Corp.*, No. 6:08-CV-467, 2009 WL 2461003, at *7 (E.D. Tex. Aug. 10, 2009) (holding that defendant's "convenience alone fails to outweigh the glaring inefficiency of

9

prosecuting two, nearly identical, complex patent infringement cases in different fora").

In its motion, Soundmouse incorrectly focuses attention on the infringing products when the Court must focus on the patents-in-suit. Here, Blue Spike is the plaintiff in more than 80 lawsuits in this Court concerning the same four patents, and the Court has consolidated those suits for pretrial purposes. *See* Ex. 12. This Court further stated that these cases "involve a common question of law or fact: and that keeping them consolidated "would promote efficient case management." *Id*. As in *Adrain v. Genetec, Inc.*, transferring the case and creating multiple suits "may be more convenient for [the defendant], but it would impose a significant burden on the plaintiff, witnesses, and the federal court system" and also create "an unnecessary risk of inconsistent claim construction and adjudication." No. 2:08-CV-423, 2009 WL 3063414, at *3 (E.D. Tex. Sept. 22, 2009). In several other recent cases with strikingly similar venue facts, the Court has likewise denied transfer. *See, e.g.*, *Net Navigation Sys., LLC v. Alcatel-Lucent USA, Inc.*, No. 4:11-CV-663, at 8-10 (E.D. Tex. Aug. 27, 2012) (attached as Ex. 13) (denying transfer because, like this case, plaintiff had filed multiple suits concerning same four patents in this district and the Court had combined those suits for pretrial purposes, meaning that "another court would be required to conduct duplicative proceedings regarding claim construction, expert discovery, and other issues"); *Oasis Research, LLC v. Pro Softnet Corp.*, No. 4:12-CV-531, at 11 (E.D. Tex. Aug. 21, 2012) (attached as Ex. 14) (holding that because plaintiff had filed multiple suits in this district concerning the

same four patents, concerns of judicial economy weighed heavily against transfer; if the Court transferred the case, "another court would have to spend significant resources to familiarize itself with the patents, prosecution history, claim construction, and other issues"); *Mosaid Techs., Inc. v. Freescale Semiconductor, Inc.*, No. 6:11-CV-173, at 9-10 (E.D. Tex. Sept. 27, 2012) (attached as Ex. 15) (denying motion to transfer patent suit that had already been consolidated with another suit, as "the existence of duplicative suits involving the same or similar issues may create practical difficulties that will weigh heavily . . . against transfer").

Soundmouse mischaracterizes Blue Spike's—and this case's—relationship to Texas. Soundmouse argues that the alleged patent infringement took place only in New York, where its clients are headquartered. Dkt. 648 at 15. Soundmouse wrongly ignores that its clients operate nationwide and have significant Texas contacts. The infringement also took place in several states, including Texas. That infringement has serious impacts on Tyler-based Blue Spike and its Texas-based owner and employees. While it is true that this District and the Southern District of New York are both competent to apply federal patent law, this Court will be much more familiar with the legal and factual issues involving Blue Spike's technology, since the Court is adjudicating over 80 other suits involving the very same patents-in-suit. This Court and a potential Texas jury have more interest in adjudication of this matter. The Court should decline Soundmouse's invitation to ignore recent precedents and the important interests in judicial efficiency.

    **B.    The Serious Health Condition of Blue Spike's CEO and Inventor—an Essential Witness—Also Defeats Transfer.**

Scott Moskowitz—an essential witness to this matter—is the CEO of Blue Spike and the inventor of the four patents-in-suit. He suffers from a severe chronic hernia condition that requires regular medical treatment and makes travel extremely painful. Moskowitz Decl. ¶11. Traveling to the Southern District of New York would exacerbate Moskowitz's pain and complicate his treatment. Such a medical condition is sufficient grounds to overcome other interest factors in favor of transfer. *See NGC Worldwide, Inc. v. Siamon*, No. 3:02CV1760 (JBA), 2003 WL 1987001, at *2 (D. Conn. Apr. 21, 2003) (finding that a patient's diabetes was sufficient cause to overcome transfer); *Vassallo v. Niedermeyer*, 495 F.Supp. 757, 760 (S.D.N.Y. 1980) (plaintiff's medical condition weighed against transfer); *compare with Praetorian Specialty Ins. Co. v. Auguillard Constr. Co.*, 829 F. Supp. 2d 456, 473 (W.D. La. 2010) (finding that health concerns were not a sufficient factor for transfer when the witness—unlike here—would not appear in court frequently). Moskowitz's medical problems weigh heavily against transfer.

### C. The Other Interest Factors Favor Keeping the Case in This District, and Soundmouse Has Not Met its Burden of Showing That the Southern District of New York is "Clearly More Convenient."

Because the parties have not even exchanged Rule 26 disclosures yet, Soundmouse cannot reasonably argue that the relative ease of access to sources of proof favors transfer to the Southern District of New York. *Contra* Dkt. 648 at 11-12. Soundmouse's argument is premature. Until Rule 26 disclosures are made, it is not possible to weigh many of the interest factors. *See GHJ Holdings, Inc. v. Mag Instrument, Inc.*, Civ. No. 5:10-CV-230, Dkt. No. 26 (E.D. Tex. Feb. 5, 2011)

(attached as Ex. 16) (holding supplemental briefing regarding disclosures should be submitted before a transfer motion is considered).

Soundmouse's argument about compulsory process is also "undercut by [Soundmouse's] failure to identify particular witnesses or documents that would require compulsory process." *Geotag, Inc. v. Aromatique, Inc.*, No. 2:10-cv-00570-JRG, Dkt 585, at *6-7 (E.D. Tex. Jan. 14, 2013); *see also Dymatize Enters., Inc. v. Maximum Human Performance, Inc.*, No. 3:09-cv-1840, 2010 WL 972240, at *2-3 (N.D. Tex. Feb. 28, 2010) (holding that a party need not provide affidavits identifying witnesses, but must at least identify the witnesses).

The Court should consider the *relative* convenience of the parties and witnesses—including Blue Spike and its witnesses—in deciding whether to transfer the case. After all, this case is not all about Soundmouse. There is a plaintiff in this case whose interests, burdens, witnesses, and other sources of proof are relevant, too. Soundmouse argues that litigating in Texas would put a burden on its willing witnesses, without identifying any of its witnesses. In contrast to Soundmouse's as-yet hypothetical burdens, litigating this action in New York would be inconvenient and burdensome for Blue Spike, Scott Moskowitz, and Blue Spike's employees—all of whom live in Texas. Those burdens are critically important in the transfer analysis because "transfer will not be ordered if the result is merely to shift the inconvenience of where the action is located from one party to the other." WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION 3D §3848.

Faced with Blue Spike's concrete burdens, Soundmouse attempts to convince the Court to ignore Blue Spike's interests, accusing Blue Spike of manufacturing connections with Texas for purposes of litigation. *See, e.g.*, Dkt. 648 at 4. Yet Blue Spike's Texas connections are real. Blue Spike's CEO—the inventor of the four patents-in-suit—is domiciled in Texas and lives in Tyler; Blue Spike was formed in Texas over one year ago; it has its headquarters and principal place of business in this District; and its employees, computer servers, and sources of proof are all located in Texas. *See* Moskowitz Decl. ¶¶1-6. Such connections are not deemed recent, ephemeral, manufactured for litigation, or meaningless. *See, e.g., Wireless Recognition Techs. LLC v. A9.com, Inc.*, No. 2:10-CV-364-JRG, 2012 WL 506669, at *3 n.6 (E.D. Tex. Feb. 15, 2012) ("Considering that WRT was incorporated more than four months before this suit was filed, and that its direct parent corporation has nine employees in the Eastern District of Texas, the Court is not prepared to hold that WRT is 'ephemeral' and created solely to manipulate venue."); *NovelPoint Learning LLC v. LeapFrog Enters., Inc.*, No. 6:10-CV-229 JDL, Dkt. 67, at 7-9 (E.D. Tex. Dec. 6, 2010) (attached at Ex. 17) (holding that the plaintiff's connection to this District was not "recent" because plaintiff opened office here four months before filing suit and was not "ephemeral" because two of plaintiff's principals lived here).

The question is whether—on balance—the proposed forum is clearly more convenient than this District. It is not—for all the reasons described above. Further, Soundmouse has more meaningful contacts with Texas than Blue Spike has in New York. Again, Soundmouse has directed its products to Texas. It collects data from

14

Texas sources as part of carrying out the alleged infringement, making Texas a site of the alleged wrongs. Soundmouse has solicited business from Texas and has purchased software from Texas. Dkt. 648 at 8-9. On the other side of the balance, Blue Spike has no such New York connections. Blue Spike has no offices, no employees, no customers, and no other meaningful contacts in New York. Moskowitz Decl. ¶7. It is unlikely that the Southern District of New York could assert personal jurisdiction over Blue Spike for claims made against it in New York. And, unlike Soundmouse, Blue Spike does not have clients around the globe and does not work with 450 of the world's leading media organizations. *See* Ex. 3. Instead, Blue Spike is a small Texas company owned and operated by an inventor with serious health problems—a man who has worked for years to develop and commercialize his inventions, but who lacks the physical and financial resources to litigate in multiple courts across the country. The Southern District of New York is not more convenient than this District—and is certainly not "clearly more convenient," as required for transfer. *Volkswagen II*, 545 F.3d at 315.

## Conclusion

For these reasons, Blue Spike respectfully asks the Court to deny Soundmouse's motion to dismiss and alternative motion to transfer venue.

Respectfully submitted,

  /s/ Randall T. Garteiser
Randall T. Garteiser
  Lead Attorney
  Texas Bar No. 24038912
  randall.garteiser@sftrialattorneys.com
Christopher A. Honea
  Texas Bar No. 24059967
  chris.honea@sftrialattorneys.com
Christopher S. Johns
  Texas Bar No. 24044849
  chris.johns@sftrialattorneys.com
GARTEISER HONEA, P.C.
44 North San Pedro Road
San Rafael, California 94903
(415) 785-3762
(415) 785-3805 fax

*Counsel for Blue Spike LLC*

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on this the 16th day of May 2013.

                                              /s/ Randall T. Garteiser