# Exhibit 3

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VIACOM INT'L INC., ET AL.,<br><br>    Plaintiffs,<br> v.<br><br>YOUTUBE, INC., ET AL.,<br><br>    Defendants | ECF Case<br>Civil No. 07-CV-2103 (LLS) |
| THE FOOTBALL ASSOCIATION PREMIER LEAGUE LIMITED, ET AL., on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br> v.<br><br>YOUTUBE, INC., ET AL.,<br><br>    Defendants. | ECF Case<br>Civil No. 07-CV-3582 (LLS) |

### DECLARATION OF CHRISTOPHER MAXCY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

CHRISTOPHER MAXCY, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am the Director of Partner Development at YouTube, where I have been employed since December 2005. I have testified in this case as YouTube's designated corporate witness regarding any service, features, or privileges that YouTube makes available to content partners that it does not make available to ordinary users of the service. I have reviewed the portions of the plaintiffs' motions for summary judgment discussing YouTube's use of Audible Magic's audio-

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

fingerprinting technology. I have first-hand knowledge about YouTube's licensing and use of Audible Magic's technology, and submit this declaration in response to certain assertions that the plaintiffs have made concerning those issues.

2. YouTube first became aware of Audible Magic in the Spring of 2006. At the time, we were negotiating with some of the major record labels (including Warner Music Group) about potential content partnerships. I recall that Warner Music suggested that we speak with Audible Magic about possibly using its audio-fingerprinting technology to identify sound recordings owned by Warner in videos uploaded to YouTube. It was my understanding at that time that Audible Magic's primary application was scanning audio files exchanged on peer-to-peer networks looking for commercial sound recordings. Based on conversations with the record labels and with Audible Magic, I learned that Audible Magic's technology had not previously been used to scan video files on a user-generated content website like YouTube. Nevertheless, I followed up with Audible Magic to learn more about its technology and determine whether it might be useful for YouTube's needs.

3. Later in 2006, after a series of discussions with Audible Magic, a group of YouTube engineers tested Audible Magic's technology alongside the audio fingerprinting technology offered by another vendor. We ultimately decided to use Audible Magic and signed a licensing agreement in October 2006. To my knowledge, YouTube was the first user-generated content website to license Audible Magic's technology.

2

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

4.  In licensing Audible Magic's technology, our goal was to integrate it into a new platform that we were building called "Claim Your Content" ("CYC"). The idea behind CYC was to enable content owners to identify videos on YouTube and "claim" the content of those videos as their own. The content owner would then instruct YouTube what to do with the claimed video: whether to "block" it (remove it from the service), "track" it (leave it up and receive information about it), or "monetize" it (leave it up with advertising displayed alongside it and share in the revenue generated by those ads). We envisioned Audible Magic's technology as one of the ways that content owners using CYC could find videos to claim.

5.  Integrating Audible Magic into our new CYC system was a significant technical and logistical challenge. Audible Magic had never before been deployed on a user-submitted content website (much less a website that had the enormous volume of uploads that YouTube did). Also, we would be using Audible Magic to identify audio files contained within videos, which was not the way that the technology had previously been used on peer-to-peer networks. We were not sure whether Audible Magic would work at all, and there were serious questions about how reliably it would work and what technical problems might arise.

6.  As with any new technology, we wanted to test and carefully roll-out Audible Magic. In doing so, we thought it prudent to work at first with a small number of companies to make sure that Audible Magic would function as we hoped and would be able to handle the significant load it would face once it launched. During this start-up phase, which lasted from roughly the time we licensed Audible

3

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

Magic through the first quarter of 2007, we worked primarily with a few of the record labels to set up the new CYC platform and to make sure that Audible Magic's technology would be effectively integrated into it. Those companies had experience with Audible Magic, and it was their sound recordings that Audible Magic was designed to identify.

7. Our expectation, however, was that once we got the new CYC platform up and running, it would be made broadly available to content owners. It was not YouTube's policy to condition the availability of Audible Magic (or any of our other content-identification technologies) on a rights holder's willingness to enter into a content-licensing deal with YouTube. To my knowledge, YouTube *never* relied on a copyright holder's unwillingness to license content as a basis for refusing access to Audible Magic or any other fingerprinting technology that we had available.

8. In 2006 and early 2007, I participated in YouTube's negotiations with Viacom over a possible content-licensing agreement. Those negotiations began before Google's acquisition of YouTube. During the course of those negotiations, I attended several meetings with Viacom executives, including Michael Wolf and Adam Cahan. Those executives said that they were aware of videos containing Viacom content on YouTube. But Mr. Cahan and Mr. Wolf told us on several occasions that Viacom wanted that content to remain on YouTube while the licensing discussions were ongoing.

9. In early February 2007, after negotiations between Viacom and YouTube had broken down, I consulted with YouTube's CEO Chad Hurley. We

4

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

concluded that YouTube should offer to Viacom our soon-to-be-released CYC tool (including Audible Magic). We believed that Viacom should be the very first company to use the tool and that this would send a powerful message that YouTube took Viacom's concerns seriously and that we did not want Viacom content on YouTube if Viacom itself did not want it there.

10. I informed YouTube's engineering department of our decision to determine if the plan was technologically feasible. Nearly simultaneously, on February 2, 2007, I reached out to Adam Cahan at Viacom to set up a meeting to discuss Viacom using the CYC tool. I asked that we speak that very day. Cahan responded that he would rather discuss the matter on Monday, February 5.

11. Over that weekend, I learned that Viacom had requested that YouTube remove music videos that supposedly had aired on MTV. That was a source of concern because Viacom did not own the rights to the audio tracks of those music videos. If Viacom were to use the CYC tool to automatically block any YouTube video containing the audio track from a music video, that would prevent our music label partners from distributing their content on YouTube and would prevent users from uploading videos that they had every right to share. I concluded that YouTube would need to develop additional protocols to ensure that content owners would use CYC to block only those materials that they actually owned.

12. In light of this development, I reached out to Cahan and told him that we would need to postpone our meeting. I did not tell Cahan that YouTube would only provide access to CYC in connection with a content-partnership deal.

**HIGHLY CONFIDENTIAL**
**FILED UNDER SEAL**

13.    On February 6, 2007, in response to a specific request from Cahan, I provided him with access to YouTube's CVP tool. That was not in lieu of CYC. My offer to Cahan to have Viacom use CYC never closed and Cahan never followed up with me to continue discussions about Viacom's use of CYC.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:    San Bruno, California
April 28, 2010

_Christopher Maxcy_