UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| Blue Spike, LLC, | § § § | |
| Plaintiff, | § | Civil Action No. 6:12-cv-00499 |
| v. | § § | JURY TRIAL DEMANDED |
| Texas Instruments, Inc., et al., | § § | |
| Defendants. | § | |

**PLAINTIFF BLUE SPIKE'S OPPOSITION TO DEFENDANT TECHNICOLOR SA'S MOTION TO DISMISS [DKT. 560]**

Plaintiff Blue Spike, LLC opposes Defendant Technicolor SA's Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Insufficient Service of Process. Technicolor's own website disproves Technicolor's claim that it has no meaningful contacts with Texas. The website demonstrates the ubiquity of Technicolor's products, services, and customers, and it also offers the accused products for sale. These facts constitute a prima facie case for personal jurisdiction. At a minimum, they require the Court to permit jurisdictional discovery before ruling on Technicolor's Motion. Additionally, Technicolor admits that it received service of process via registered mail, which is all that the Hague Convention requires.

**FACTUAL BACKGROUND**

Blue Spike's four patents-in-suit teach bedrock principles and pioneering advancements essential to the digital-fingerprinting industry. Indeed, most of today's digital-fingerprinting providers—including Technicolor—built their

1

fingerprinting products and services by infringing Blue Spike's patents. A basic understanding of digital fingerprinting helps explain why Technicolor necessarily uses Texas sources to infringe Blue Spike's patents.

Broadly speaking, digital fingerprinting is a means to identify digital material—including video, audio, and text—based on unique digital markers within the material itself. At its most basic, digital fingerprinting involves at least three steps: (1) cataloging a digital work's identifying characteristics, (2) putting an abstract of the digital work into a database, and (3) scanning the Internet, radio stations, television stations, and other media sources to see whether the digital content from those sources has the name "digital fingerprint" as the abstracted digital work in the database. By finding matches between "what's found out in the world" and "what's found in a database of protected digital content," the digital-fingerprinting process is able to detect the use of protected works. Indeed, Technicolor explains the fingerprinting process in a YouTube video aimed at selling some of its infringing products. *See* http://bit.ly/VrJ0Tp.

To use Technicolor's own example, a motion-picture studio may film a movie and obtain a copyright on it. The studio could then take the recording to a "digital fingerprinter," who would identify particular characteristics about the film's digital file (such as the exact placement of certain 1's and 0's in the digital stream) and create an abstract of the film. *See id.* After putting this abstract in a "master database," the fingerprinter may connect to a "professional network" that trawls the Internet and other media outlets—comparing digital content out in the world with

the digital markers in its database—to see whether there were any "matches." *Id*. Anytime there's a match with the studio's film, Technicolor's software creates a "Report File" that identifies who is using the song—and track how many times each sources plays it. *Id*. The content owner can then chose to let certain sources use the song, compel payment for using the song, or sue for copyright infringement.

Here, Technicolor's infringing products use digital fingerprinting to track and catalog unauthorized uses of proprietary content on the web and other media sources. Technicolor accomplishes this feat by interfacing its accused products with a "master database" of protected digital works and a system to trawl the Internet (including Texas sources) and media outlets around the country (including from Texas) to see whether any video-data transmissions bear fingerprints matching those in the master database. *Id*.

Technicolor's infringing products are, ironically, a very effective way to limit the misappropriation of intellectual property.

## LEGAL STANDARD

In ruling on a motion to dismiss for lack of personal jurisdiction, a trial court accepts a plaintiff's uncontroverted, nonconclusory factual allegations as true and resolves all controverted allegations in the plaintiff's favor. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868 (5th Cir. 2001). If the plaintiff presents a prima facie case supporting jurisdiction, dismissal is improper. *Id*; *Bullion v. Gillespie*, 895 F.2d 213, 217 (5th Cir. 1990).

## ARGUMENT

**1.     The Court Has Personal Jurisdiction over Technicolor.[1]**

Technicolor claims that it has never conducted any business or activities in Texas, has never solicited business in Texas, does not have any customers in Texas, does not receive any sales or revenue originating from Texas, does not render services to any Texas residents, and has no sales contracts with entities located in Texas. Dkt. 13 at 6-8. In short, Technicolor claims to be an utter stranger to Texas in every way. These claims are not credible given the nature of Technicolor's business and customers, its website, and its use of contacts with Texas in accomplishing the alleged infringement.

Technicolor "lead[s] the market in delivering advanced video services to content creators and distributors." Declaration of Randall Garteiser at Ex. 1 ("Ex. 1")(screen shot). The company's website further describes the breadth and scope of its operations, as follows:

> Serving motion picture, television, and other media clients, the company is a leading provider of high-end visual effects, animation, and postproduction services. In support of network service providers and broadcasters globally, Technicolor ranks among the worlds' leading suppliers of digital content delivery services and home access devices, including set-top boxes and gateways. The company also remains a large physical media service provider, being one of the world's largest film processors and independent manufacturers and distributors of DVDs and Blu-ray discs.

---

[1] The analyses of personal jurisdiction and venue merge in this case. *See Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1280 (Fed. Cir. 2005) ("Venue in a patent action against a corporate defendant exists wherever there is personal jurisdiction."). Because "no separate venue inquiry is necessary" (*id.*), this Opposition does not discuss venue separately from personal jurisdiction.

Ex. 2 (screen shot). Technicolor's website also reveals that it uses a major distribution network to ship its products throughout North America:

> We are proud to number amongst our clients the home entertainment divisions of major Hollywood studios and leading game publishers. Our clients are shipping yearly millions of products to some 10,000 retail locations in North America including major chains.

Ex. 3 (screen shot).

Technicolor's statements on its website help show why personal jurisdiction is proper. Technicolor's customer base and distribution network ensure that Technicolor's infringing products are used continuously and systematically in Texas. *See ATEN Int'l Co. Ltd. v. Emine Tech. Co., Ltd.*, 261 F.R.D. 112, 119 (E.D. Tex. 2009) (given that Texas has second largest population of any state and three of the ten most populous cities, evidence that defendant continuously sells its products to a U.S. nationwide retailer is a strong indication that defendant intends to direct its products into Texas). Technicolor and its customers are indisputably responsible for massive amounts of content sold, used, stored, and transmitted in Texas. And given the ubiquity of Technicolor's customers, it defies logic that Technicolor somehow operates without extensive contact with Texas. *See Avocent Huntsville Corp. v. Aten Int'l Co., Ltd.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008) (in patent-infringement cases, personal jurisdiction turns on nature and extent of the commercialization of the accused products or services by defendant in the forum); *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 245 (5th Cir. 2008) ("the foreseeable effects of a tort" are "part of the analysis of the defendant's relevant contacts with the forum").

5

Independently supporting jurisdiction, Technicolor's website offers to sell infringing video-fingerprinting products to residents of Texas and other states. Such "offers to sell" constitute patent infringement. *See* 35 U.S.C. §271 (barring "offers to sell" patented invention). Technicolor's website contains a page clearly titled "Sales Contacts" that allows potential customers to initiate direct contact with Technicolor's salespeople for the accused products. Ex. 4 (screen shot). And, here, Technicolor's website is designed to facilitate sales, not merely to allow people to "make comments." *See AdvanceMe, Inc. v. Rapidpay LLC*, 450 F. Supp. 2d 669, 673 (E.D. Tex. 2006) (holding that Texas courts have personal jurisdiction over company whose "potential customers" in Texas can "fill out an online form and apply for [the company's] services through its website").

Further, the very nature of Technicolor's accused products ensures that Technicolor's infringing activity is directed toward Texas. Technicolor's video-fingerprinting technology works by collecting digital video files—such as files uploaded onto YouTube and other file-sharing websites—and comparing them to the content in a "master database." *See* http://bit.ly/VrJ0Tp (Technicolor's YouTube demonstration about its "Video Finger Printing Technology" and "Spider Scan Process"). Technicolor's technology necessarily uses content generated and collected in Texas—which is home to several major media markets and is America's second-most-populous state—in order to accomplish the alleged infringement. Moreover, this infringing activity directly impacts Blue Spike's interests in Texas, making the exercise of jurisdiction proper. *See Trintec Indus., Inc. v. Pedre Promotional Prods.,*

*Inc.*, 395 F.3d 1275, 1280 (Fed. Cir. 2005) ("[I]n patent litigation the injury occurs at the place where the infringing activity directly impacts on the interests of the patentee.").[2]

Blue Spike's allegations—supported by Technicolor's own sources—establish more than a prima facie case supporting specific jurisdiction. *Id.*; *see also Panda Brandywine*, 253 F.3d at 868 (explaining "specific jurisdiction . . . exists when a nonresident has 'purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities'") (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)). Here, Technicolor can "reasonably expect to be haled into court"[3] in Texas because it has pushed its accused products through its distribution system into Texas, because it offers to sell the accused products to Texas residents through its website, and because it has reached out for Texas content as part of the alleged infringement.

But if the Court is not yet persuaded, it should permit Blue Spike to conduct jurisdictional discovery before ruling on Technicolor's motion. "If a plaintiff presents

---

[2] At this stage, there is no reason to believe Technicolor's claim that it has "never made, used, sold, offered to sell, or imported any . . . software, system, application, or technology involving fingerprinting." Dkt. 13 at 8. Technicolor's own datasheet describes the infringing products, and page 4 of the datasheet lists Technicolor SA ("Technicolor Worldwide Headquarters" in France) as the publisher. *See* Ex. 5. And as mentioned above, Technicolor has also put a video describing its infringing products on YouTube. *See* http://bit.ly/VrJ0Tp. Technicolor's other marketing activities further undermine its alleged unfamiliarity with the accused products. For example, Eric Diehl, a vice president at Technicolor, recently presented Technicolor's fingerprinting technology at a security presentation at the Technology Committee gathering in Burbank. *See* Ex. 6 (screen shot). Mr. Diehl made another similar presentation in September 2012 at a conference hosted by the Airline Passenger Experience Association. *Id*. Both events "generated great interest to the airlines and [in-flight entertainment] distribution companies." *Id*. Also undercutting Technicolor's assertions, the company partnered with Vobile in 2008 to offer video fingerprinting technology to "all filmmakers." Ex. 7 (press release).
[3] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

7

factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained." *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003) (internal quotation marks, punctuation, and citation omitted). Blue Spike has easily surpassed this threshold.

**2.     Service of Process Was Proper Under the Hague Convention.**

Technicolor argues that service of process did not comply with the Hague Convention. Technicolor is mistaken.

Service was accomplished under Federal Rule of Civil Procedure 4(h)(1)(A), which specifies that a foreign corporation may be served "in the manner prescribed by Rule 4(e)(1) for serving an individual." FED. R. CIV. P. 4(h)(1)(A). "[A]n individual . . . may be served in a judicial district of the United States by following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located." FED. R. CIV. P. 4(e)(1). Texas law provides for service of process on foreign companies through the Texas Secretary of State:

> The secretary of state is an agent for service of process on a nonresident who engages in business in this state, but does not maintain a regular place of business in this state or a designated agent for service of process, in any proceeding that arises out of the business done in this state and to which the nonresident is a party.

TEX. CIV. PRAC. & REM. CODE §17.044(b). A nonresident does "business in this state" if it "commits a tort in whole or in part in [Texas]." *Id*. §17.042(2). Patent infringement is a tort; thus, the use, sale, and marketing of Technicolor's infringing

8

products in Texas establish that Technicolor was "doing business" in Texas for purposes of the Texas service statute and Rule 4(h)(1)(A). *Emine Tech. Co.*, 261 F.R.D. at 121. It follows that substituted service on the Texas Secretary of State was proper. *Id.*[4]

Technicolor complains that even if substituted service on the Secretary of State were theoretically permissible, Blue Spike did not comply with the Hague Convention here because the Secretary merely forwarded the process documents via registered mail. Dkt. 13 at 10-11. This argument fails because the Hague Convention permits service of process by mail if the receiving state does not object. *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 299-300 (2d Cir. 2005). France does not object. *See* http://bit.ly/UbO1bQ (Hague Convention website indicating that France does not object to service of process by mail); http://1.usa.gov/SsP8Xj (U.S. State Department website indicating same); *Ramirez De Arellano v. Colloides Naturels Int'l*, 236 F.R.D. 83, 88 (D.P.R. 2006) (noting that France does not object to service of process by mail under section 10(a) of Hague Convention). Technicolor admits that it received the process documents from the Texas Secretary of State via registered mail on November 5, 2012. *See* Dkt. 13 at 4; *id.* at Cadieux Decl., Ex. A. This is all that was necessary to effect proper service. *See Int'l Transactions, Ltd. v. Embotelladora Agral Regionmontana SA de CV*, 277 F. Supp. 2d 654, 662 (N.D. Tex. 2002) (substituted service of process on Texas Secretary of State satisfies Hague

---

[4] The same result follows from Rule 4(h)(1)(B), which allows service of a foreign corporation to be made in a judicial district of the United States by delivering a copy of the summons and complaint to any agent "authorized by appointment or by law to receive service of process." FED. R. CIV. P. 4(h)(1)(B). The Texas Secretary of State is such an agent. *See* TEX. CIV. PRAC. & REM. CODE §17.044(b).

Convention provided that Secretary forwards process documents to defendant via registered mail).

Technicolor is correct that the Fifth Circuit once concluded that the Hague Convention did not permit service of process by mail. *Nuovo Pignone, SpA v. STORMAN ASIA M/V*, 310 F.3d 374, 384 (5th Cir. 2002).[5] But *Nuovo Pignone* was handed down *before* the announcement of a critical treaty clarification from the Hague Convention itself. The Fifth Circuit in *Nuovo Pignone* based its holding on the fact that Article 10(a) of the Convention, which permits transmission of judicial documents by mail, uses the term "send" rather that the term "serve" (which is used elsewhere in the Convention). *See id*. ("[B]ecause the drafters purposely elected to use forms of the word 'service' throughout the Hague Convention, while confining use of the word 'send' to article 10(a), we will not presume that the drafters intended to give the same meaning to 'send" that they intended to give to "service."). Following the Fifth Circuit's 2002 decision, the Hague Conference itself expressly repudiated the Fifth Circuit's position. *See* Conclusions and Recommendations Adopted by the Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions (28 October to 4 November 2003) at 11, *available at* http://bit.ly/QCSBUQ (explaining that the Special Commission has "reaffirmed its clear understanding that the term 'send' in Article 10(a) is to be

---

[5] Even before the clarification of the treaty, other federal courts of appeal disagreed with the Fifth Circuit's position in *Nuovo Pignone*, holding instead that service by mail was permissible, which mirrored "the essentially unanimous view of other member countries of the Hague Convention." *Brockmeyer v. May*, 383 F.3d 798, 802 (9th Cir. 2004) (holding that Hague Convention permits service of process by mail); *Ackermann v. Levine*, 788 F.2d 830 (2d Cir. 1986) (same).

10

understood as meaning 'service' through postal channels"); *R. Griggs Group Ltd. v. Filanto Spa*, 920 F.Supp. 1100, 1106 (D. Nev. 1996) (noting that multiple official Hague Convention publications have directly criticized "the line of cases . . . holding that 10(a) does not allow mail service, as contradicting not only the implicit understanding of the delegates to the [1977] Special Commission meeting but substantial legal literature on the Convention and its predecessor treaties.").

The U.S. State Department has also officially opined that the old Fifth Circuit position, which the Eight Circuit adopted in 1989, "'is incorrect to the extent that it suggests that the Hague Convention does not permit as a method of service the sending of a copy of the summons and complaint by registered mail to a defendant in a foreign country.'" *Id.* (quoting Ltr. from Alan J. Kreczo, U.S. Dep't of State Legal Advisor to the Admin. Off. of the U.S. Courts & Nat'l Ctr. for State Courts of Mar. 14, 1991, excerpted at 30 I.L.M. 260); *see also id.* (noting that "courts often give great weight to treaty interpretations made by the Executive Branch"). In light of the Hague Convention's own treaty clarification and the deference owed the Executive Branch when interpreting treaties, the Fifth Circuit's holding is no longer good law.

Service was proper, making it appropriate to deny Technicolor's motion. But if the Court were inclined to grant it, the Court should first give Blue Spike a chance to re-serve Technicolor rather than dismiss the case outright. *See Rhodes v. J.P. Sauer & Sons, Inc.*, 98 F. Supp. 2d 746, 750 (W.D. La. 2000) ("The general rule is that when a court finds that service is insufficient but curable, it generally should

11

quash the service and give the plaintiff an opportunity to re-serve the defendant.") (internal punctuation omitted); *Albo v. Suzuki Motor Corp.*, No. 3:08-0139-KC, 2008 WL 2783508, at *3 (W.D. Tex. July 2, 2008) ("In most instances where a foreign corporation has not been served in compliance with the Hague Convention the favored remedy is to allow the plaintiff the appropriate time to properly serve the defendant."). Dismissal is generally appropriate only where proper service would be futile. *Rhodes*, 98 F. Supp. 2d at 750.

## CONCLUSION

For these reasons, Blue Spike respectfully asks the Court to deny Technicolor's motion to dismiss.

If, however, the Court is inclined to grant the motion, Blue Spike asks the Court to postpone ruling on Technicolor's motion until Blue Spike has had the opportunity to conduct jurisdictional discovery or re-serve Technicolor, as appropriate.

Respectfully submitted,

 /s/ Randall Garteiser
Randall T. Garteiser
  Texas Bar No. 24038912
  randall.garteiser@sftrialattorneys.com
Christopher A. Honea
  Texas Bar No. 24059967
  chris.honea@sftrialattorneys.com
Christopher S. Johns
  Texas Bar No. 24044849
  chris.johns@sftrialattorneys.com
GARTEISER HONEA, P.C.
44 North San Pedro Road
San Rafael, California 94903
(415) 785-3762
(415) 785-3805 fax

Kirk J. Anderson
  California Bar No. 289043
Peter S. Brasher
  California Bar No. 283992
GARTEISER HONEA, P.C.
44 North San Pedro Road
San Rafael, California 94903
(415) 785-3762
(415) 785-3805 fax


*Counsel for Blue Spike LLC*

13


**CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email, on June 28, 2013 that was originally served on 11th day of December, 2012.

                                                                        /s/ Randall T. Garteiser