**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **BLUE SPIKE, LLC,** | § | |
| *Plaintiff*, | § | **Civil Action No. 12-CV-499-MHS** |
| | § | |
| **v.** | § | **LEAD CASE** |
| | § | |
| **TEXAS INSTRUMENTS, INC.,** *et al.*, | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendants*. | § | |

**FIRST AMENDED COMPLAINT FOR PATENT INFRINGEMENT AGAINST
AUDIBLE MAGIC CORPORATION, FACEBOOK, INC., MYSPACE, LLC,
SPECIFIC MEDIA, LLC, PHOTOBUCKET CORPORATION, DAILYMOTION,
INC., DAILYMOTION S.A., SOUNDCLOUD, INC., SOUNDCLOUD LTD.,
MYXER, INC., QLIPSO, INC., QLIPSO MEDIA NETWORKS LTD., YAP.TV,
INC., GOMISO, INC., IMESH, INC., METACAFE, INC., BOODABEE
TECHNOLGIES INC., ZEDGE HOLDINGS, INC., HARMONIX MUSIC
SYSTEMS, INC., BRIGHTCOVE INC., COINCIDENT.TV, INC., ACCEDO
BROADBAND NORTH AMREICA, INC., ACCEDO BROADBAND AB, AND
MEDIAFIRE, LLC**

Plaintiff Blue Spike, LLC files this amended complaint against Defendants Audible Magic Corporation ("Audible Magic"), Facebook, Inc. ("Facebook"), MySpace, LLC and Specific Media, LLC ("MySpace"), Photobucket Corporation ("Photobucket"), Dailymotion, Inc. and Dailymotion S.A. (collectively, "Dailymotion"), Soundcloud, Inc. and Soundcloud Ltd. (collectively, "Soundcloud"), Myxer, Inc. ("Myxer"), Qlipso, Inc. and Qlipso Media Networks Ltd. ("Qlipso"), Yap.tv, Inc. ("Yap.tv"), GoMiso, Inc. ("GoMiso"), iMesh, Inc. ("iMesh"), Metacafe, Inc. ("Metacafe"), Boodabee Technologies Inc. ("Boodabee"), Zedge Holdings, Inc. ("Zedge"), Harmonix Music Systems, Inc., Brightcove, Inc. ("Brightcove"), Coincident.TV, Inc. ("Coincident") Accedo Broadband North America, Inc. and Accedo Broadband AB (collectively, "Accedo"), and MediaFire, LLC ("MediaFire") (collectively, "Defendants") and alleges

infringement of U.S. Patent Nos. 7,346,472 (the '472 Patent), 7,660,700 (the '700 Patent), 7,949,494 (the '494 Patent), and 8,214,175 (the '175 Patent, and together with the '472, '700, and '494 Patents, the Patents-in-Suit) as follows:

## NATURE OF THE SUIT

1.      This is a claim for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.

## PARTIES

2.      Plaintiff Blue Spike, LLC is a Texas limited liability company and has its headquarters and principal place of business at 1820 Shiloh Road, Suite 1201-C, Tyler, Texas 75703. Blue Spike, LLC is the assignee of the Patents-in-Suit from Blue Spike, Inc. (a Florida corporation), which was the assignee of the Patents-in-Suit from Scott Moskowitz and Michael Berry. Blue Spike, LLC and Blue Spike, Inc. are collectively referred to as "Blue Spike." Blue Spike CEO Scott Moskowitz is an inventor on more than 66 U.S. Patents related to managing, monitoring, and monetizing digital content and informational assets. Blue Spike has practiced and has continued business plans to practice Moskowitz's patented inventions. Many of Blue Spike's patents are foundational to today's robust markets for content, which grew into their present form only after using Blue Spike's technology to catalogue, manage, monitor, and monetize that content.

3.      On information and belief, Defendant Audible Magic is a California corporation, having its principal place of business at 985 University Avenue, Suite 35, Los Gatos, California 95032. Audible Magic can be served with process through its registered agent, CAL Title-Search, Inc., located at 1005 12th Avenue, Suite E, Sacramento, California

95814. Audible Magic does business in the State of Texas and in the Eastern District of Texas.

4.      On information and belief, Defendant Facebook is a Delaware corporation, having its principal place of business at 1601 Willow Road, Menlo Park, California 94025. Facebook can be served with process through its registered agent, Corporation Service Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Facebook does business in the State of Texas and in the Eastern District of Texas.

5.      On information and belief, Defendant MySpace, LLC is a Delaware corporation, having its principal place of business at 407 North Maple Drive, Beverly Hills, California 90210. MySpace can be served with process through its registered agent, CT Corporation System, located at 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201. MySpace does business in the State of Texas and in the Eastern District of Texas.

6.      On information and belief, Defendant Specific Media, LLC is a Delaware corporation, having its principal place of business at 4 Park Plaza, Suite 1500, Irvine, California 92614. MySpace can be served with process through its registered agent, Corporation Service Company, located at 211 E. 7th Street, Suite 620, Austin, Texas 78701. MySpace does business in the State of Texas and in the Eastern District of Texas.

7.      On information and belief, Defendant Dailymotion, Inc. is a Delaware corporation, having its principal place of business at 80 5th Avenue, New York, New York 10011. Dailymotion, Inc. can be served with process through its registered agent, National Registered Agents, Inc., located at 160 Greentree Drive, Ste. 101, Dover, Delaware, 19904. Dailymotion, Inc. does business in the State of Texas and in the Eastern District of Texas.

8.      On information and belief, Defendant Dailymotion S.A. is a French limited liability company, having its principal place of business at 49/51 rue Ganneron, 75018 Paris, France. Dailymotion S.A. can be served with process through its U.S. subsidiary, Dailymotion, Inc., or through the Texas Secretary of State.  Dailymotion S.A. does business in the State of Texas and in the Eastern District of Texas.

9.      On information and belief, Defendant Soundcloud, Inc. is a Delaware corporation, having its principal place of business at 801 California Street, Mountain View, California 94041. Soundcloud, Inc. can be served with process through its registered agent, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Soundcloud, Inc. does business in the State of Texas and in the Eastern District of Texas.

10.     On information and belief, Defendant Soundcloud Ltd. is a German limited liability company, having its principal place of business Rosenthaler Str. 13, 10119 Berlin, Germany. Soundcloud Ltd. can be served with process through its U.S. subsidiary, Soundcloud, Inc., or through the Texas Secretary of State.  Soundcloud Ltd. does business in the State of Texas and in the Eastern District of Texas.

11.     On information and belief, Defendant Myxer is a Delaware corporation, having its principal place of business at 245 N. Ocean Blvd., Suite 200, Deerfield Beach, Florida 33441. Myxer can be served with process through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Myxer does business in the State of Texas and in the Eastern District of Texas.

12.     On information and belief, Defendant Qlipso, Inc. is a Delaware corporation, having its principal place of business at 2434 Main Street, Suite 202, Santa Monica, California 90405. Qlipso, Inc. can be served with process through its registered agent, PHS Corporate Services, Inc., located at 1313 North Market Street, Suite 5100, Wilmington, Delaware 19801. Qlipso, Inc. does business in the State of Texas and in the Eastern District of Texas.

13.     On information and belief, Defendant Qlipso Media Networks Ltd. is an Israeli limited liability company, having its principal place of business 2434 Main Street, Suite 202, Santa Monica, California 90405. Qlipso Media Networks Ltd. can be served with process through its U.S. subsidiary, Qlipso, Inc., or through the Texas Secretary of State. Qlipso Media Networks Ltd. does business in the State of Texas and in the Eastern District of Texas.

14.     On information and belief, Defendant Yap.tv is a Delaware corporation, having its principal place of business at 4966 El Camino Real, Suite 223, Los Altos, CA, 94022. Yap.tv can be served with process through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Yap.tv does business in the State of Texas and in the Eastern District of Texas.

15.     On information and belief, Defendant GoMiso is a Delaware corporation, having its principal place of business at 580 Howard Street, San Francisco, California 94105. GoMiso can be served with process through its registered agent, Incorporating Services, Ltd., located at 3500 South DuPont Highway, Dover, Delaware 19901. GoMiso does business in the State of Texas and in the Eastern District of Texas.

16.     On information and belief, Defendant iMesh is a Delaware corporation, having its principal place of business at 211 East 43rd Street, #23, New York, New York 10017. iMesh can be served with process through its registered agent, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. iMesh does business in the State of Texas and in the Eastern District of Texas.

17.     On information and belief, Defendant Metacafe is a Delaware corporation, having its principal place of business at 128 King Street, 3rd Floor, San Francisco, California 94107. Metacafe can be served with process through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Metacafe does business in the State of Texas and in the Eastern District of Texas.

18.     On information and belief, Defendant Boodabee is a Florida corporation, having its principal place of business at 3787 Palm Valley Road, Suite 102-137, Ponte Vedra Beach, Florida 32082. Boodabee can be served with process through its registered agent, John Coogan, located at 1133 Pine Mill Lane, Ponte Verde Beach, Florida 32082. Boodabee does business in the State of Texas and in the Eastern District of Texas.

19.     On information and belief, Defendant Zedge is a Delaware corporation, having its principal place of business at 22 Cortlandt Street, 12th Floor, New York, New York 10007. Zedge can be served with process through its registered agent, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Zedge does business in the State of Texas and in the Eastern District of Texas.

20.     On information and belief, Defendant Harmonix is a Delaware corporation, having its principal place of business at 625 Massachusetts Avenue, 2nd Floor,

Cambridge, Massachusetts 02139. Harmonix can be served with process through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Harmonix does business in the State of Texas and in the Eastern District of Texas.

21.   On information and belief, Defendant Photobucket is a Washington corporation, having its principal place of business at 1099 18th Street, Denver, CO 80202. Photobucket can be served with process through its registered agent, Corporation Service Company, located at 300 Deschutes Way SW, Sutie 304, Tumwater, WA 98501. Photobucket does business in the State of Texas and in the Eastern District of Texas.

22.   On information and belief, Defendant Brightcove is a Delaware corporation, having its principal place of business at 290 Congree Street, 4th Floor, Boston, Massachusetts 02110. Brightcove can be served with process through its registered agent, The Corporation Trust Company, located at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. Brightcove does business in the State of Texas and in the Eastern District of Texas.

23.   On information and belief, Defendant Coincident is a Delaware corporation, having its principal place of business at 3435 Cesar Chavez, Penthouse, San Francisco, California 94110. Coincident can be served with process through its registered agent, Incorporating Services, Ltd., located at 3500 South DuPont Highway, Dover, Delaware 19901. Coincident does business in the State of Texas and in the Eastern District of Texas.

24.   On information and belief, Defendant Accedo Broadband North America, Inc. is a Delaware corporation, having its principal place of business at 480 San Antonio Road,

Suite 130, Mountain View, California 94040. Accedo Broadband North America, Inc. can be served with process through its registered agent, Corporation Service Company, located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808. Accedo Broadband North America, Inc. does business in the State of Texas and in the Eastern District of Texas.

25.     On information and belief, Defendant Accedo Broadband AB is a Swedish company, having its principal place of business at Heliosgatan 26, 120 30 Stockholm, Sweden. Accedo Broadband AB can be served with process through its U.S. subsidiary, Accedo Broadband North America, Inc., or through the Texas Secretary of State.  Accedo Broadband AB does business in the State of Texas and in the Eastern District of Texas.

26.     On information and belief, Defendant MediaFire is a Texas limted liability company, having its principal place of business at 19241 David Memorial Drive #170, Shenandoah, Texas 77385. MediaFire can be served with process through its registered agent, Derek Labian, located at 19241 David Memorial Drive #170, Shenandoah, Texas 77385. MediaFire does business in the State of Texas and in the Eastern District of Texas.

## JURISDICTION AND VENUE

27.     This lawsuit is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §101 *et seq.* The Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§1331, 1332, 1338(a), and 1367.

28.     The Court has personal jurisdiction over Defendants for at least four reasons: (1) Defendants have committed acts of patent infringement and contributed to and induced acts of patent infringement by others in this District and elsewhere in Texas;

(2) Defendants regularly do business or solicit business in the District and in Texas; (3) Defendants engage in other persistent courses of conduct and derive substantial revenue from products and/or services provided to individuals in the District and in Texas; and (4) Defendants have purposefully established substantial, systematic, and continuous contacts with the District and should reasonably expect to be haled into court here. Thus, the Court's exercise of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice.

29.     Venue is proper in this judicial district under 28 U.S.C. §§1391(b)–(c) and 1400(b) because Defendants do business in the State of Texas, Defendants have committed acts of infringement in Texas and in the District, a substantial part of the events or omissions giving rise to Blue Spike's claims happened in the District, and Defendants are subject to personal jurisdiction in the District.

## JOINDER

30.     The defendants are properly joined in this action because (1) Blue Spike seeks relief, jointly and severally, against some defendants that have a parent or subsidiary relationship; (2) the defendants' infringing acts arise out of the same transaction, occurrence, or series of transactions or out of occurrences relating to the making, using, offering for sale, or selling of the accused products in this action; and (3) questions of fact common to all defendants will arise in the action. More specifically, on information and belief, each of the defendants' accused products and methods use the common and related infringing technologies—Audible Magic's digital fingerprint based technology for automatic content recognition. For these reasons, infringement issues for all defendants in this case will focus on one or two common and related automatic content

recognition systems using fingerprint technology purchased from a single company, resulting in substantial evidentiary overlap in the operation of the accused products as applied to the claims of the Patents-in-Suit.

## FACTUAL BACKGROUND

A.    **Moskowitz's History**

31.    The owners of art, music, films, and other creations who want to sell and license their work in digital form over the Internet need an efficient way to manage, monitor, and monetize it. Blue Spike founder Scott Moskowitz pioneered—and continues to invent—technology that makes such management possible, and which has parlayed with equal importance into other industries.

32.    Moskowitz, who earned two degrees *cum laude* from the Wharton School of Finance and Commerce at the University of Pennsylvania, is an inventor of more than 66 U.S. Patents, including each of the Patents-in-Suit.

33.    In 1992, Moskowitz entered the entertainment industry by doing agency work in Japan for a large U.S. wholesaler of music-related products.

34.    In 1993, Moskowitz filed his first U.S. digital-content-management patent application. That year, he also founded the software start-up The Dice Company, which would become widely recognized as a leader in digital watermarking. Since that first patent, Moskowitz has continued to create patented inventions in the field of information management and security at a prodigious pace. His goal from the outset has been to commercialize his patented inventions.

35.    Moskowitz founded Blue Spike, Inc. in November 1997. Just over two years later, he filed his first patent application related to signal recognition technology, which issued

as the '472 Patent. In describing this pioneering technology, Moskowitz coined the term "signal abstracting," which enhanced the ability to catalogue, archive, identify, authorize, transact, and monitor the use and/or application of signals, such as images (for example, photographs, paintings, and scanned fingerprints), audio (for example, songs, jingles, commercials, movies soundtracks, and their versions), video (for example, videos, television shows, commercials, and movies), and multimedia works. This revolutionary technology greatly improves the efficiency and speed of monitoring, analyzing, and identifying signals as perceived, as well as enabling the optimal compression of the signals and their associated signal abstracts for memory accommodation.

36.     Moskowitz's status as a pioneer in this new field between cryptography and signal analysis is evident from the United States Patent and Trademark Office's categorization of his patent applications. The USPTO was initially puzzled about how to classify his early inventions, as the then-existing patent categories in cryptography and signal analysis were, by themselves, inadequate. The USPTO therefore created a new classification for his groundbreaking inventions: classification 713, subclass 176, called "Authentication by digital signature representation or digital watermark."

37.     The National Security Agency (NSA) even took interest in his work after he filed one of his early patent applications. The NSA made the application classified under a "secrecy order" while it investigated his pioneering innovations and their impact on national security.

38.     As an industry trailblazer, Moskowitz has been an active author and public figure on digital-watermarking and signal-recognition technologies since their emergence. A 1995 *New York Times* article—titled "TECHNOLOGY: DIGITAL COMMERCE; 2

plans for watermarks, which can bind proof of authorship to electronic works"—
recognized Moskowitz's The Dice Company as one of two leading software start-ups in
this newly created field. *Forbes* also interviewed Moskowitz as an expert for "Cops
Versus Robbers in Cyberspace," a September 9, 1996 article about the emergence of
digital watermarking and rights-management technology. He has also testified before the
Library of Congress regarding the Digital Millennium Copyright Act.

39.     He has spoken to the RSA Data Security Conference, the International Financial
Cryptography Association, Digital Distribution of the Music Industry, and many other
organizations about the business opportunities that digital watermarking creates.
Moskowitz also authored *So This Is Convergence?*, the first book of its kind about secure
digital-content management. This book has been downloaded over a million times online
and has sold thousands of copies in Japan, where Shogakukan published it under the
name *Denshi Skashi*, literally "electronic watermark." Moskowitz was asked to author the
introduction to *Multimedia Security Technologies for Digital Rights Management*, a 2006
book explaining digital-rights management. Moskowitz authored a paper for the 2002
International Symposium on Information Technology, titled "What is Acceptable Quality
in the Application of Digital Watermarking: Trade-offs of Security, Robustness and
Quality." He also wrote an invited 2003 article titled "Bandwidth as Currency" for the
*IEEE Journal*, among other publications.

40.     Moskowitz is a senior member of the Institute of Electrical and Electronics
Engineers (IEEE), a member of the Association for Computing Machinery, and the
International Society for Optics and Photonics (SPIE). As a senior member of the IEEE,

Moskowitz has peer-reviewed numerous conference papers and has submitted his own publications.

41.     Moskowitz has been at the forefront of industry-based tests—such as the MUSE Embedded Signaling Tests, Secure Digital Music Initiative ("SDMI"), and various tests by performance-rights organizations including ASCAP and BMI, as well as Japan's Nomura Research Institute.

42.     Moskowitz has negotiated projects to incorporate his technologies with leaders in a gamut of industries. For example, Moskowitz worked with EMI, Warner Brothers, and Universal Music Group on music-release tracking systems; with AIG on insurance and financial services; with IBM on watermarking its software and managing movie scripts; and with Juniper Networks on measuring and provisioning the bandwidth used on its routers. Blue Spike is also registered with the Federal Government's Central Contractor Registry (managed under the System for Award Management, "SAM") and participated in the Department of Defense Small Business Innovative Research (SBIR) program.

43.     Moskowitz and his companies have always practiced or had business plans to practice his patented inventions. He has worked extensively to ensure that his technology's powerful and patented Giovanni® suite of media security technologies can be licensed to all. Before the industry understood where digital management of content was heading, Moskowitz believed that copyright management was an invaluable element for dramatically expanding the business of music, emphasizing that security must not be shrouded in secrecy and that his patented techniques were the strongest to do so.

44.     Moskowitz and Blue Spike continued to produce new versions of its popular digital-watermarking tools. Under Moskowitz's control, Blue Spike also developed its

unique Scrambling technologies, which continue to gain currency. Moskowitz and Blue Spike rolled out its "end-to-end" solution for music security. Music encoded with Blue Spike's watermark had both security and CD-quality sound, even when integrated with text, image, and video content. To this day, Moskowitz and Blue Spike are working with artists to help them manage and secure their valuable artistic contributions from its office in Tyler, Texas.

**B.      Patents-in-Suit**

45.      As content becomes increasingly profitable and prevalent in the U.S. and around the globe, pirates will continue to proliferate and use increasingly sophisticated technologies to steal and illegally copy others' work, especially those works that are digitally formatted or stored. The Patents-in-Suit comprise, in part, what Moskowitz has coined "signal abstracting," which encompasses techniques, among others, also known as "signal fingerprinting," "acoustic fingerprinting," or "robust hash functions." These are among the most effective techniques available for combating piracy, which are completely undetectable to the thief, yet still enable content owners to easily search through large amounts of data to identify unauthorized copies of their works.

46.      Broadly speaking, "signal abstracting" identifies digital information and material—including video, audio, graphics, multimedia, and text—based solely on the perceptual characteristics of the material itself.  If desired, however, the abstract need not be static, and other information or heuristics can be used to augment the perceptual characteristics, resulting in a more robust abstract. In contrast, other technologies (such as digital watermarking) embed additional information or messages into the original source material to enable traceability of the subsequently watermarked content, much like an

14

audit trail or the serial number on a dollar bill. When a pirate attempts to remove embedded information or messages, ideally the quality of the content may be degraded, making the tampered copies unusable or of such poor quality that they have little commercial value. Signal abstracting avoids watermarking's vulnerabilities by leaving the source signal unchanged and catalogues the signal's identifying features or perceptual characteristics in a database.

47.    Content owners can also then monitor and analyze distribution channels, such as the Internet, radio broadcasts, television broadcasts, and other media sources, to determine whether any content from those sources has the same abstract as their catalogued works. Unauthorized versions of copies of content may then be successfully identified. With the unauthorized copies identified, the content owner can then restrict access, compel payment for authorized use, and develop better intelligence about content markets and those consumers with a willingness to pay. In some cases, new versions of the content can be observed and analyzed, creating more robust abstracts or new abstracts entirely, informing owners and content aggregators about new channels or new opportunities for consumption of their content.

48.    Similarly, content recognition applications running on mobile devices, smartphones, and tablets can use abstracts to identify content for users who would like to know what it is they are listening to (such as applications that just identify content) or would like to know more about that content  (such as applications that are now popularly known as "second screen applications," which allow a television audience to identify and interact with the content they are consuming, whether it be, for example, TV shows, movies, music, or video games). Once identified by an abstract, songwriters, for example,

can be given lyrics, or budding video producers can be provided related versions or background on a video identified. Thus, value add in markets can be adjusted to meet the specific needs and consumption patterns of users.

49.     This idea of "signal abstracting" applies equally to biometric identification and today's security systems, such as fingerprint, facial, and optic systems that analyze, catalogue, monitor, and identify a person's biometric features. Once an image is created from the features of these biometric identifiers, signal abstracting can be used to optimally compress the signal and its associated abstract, resulting in less memory usage and increased accuracy and speed of signal analysis and identification. Further, signal abstracts of the biometric information can be secured independently; this means that authentication and verification of the identifying abstract do not compromise the original information. This separation of the abstracts from the original source material enables more secure environments, such as those dealing with the security of a person's biometrics. Thus, fingerprint scanners are made more secure, as are systems requiring physical scans of a person's body. The recent evolution to smaller and cheaper processors and memory storage has led to the proliferation of these biometric-identification systems, which rely on the inventions of the Patents-in-Suit to be implemented.

50.     The four Patents-in-Suit are prime examples of Moskowitz's pioneering contributions to signal recognition technology.

**C.     The Accused Products and Services**

51.     Audible Magic designs and develops software, systems, and technology for content recognition using digital fingerprinting to monetize, protect, measure, engage, and verify content. Audible Magic makes, uses, offers for sale and/or imports into the

U.S. products, systems and/or services including, but not limited to, its Audible Magic Content Recognition Technology, including its SmartID, CopySense Appliance, CopySense Custom, CopySense Premier, Live TViD, Music-Speech iD, SmartSync, and RepliCheck products, solutions, and technology ("Audible Magic Accused Products"), which infringe one or more claims of the Patents-in-Suit.

52.     Facebook designs and develops software, systems, applications, and technology for social networking. Facebook makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Facebook website and application copyrighted content recognition software, systems, applications, and technology ("Facebook Accused Products"), which infringe one or more claims of the Patents-in-Suit.

53.     MySpace designs and develops software, systems, applications, and technology for social networking and entertainment. MySpace makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its MySpace website and application copyrighted content recognition software, systems, applications, and technology ("MySpace Accused Products"), which infringe one or more claims of the Patents-in-Suit.

54.     Photobucket designs and develops software, systems, applications, and technology to store, create and share photos and videos. Photobucket is extremely successful, with more than 23 million monthly unique users in the U.S. who upload over four million images and videos per day. Photobucket makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Photobucket website and application copyrighted content recognition software, systems,

applications, and technology ("Photobucket Accused Products"), which infringe one or more claims of the Patents-in-Suit.

55.    Dailymotion designs and develops software, systems, applications, and technology for sharing videos. Dailymotion is extremely successful, with over 110 million unique monthly visitors and 1.8 billion videos views worldwide. Dailymotion makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Dailymotion website and application copyrighted content recognition software, systems, applications, and technology ("Dailymotion Accused Products"), which infringe one or more claims of the Patents-in-Suit.

56.    Soundcloud designs and develops software, systems, applications, and technology for creating and sharing music. Soundcloud is extremely successful, with over 10 million registered users and over 5 million downloads of its application. Soundcloud makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Soundcloud website and application copyrighted content recognition software, systems, applications, and technology ("Soundcloud Accused Products"), which infringe one or more claims of the Patents-in-Suit.

57.    Myxer designs and develops software, systems, applications, and technology for social networking and entertainment. Myxer is extremely successful, with over 53 million users that have performed more than 3 billion downloads. Myxer makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Myxer website and application copyrighted content recognition software, systems, applications, and technology ("Myxer Accused Products"), which infringe one or more claims of the Patents-in-Suit.

58.     Qlipso designs and develops software, systems, applications, and technology for social networking and sharing. Qlipso makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Veoh website and application copyrighted content recognition software, systems, applications, and technology  ("Qlipso Accused Products"), which infringe one or more claims of the Patents-in-Suit.

59.     Yap.tv designs and develops software, systems, applications, and technology to be used with smartphones and tablets so that users can identify and engage media and content. Yap.tv makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Yap.tv smartphone and tablet software, systems, applications, and technology  ("Yap.tv Accused Products"), which infringe one or more claims of the Patents-in-Suit.

60.     GoMiso designs and develops software, systems, applications, and technology to be used with smartphones and tablets so that users can identify and engage media and content. GoMiso makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Miso smartphone and tablet software, systems, applications, and technology  ("GoMiso Accused Products"), which infringe one or more claims of the Patents-in-Suit.

61.     iMesh designs and develops software, systems, applications, and technology for social networking and sharing. iMesh is extremely successful, being the first (and thus far the only) file sharing service to announce an agreement with the US major record labels. iMesh makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its iMesh website and application copyrighted

content recognition software, systems, applications, and technology ("iMesh Accused Products"), which infringe one or more claims of the Patents-in-Suit.

62.    Metacafe designs and develops software, systems, applications, and technology for short-form video entertainment, specializing in movies, video games and live action sports. Metacafe is extremely successful, as a top-3 video site in the U.S., with 12 million unique monthly viewers. Metacafe makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Metacafe website and application copyrighted content recognition software, systems, applications, and technology  ("Metacafe Accused Products"), which infringe one or more claims of the Patents-in-Suit.

63.    Boodabee designs and develops software, systems, applications, and technology to be used with smartphones and tablets so that users can identify and engage media and content. Boodabee makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Boodabee smartphone and tablet software, systems, applications, and technology  ("Boodabee Accused Products"), which infringe one or more claims of the Patents-in-Suit.

64.    Tunecore designs and develops software, systems, applications, and technology for manage, distribute, and monetize content. Tunecore makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Tunecore online distribution service software, systems, applications, and technology  ("Tunecore Accused Products"), which infringe one or more claims of the Patents-in-Suit.

65.     Zedge designs and develops software, systems, applications, and technology for social networking and sharing. Zedge is extremely successful, with more than 42 million unique users per month, downloading 7 million items every day. Zedge makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Zedge website and application copyrighted content recognition software, systems, applications, and technology   ("Zedge Accused Products"), which infringe one or more claims of the Patents-in-Suit.

66.     Harmonix designs and develops software, systems, applications, and technology for social networking and sharing. Harmonix makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its RockBand.com,              TheBeatlesRockBand.com,              DanceCentral.com, GreenDayRockBand.com,    vidrhythm.com,    HarmonixMusic.com    websites    and applications  copyrighted  content  recognition  software,  systems,  applications,  and technology  ("Harmonix Accused Products"), which infringe one or more claims of the Patents-in-Suit.

67.     Brightcove designs and develops software, systems, applications, and technology for cloud content services. Brightcove makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its Brightcove Video Cloud and App Cloud software, systems, applications, and technology   ("Brightcove Accused Products"), which infringe one or more claims of the Patents-in-Suit.

68.     Coincident designs and develops software, systems, applications, and technology that enables content creators and distributors to easily design, manage and measure interactive video experiences across all digital platforms and on devices including TV's,

tablets, phones, consoles and set-top boxes. Coincident makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its ScreenSync TV smartphone and tablet software, systems, applications, and technology ("Coincident Accused Products"), which infringe one or more claims of the Patents-in-Suit.

69.     MediaFire designs and develops software, systems, applications, and technology for cloud storage and sharing services. MediaFire makes, uses, offers for sale and/or imports into the U.S. products, systems and/or services including, but not limited to, its MediaFire cloud storage services' copyrighted content recognition software, systems, applications, and technology  ("MediaFire Accused Products"), which infringe one or more claims of the Patents-in-Suit.

70.     Collectively, all of the Defendants accused products identified above are referred to as "Accused Products."

71.     Defendants have not sought or obtained a license for any of Blue Spike's patented technologies.

72.     Yet Defendants are using methods, devices, and systems taught by Blue Spike's Patents-in-Suit.

## COUNT 1:
## INFRINGEMENT OF U.S. PATENT NO. 8,214,175

73.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 75 of this complaint.

74.     Blue Spike, LLC is assignee of the '175 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the

'175 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

75.     The '175 Patent is valid, is enforceable, and was duly and legally issued on July 3, 2012..

76.     Without a license or permission from Blue Spike, Defendants have infringed and continue to infringe on one or more claims of the '175 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

77.     Defendants have been and now are indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '175 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '175 Patent. *See e.g.* Ex. 1 (advertising that Audible Magic's accused products and technology can be used to build infringing systems and applications); Ex. 2 (announcing that Related Content Database, Inc. would "integrate, resell and enhance" Audible Magic's products and technology to create new end user applications). Such products for use in other systems include, without limitation, one or more of the Accused Products, which, for example, create abstracts that identify specific digital information and material based on the characteristics of the material itself. Such products have no substantial non-infringing uses and are for use in systems that infringe the '175 Patent. By making, using, importing offering for sale, and/or selling such

products, Defendants injured Blue Spike and are thus liable to Blue Spike for infringement of the '175 Patent under 35 U.S.C. § 271. Those whom Defendants induce to infringe and/or to whose infringement Defendants contribute are the end users of the Accused Products. Defendants had knowledge of the '175 Patent at least as early as the service of the original complaint and are thus liable for infringement of one or more claims of the '175 Patent by actively inducing infringement and/or are liable as contributory infringers of one or more claims of the '175 Patent under 35 U.S.C. §271.

78.   Defendants' acts of infringement of the '175 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendants' infringement of Blue Spike's exclusive rights under the '175 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

79.   On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

a.   The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents and patent applications, including patents originally assigned to such prominent companies as Microsoft, Agilent, Nvidia, and Avaya.

b.     Through the filing and known attempted service of the original Complaint

in this lawsuit in August 2012.

80.     On information and belief, Defendants have at least had constructive notice of the

'175 Patent by operation of law.

## COUNT 2:
## INFRINGEMENT OF U.S. PATENT NO. 7,949,494

81.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 83 of

this complaint.

82.     Blue Spike, LLC is assignee of the '494 Patent, titled "Method and Device for

Monitoring and Analyzing Signals," and has ownership of all substantial rights in the

'494 Patent, including the rights to grant sublicenses, to exclude others from using it, and

to sue and obtain damages and other relief for past and future acts of patent infringement.

83.     The '494 Patent is valid, is enforceable, and was duly and legally issued on May

24, 2011.

84.     Without a license or permission from Blue Spike, Defendants have infringed and

continue to infringe on one or more claims of the '494 Patent—directly, contributorily, or

by inducement—by importing, making, using, offering for sale, or selling products and

devices that embody the patented invention, including, without limitation, one or more of

the Accused Products, in violation of 35 U.S.C. §271.

85.     Defendants have been and now are indirectly infringing by way of inducing

infringement by others and/or contributing to the infringement by others of the '494

Patent in the State of Texas, in this judicial district, and elsewhere in the United States,

by, among other things, making, using, importing, offering for sale, and/or selling,

without license or authority, products for use in systems that fall within the scope of one

or more claims of the '494 Patent. *See e.g.* Ex. 1 (advertising that Audible Magic's accused products and technology can be used to build infringing systems and applications); Ex. 2 (announcing that Related Content Database, Inc. would "integrate, resell and enhance" Audible Magic's products and technology to create new end user applications). Such products have no substantial non-infringing uses and are for use in systems that infringe the '494 Patent. By making, using, importing offering for sale, and/or selling such products, Defendants injured Blue Spike and are thus liable to Blue Spike for infringement of the '494 Patent under 35 U.S.C. §271. Those whom Defendants induce to infringe and/or to whose infringement Defendants contribute are the end users of the Accused Products. Defendants had knowledge of the '494 Patent at least as early as the service of the original complaint and are thus liable for infringement of one or more claims of the '494 Patent by actively inducing infringement and/or are liable as contributory infringer of one or more claims of the '494 Patent under 35 U.S.C. § 271.

86.     Defendants' acts of infringement of the '494 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendants' infringement of Blue Spike's exclusive rights under the '494 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

87.     On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

a.   The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents and patent applications, including patents originally assigned to such prominent companies as Microsoft, Agilent, Nvidia, and Avaya.

b.   Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

88.   On information and belief, Defendants have at least had constructive notice of the '494 Patent by operation of law.

## COUNT 3:
## INFRINGEMENT OF U.S. PATENT NO. 7,660,700

89.   Blue Spike incorporates by reference the allegations in paragraphs 1 through 91 of this complaint.

90.   Blue Spike, LLC is assignee of the '700 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the '700 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

91.   The '700 Patent is valid, is enforceable, and was duly and legally issued on February 9, 2010.

92.   Without a license or permission from Blue Spike, Defendants have infringed and continue to infringe on one or more claims of the '700 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and

27

devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

93.     Defendants have been and now are indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '700 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '700 Patent. *See e.g.* Ex. 1 (advertising that Audible Magic's accused products and technology can be used to build infringing systems and applications); Ex. 2 (announcing that Related Content Database, Inc. would "integrate, resell and enhance" Audible Magic's products and technology to create new end user applications). Such products have no substantial non-infringing uses and are for use in systems that infringe the '700 Patent. By making, using, importing offering for sale, and/or selling such products, Defendants injured Blue Spike and are thus liable to Blue Spike for infringement of the '700 Patent under 35 U.S.C. §271. Those whom Defendants induce to infringe and/or to whose infringement Defendants contribute are the end users of the Accused Products. Defendants had knowledge of the '700 Patent at least as early as the service of the original complaint and are thus liable for infringement of one or more claims of the '700 Patent by actively inducing infringement and/or are liable as contributory infringer of one or more claims of the '700 Patent under 35 U.S.C. § 271.

94.     Defendants' acts of infringement of the '700 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial pursuant to 35

U.S.C. §271. Defendants' infringement of Blue Spike's exclusive rights under the '700 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

95.     On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

      a.     The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents and patent applications, including patents originally assigned to such prominent companies as Microsoft, Agilent, Nvidia, and Avaya.

      b.     Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

96.     On information and belief, Defendants have at least had constructive notice of the '700 Patent by operation of law.

## COUNT 4:
## INFRINGEMENT OF U.S. PATENT NO. 7,346,472

97.     Blue Spike incorporates by reference the allegations in paragraphs 1 through 99 of this complaint.

98.     Blue Spike, LLC is assignee of the '472 Patent, titled "Method and Device for Monitoring and Analyzing Signals," and has ownership of all substantial rights in the

'472 Patent, including the rights to grant sublicenses, to exclude others from using it, and to sue and obtain damages and other relief for past and future acts of patent infringement.

99.     The '472 Patent is valid, is enforceable, and was duly and legally issued on March 18, 2008.

100.    Without a license or permission from Blue Spike, Defendants have infringed and continue to infringe on one or more claims of the '472 Patent—directly, contributorily, or by inducement—by importing, making, using, offering for sale, or selling products and devices that embody the patented invention, including, without limitation, one or more of the Accused Products, in violation of 35 U.S.C. §271.

101.    Defendants have been and now are indirectly infringing by way of inducing infringement by others and/or contributing to the infringement by others of the '472 Patent in the State of Texas, in this judicial district, and elsewhere in the United States, by, among other things, making, using, importing, offering for sale, and/or selling, without license or authority, products for use in systems that fall within the scope of one or more claims of the '472 Patent. *See e.g.* Ex. 1 (advertising that Audible Magic's accused products and technology can be used to build infringing systems and applications); Ex. 2 (announcing that Related Content Database, Inc. would "integrate, resell and enhance" Audible Magic's products and technology to create new end user applications). Such products have no substantial non-infringing uses and are for use in systems that infringe the '472 Patent. By making, using, importing offering for sale, and/or selling such products, Defendants injured Blue Spike and are thus liable to Blue Spike for infringement of the '472 Patent under 35 U.S.C. §271. Those whom Defendants induce to infringe and/or to whose infringement Defendants contribute are the end users

of the Accused Products. Defendants had knowledge of the '472 Patent at least as early as the service of the original complaint and are thus liable for infringement of one or more claims of the '472 Patent by actively inducing infringement and/or are liable as contributory infringer of one or more claims of the '472 Patent under 35 U.S.C. § 271.

102.    Defendants' acts of infringement of the '472 Patent have caused damage to Blue Spike, and Blue Spike is entitled to recover from Defendants the damages sustained as a result of Defendants' wrongful acts in an amount subject to proof at trial pursuant to 35 U.S.C. §271. Defendants' infringement of Blue Spike's exclusive rights under the '472 Patent will continue to damage Blue Spike, causing it irreparable harm, for which there is no adequate remedy at law, warranting an injunction from the Court.

103.    On information and belief, the infringement of the Patents-in-Suit by Defendant has been willful and continues to be willful. Defendant had knowledge of the Patents-in-Suit, including but not limited to at least one or more of the following:

a.    The Patents-in-Suit are prominent, pioneering patents in the field of monitoring and analyzing signals. This is evidenced, in part, by the extent to which each of these patents has been forward-cited as prior art in connection with the examination of subsequently-issued U.S. patents. The Patents-in-Suit have been forward-cited in at least 50 U.S.-issued patents and patent applications, including patents originally assigned to such prominent companies as Microsoft, Agilent, Nvidia, and Avaya.

b.    Through the filing and known attempted service of the original Complaint in this lawsuit in August 2012.

104.    On information and belief, Defendants have at least had constructive notice of the '472 Patent by operation of law.

## REQUEST FOR RELIEF

Blue Spike incorporates each of the allegations in paragraphs 1 through 107 above and respectfully asks the Court to:

(a)     enter a judgment that Defendants have directly infringed, contributorily infringed, and/or induced infringement of one or more claims of each of the Patents-in-Suit;

(b)     enter a judgment awarding Blue Spike all damages adequate to compensate it for Defendants' infringement of, direct or contributory, or inducement to infringe, the Patents-in-Suit, including all pre-judgment and post-judgment interest at the maximum rate permitted by law;

(c)     enter a judgment awarding treble damages pursuant to 35 U.S.C. §284 for Defendants' willful infringement of one or more of the Patents-in-Suit;

(d)     issue a preliminary injunction and thereafter a permanent injunction enjoining and restraining Defendants, their directors, officers, agents, servants, employees, and those acting in privity or in concert with them, and their subsidiaries, divisions, successors, and assigns, from further acts of infringement, contributory infringement, or inducement of infringement of the Patents-in-Suit;

(c)     enter a judgment requiring Defendants to pay the costs of this action, including all disbursements, and attorneys' fees as provided by 35 U.S.C. §285, together with prejudgment interest; and

(d)     award Blue Spike all other relief that the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Blue Spike demands a jury trial on all issues that may be determined by a jury.

Respectfully submitted,

/s/ Randall T. Garteiser
Randall T. Garteiser
  Texas Bar No. 24038912
  rgarteiser@ghiplaw.com
Christopher A. Honea
  Texas Bar No. 24059967
  chonea@ghiplaw.com
Christopher S. Johns
  Texas Bar No. 24044849
  cjohns@ghiplaw.com
Kirk J. Anderson
  California Bar No. 289043
Peter S. Brasher
  California Bar No. 283992
GARTEISER HONEA, P.C.
218 N. College Ave.
Tyler, Texas 75702
Telephone:  (903) 705-7420
Facsimile:  (888) 908-4400

*Counsel for Blue Spike LLC*

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a). As such, this document was served on all counsel who are deemed to have consented to electronic service. Local Rule CV-5(a)(3)(A). Pursuant to Federal Rule of Civil Procedure 5(d) and Local Rule CV-5(d) and (e), all other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by email.

/s/ Randall T. Garteiser
Randall T. Garteiser