**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 6:12-CV-499-LED |
| | § | |
| v. | § | |
| | § | (LEAD CASE) |
| TEXAS INSTRUMENTS, INC. | § | |
| | § | |
| *Defendants.* | § | JURY TRIAL DEMANDED |
| | § | |
| _____ | § | |
| | § | |
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 6:12-CV-576-LED |
| v. | § | |
| | § | |
| AUDIBLE MAGIC CORPORATION, ET AL. | § | (CONSOLIDATED WITH 6:12-CV-499) |
| | § | |
| *Defendants.* | § | JURY TRIAL DEMANDED |
| | § | |
| _____ | § | |

**QLIPSO MEDIA NETWORKS LTD.'S ANSWER TO BLUE SPIKE LLC'S FIRST
AMENDED COMPLAINT FOR PATENT INFRINGEMENT AND COUNTERCLAIMS**

Defendant Qlipso Media Networks Ltd. ("Qlipso") answers the First Amended

Complaint of Blue Spike LLC ("Blue Spike") as follows:

**<ins>NATURE OF THE SUIT</ins>**

1.      The allegations in this paragraph state a legal conclusion to which no response is

required.  To the extent a response is deemed to be required, Qlipso admits that paragraph 1

purports to assert a claim arising under the patent laws of the United States, Title 35 of the

United States Code, and in all other respects denies the allegations of paragraph 1.

## **PARTIES**

2.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2, and therefore denies them.

3.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3, and therefore denies them.

4.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4, and therefore denies them.

5.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5, and therefore denies them.

6.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 6, and therefore denies them.

7.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 7, and therefore denies them.

8.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 8, and therefore denies them.\

9.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9, and therefore denies them.

10.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 10, and therefore denies them.

11.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 11, and therefore denies them.

12.      Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 12, and therefore denies them.

13.    Qlipso admits that it is an Israeli limited liability company.  Qlipso denies that its principal place of business is 2434 Main Street, Suite 202, Santa Monica, California 90405. Qlipso denies that it does business in the State of Texas or in the Eastern District of Texas. Except as expressly admitted, Qlipso denies the remaining allegations of paragraph 13.

14.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 14, and therefore denies them.

15.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 15, and therefore denies them.

16.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16, and therefore denies them.

17.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 17, and therefore denies them.

18.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 18, and therefore denies them.

19.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 19, and therefore denies them.

20.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 20, and therefore denies them.

21.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 21, and therefore denies them.

22.    Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 22, and therefore denies them.

23.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 23, and therefore denies them.

24.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 24, and therefore denies them.

25.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 25, and therefore denies them.

26.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 26, and therefore denies them.

## JURISDICTION AND VENUE

27.     The allegations in this paragraph state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, Qlipso admits that the Complaint purports to be an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 101 *et seq*.  Qlipso admits that this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1338(a) and 1331.  Except as expressly admitted, Qlipso denies the remaining allegations of paragraph 27 that are directed to Qlipso.

28.     The allegations in this paragraph state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, Qlipso denies that it is subject to the personal jurisdiction of this Court.  Qlipso does not waive any argument that this Court lacks jurisdiction over Qlipso by filing this answer.  Qlipso denies that it has committed, contributed to, or induced any act of infringement.  Qlipso denies the remaining allegations of paragraph 28 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 28 that are directed to other defendants, and therefore denies them.

4

29.     The allegations in this paragraph state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, Qlipso denies that venue is proper in the Tyler Division of the Eastern District of Texas, and denies that this judicial district is the most convenient forum for the parties and witnesses or in the interests of justice.  By filing this answer, Qlipso does not waive any argument that venue is not proper in this District as to Qlipso.  Qlipso denies that it has committed any act of infringement.  Qlipso denies the remaining allegations of paragraph 29 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 29 that are directed to other defendants, and therefore denies them.

## JOINDER

30.     The allegations in this paragraph state a legal conclusion to which no response is required.  To the extent a response is deemed to be required, Qlipso denies the allegations of paragraph 30 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 30 that are directed to other defendants, and therefore denies them.

## FACTUAL BACKGROUND

31.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 31, and therefore denies them.

32.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 32, and therefore denies them.

33.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 33, and therefore denies them.

34.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 34, and therefore denies them.

35.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 35, and therefore denies them.

36.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 36, and therefore denies them.

37.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 37, and therefore denies them.

38.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 38, and therefore denies them.

39.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 39, and therefore denies them.

40.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 40, and therefore denies them.

41.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 41, and therefore denies them.

42.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 42, and therefore denies them.

43.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 43, and therefore denies them.

44.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 44, and therefore denies them.

45.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 45, and therefore denies them.

46.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 46, and therefore denies them.

47.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 47, and therefore denies them.

48.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 48, and therefore denies them.

49.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 49, and therefore denies them.

50.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 50, and therefore denies them.

51.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 51, and therefore denies them.

52.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 52, and therefore denies them.

53.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 53, and therefore denies them.

54.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 54, and therefore denies them.

55.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 55, and therefore denies them.

56.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 56, and therefore denies them.

57.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 57, and therefore denies them.

58.     Qlipso denies the allegations of paragraph 58. The isreali Qlipso (this defendant) does not operate the Veoh website directly, but through Qlipso Inc subsidiary.

59.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 59, and therefore denies them.

60.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 60, and therefore denies them.

61.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 61, and therefore denies them.

62.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 62, and therefore denies them.

63.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 63, and therefore denies them.

64.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 64, and therefore denies them.

65.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 65, and therefore denies them.

66.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 66, and therefore denies them.

67.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 67, and therefore denies them.

68.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 68, and therefore denies them.

69.     Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 69, and therefore denies them.

70.     Qlipso denies that it has committed any act of infringement.  Qlipso denies the remaining allegations of paragraph 70 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 70 that are directed to other defendants, and therefore denies them.

71.     Qlipso denies that a license for any of Blue Spike's patented technologies is necessary.  Qlipso admits that it has not sought a license from Blue Spike.  Qlipso denies the remaining allegations of paragraph 71 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 71 that are directed to other defendants, and therefore denies them.

72.     Qlipso denies that it has committed any act of infringement.  Qlipso denies the remaining allegations of paragraph 72 that are directed to Qlipso.  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 72 that are directed to other defendants, and therefore denies them.

## COUNT 1

## INFRINGEMENT OF U.S. PATENT NO. 8,214,175

73.     Qlipso incorporates by reference its responses to paragraphs 1 through 72 above.

74.     Qlipso admits that, on its face, U.S. Patent No. 8,214,175 ("the '175 patent") is titled "Method and Device for Monitoring and Analyzing Signals."  Qlipso is without knowledge

9

or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 74, and therefore denies them.

75.     Qlipso admits that, on its face, the '175 patent states that it was issued on July 3, 2012.  Qlipso admits that the '175 patent is attached as Exhibit A to the complaint.  Qlipso denies the remainder of the allegations of paragraph 75.

76.     Qlipso denies the allegations of paragraph 76.

77.     Qlipso denies the allegations of paragraph 77.

78.     Qlipso denies the allegations of paragraph 78.

79.     Qlipso denies the allegations of paragraph 79.

80.     Qlipso denies the allegations of paragraph 80.

## COUNT 2

### INFRINGEMENT OF U.S. PATENT NO. 7,949,494

81.     Qlipso incorporates by reference its responses to paragraphs 1 through 80 above.

82.     Qlipso admits that, on its face, U.S. Patent No. 7,949,494 ("the '494 patent") is titled "Method and Device for Monitoring and Analyzing Signals."  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 82, and therefore denies them.

83.     Qlipso admits that, on its face, the '494 patent states that it was issued on May 24, 2011.  Qlipso admits that the '494 patent is attached as Exhibit B to the complaint.  Qlipso denies the remainder of the allegations of paragraph 83.

84.     Qlipso denies the allegations of paragraph 84.

85.     Qlipso denies the allegations of paragraph 85.

86.     Qlipso denies the allegations of paragraph 86.

87.     Qlipso denies the allegations of paragraph 87.

88.     Qlipso denies the allegations of paragraph 88.

## COUNT 3

## INFRINGEMENT OF U.S. PATENT NO. 7,660,700

89.     Qlipso incorporates by reference its responses to paragraphs 1 through 88 above.

90.     Qlipso admits that, on its face, U.S. Patent No. 7,660,700 ("the '700 patent") is titled "Method and Device for Monitoring and Analyzing Signals."  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 90, and therefore denies them.

91.     Qlipso admits that, on its face, the '700 patent states that it was issued on February 9, 2010.  Qlipso admits that the '700 patent is attached as Exhibit C to the complaint. Qlipso denies the remainder of the allegations of paragraph 91.

92.     Qlipso denies the allegations of paragraph 92.

93.     Qlipso denies the allegations of paragraph 93.

94.     Qlipso denies the allegations of paragraph 94.

95.     Qlipso denies the allegations of paragraph 95.

96.     Qlipso denies the allegations of paragraph 96.

## COUNT 4

## INFRINGEMENT OF U.S. PATENT NO. 7,346,472

97.     Qlipso incorporates by reference its responses to paragraphs 1 through 96 above.

98.     Qlipso admits that, on its face, U.S. Patent No. 7,346,472 ("the '472 patent") is titled "Method and Device for Monitoring and Analyzing Signals."  Qlipso is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 98, and therefore denies them.

99.     Qlipso admits that, on its face, the '472 patent states that it was issued on March 18, 2008.  Qlipso admits that the '472 patent is attached as Exhibit D to the complaint.  Qlipso denies the remainder of the allegations of paragraph 99.

100.    Qlipso denies the allegations of paragraph 100.

101.    Qlipso denies the allegations of paragraph 101.

102.    Qlipso denies the allegations of paragraph 102.

103.    Qlipso denies the allegations of paragraph 103.

104.    Qlipso denies the allegations of paragraph 104.

## REQUEST FOR RELIEF

Qlipso incorporates by reference its responses to paragraphs 1 through 104 above.  Qlipso denies that Blue Spike is entitled to any relief whatsoever against Qlipso in this action, either as prayed for in the First Amended Complaint or otherwise.

Except as expressly admitted above, Qlipso denies each and every allegation contained in the First Amended Complaint.

## AFFIRMATIVE DEFENSES

## FIRST AFFIRMATIVE DEFENSE

### (Forum Non Conveniens)

1.      The Eastern District of Texas is an inconvenient forum in which to litigate this action against Qlipso under 28 U.S.C. § 1404(a).

## SECOND AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

2.      The First Amended Complaint for Patent Infringement fails to state a claim on which relief can be granted.

### THIRD AFFIRMATIVE DEFENSE

**(Non-infringement)**

3.      Qlipso has not and does not willfully or otherwise infringe, contribute to the infringement of, or actively induce others to infringe, any claim of the '175, '494, '700 or '472 patents.

### FOURTH AFFIRMATIVE DEFENSE

**(Invalidity)**

4.      The '175, '494, '700 or '472 patents, including all of the claims, are invalid for failure to comply with the requirements of patentability specified in Title 35 of the United States Code, including Sections 101, 102, 103, and 112.

### FIFTH AFFIRMATIVE DEFENSE

**(Failure to Mark)**

5.      Prior to receiving a copy of the complaint in this action, Qlipso did not have notice of Blue Spike's allegations of infringement.  Upon information and belief, neither Blue Spike nor Blue Spike's licensees have marked instrumentalities that embody any of the claims of the '175, '494, '700 or '472 patents with proper notice of the patents in compliance with 35 U.S.C. § 287.  Blue Spike is not entitled to any pre-filing damages pursuant to 35 U.S.C. § 287 for any claims to which 35 U.S.C. § 287 applies.

### SIXTH AFFIRMATIVE DEFENSE

**(Prosecution History Estoppel)**

6.      Based on proceedings before the United States Patent and Trademark Office ("PTO") during the prosecution of the application that ultimately issued as the '175, '494, '700 or '472 patents, Blue Spike is precluded or otherwise estopped from asserting any construction of the claims of the '175, '494, '700 or '472 patents that is inconsistent with its or its

13

predecessor(s)-in-interest's representations before the PTO.  On information and belief, Blue Spike is estopped from asserting any construction of the claims sufficiently broad to cover or include any product made, used, sold, offered for sale within the United States, or imported into the United States, by Qlipso.

## SEVENTH AFFIRMATIVE DEFENSE

### (Laches, Waiver, Acquiescence, Estoppel, and Unclean Hands)

7.      Blue Spike's claims are barred, in whole or in part, by the equitable doctrines of laches, waiver, acquiescence, estoppel, and/or unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

### (Limitation on Damages and Remedies)

8.      Blue Spike's claims and prayer for relief are barred in whole or in part by 35 U.S.C. §§ 286, 287, and/or 288.

## NINTH AFFIRMATIVE DEFENSE

### (Unavailability of Injunctive Relief)

9.      Blue Spike is not entitled to injunctive relief or any other equitable relief because any alleged injury to Blue Spike is not irreparable and because – had Blue Spike been injured – it would have an adequate remedy at law.

## TENTH AFFIRMATIVE DEFENSE

### (Lack of Standing/Failure to Join Necessary Party)

10.      Blue Spike lacks standing to bring a patent infringement action based on the '175, '494, '700 or '472 patents and/or has failed to join a necessary party under Fed. R. Civ. P. 19.

## ELEVENTH AFFIRMATIVE DEFENSE

### (Single Recovery Rule)

11.      Plaintiff's damages are barred in whole or in part by the single recovery rule.

## TWELFTH AFFIRMATIVE DEFENSE

### (License/Implied License/Patent Exhaustion)

12.     Plaintiff's damages are barred in whole or in part by the defenses of license, implied license, and/or patent exhaustion.

## THIRTEENTH AFFIRMATIVE DEFENSE

### (Unenforceability of '472, '700, '494 and '175 Patents Due to Inequitable Conduct)

13.     The '472, '700, '494 and '175 patents, and each claim thereof, is unenforceable due to inequitable conduct during the prosecution of the '472, '700, '494 and '175 patents.

14.     During prosecution of the '472, '700, '494 and '175 patents, the applicants failed to disclose, withheld, concealed and/or mischaracterized to the United States Patent and Trademark Office ("PTO") prior art that was highly material to the patentability of the claims of the '472, '700, '494 and '175 patents under prosecution, and which they knew or should have known would have been important to a reasonable examiner.  Upon information and belief, the applicants failed to disclose and mischaracterized the prior art with an intent to deceive the PTO.

## The Applicants Knew Of Highly Material Prior Art, Including Prior Art Of Audible Magic And Its Predecessor Company Muscle Fish LLC

15.     Upon information and belief, the applicants of the '472, '700, '494 and '175 patents knew of an enormous amount of highly material prior art regarding content identification technologies.  Despite having full knowledge of this material prior art, the applicants did not share any of it with the PTO.  Upon information and belief, prior to filing and issuance of the '472, '700, '494 and '175 patents, the applicants investigated products or services that competed with or were otherwise relevant to the business of applicant Scott Moskowitz ("Moskowitz") and his company Blue Spike, Inc. ("Blue Spike, Inc.") and to the patent claims being drafted by the applicants.  Upon information and belief, the applicants investigated products and services that

15

carried out the monitoring, analysis and recognition of digital information and signals, including products and services that used content-based fingerprints in order to identify content or signals.

16.     Upon information and belief, prior to the filing of the applications for the '472, '700, '494 and '175 patents, the applicants were aware of prior art technology and systems of Audible Magic's predecessor company, a consulting company called Muscle Fish, LLC ("Muscle Fish").  Upon information and belief, prior to the filing of the applications for the '472, '700, '494 and '175 patents, the applicants were also aware of prior art technology and systems of Audible Magic.

17.     Upon information and belief, Muscle Fish was founded in Berkeley, California, in 1992, by engineers, mathematicians and musicians Erling Wold, Doug Keislar, Thom Blum and Jim Wheaton.  Upon information and belief, these were some of the most experienced and brightest audio technologists in the world; they had worked with signal processing and sound technologies from the late 1970s through the early 1990s.  Upon information and belief, by 1992, these gentlemen had advanced degrees in electrical engineering, computer science and computer applications to music synthesis and had extensive experience with acoustic models, signal processing, parameter estimation, non-linear and applied mathematics, software engineering, computer architecture, circuit design and computer music.  Upon information and belief, one co-founded the Computer Music Association, and another conducted psycho-acoustical research at Stanford's Center for Computer Research in Music and Acoustics ("CCRMA").  Upon information and belief, all had been engineers for years at a variety of companies, including Yamaha Music Technologies, developing new music analysis and synthesis techniques.

18.     Upon information and belief, beginning in 1992, the Muscle Fish engineers worked on systems for analyzing content and signals.  Upon information and belief, in the 1990s,

the Muscle Fish engineers designed a system for looking up and comparing known and unknown content based on a set of features of content called "MFCCs."  Upon information and belief, the Muscle Fish engineers published papers about this technology.  For example, on July 20, 1995, upon information and belief, they published a paper, "Audio Databases with Content-Based Retrieval," about MFCC-based fingerprints and presented it in August 1995 at the IJCAI Workshop on Intelligent Multimedia and also in September 1995, at the International Computer Music Conference.  Upon information and belief, in January and May 1996, respectively, they gave talks to IBM and to the CCRMA called "Content-Based Classification, Search, and Retrieval of Audio."  Upon information and belief, in 1996, Muscle Fish filed application No. 08/681,174 on aspects of its MFCC-based fingerprinting technology; a continuation-in-part application was filed on July 21, 1997, resulting in the issuance of U.S. Patent No. 5,918,223 ('223 Patent) on aspects of the MFCC-based technology on June 29, 1999.

19.     Upon information and belief, in the 1990s, interest in Muscle Fish's pioneering content recognition system was very high and the technology was known in the industry.  Upon information and belief, Muscle Fish disclosed, marketed and sold its technology and systems to numerous companies, including database companies, advertising companies, content owners, performing rights societies, search engines, websites, online music stores, sound effects designers and musicians and multimedia companies.  Upon information and belief, Muscle Fish offered standard code libraries and also developed custom implementations for its clients; these products went under various names, including the Muscle Fish "content-based recognition" system, "CBR," "cbrStream," "SoundFisher" and other names.  Upon information and belief, a demo of the content-based recognition technology was available on Muscle Fish's website.  Upon information and belief, Muscle Fish publicized implementations of these technologies,

including Audio Information Retrieval (AIR) DataBlade module for INFORMIX Universal Server, the Video Cataloger product by Virage, Inc., The Bulldog Group's media asset management system, R2, SURF and EAR among others.  Upon information and belief, the applicants for the '472, '700, '494 and '175 patents were aware of Muscle Fish technologies and implementations in the mid-1990s, but did not disclose them to the PTO.

20.     Upon information and belief, in 2000, Muscle Fish was merged into another company called Audible Magic Corp.  Upon information and belief, Audible Magic Corp. had been formed in 1999 and was originally known as Wired Air, LLC.  Upon information and belief, in 2000, Audible Magic Corp. acquired all of Muscle Fish's intellectual property, technology, contracts, assets and employees, and all rights therein.  Upon information and belief, in 1999 and 2000, Audible Magic implemented the Muscle Fish technology in a content recognition system, one implementation of which was called "Clango."  On February 17, 2000, Audible Magic filed the application for U.S. Patent No. 6,834,308, entitled "Method and Apparatus for Identifying Media Content Presented on a Media Playing Device," which issued on December 21, 2004.  Upon information and belief, the applicants for the '472, '700, '494 and '175 patents were aware of the Audible Magic technologies, but did not disclose them to the PTO.

21.     Upon information and belief, in 1992, by contrast to the extensive technical experience of the Muscle Fish engineers, upon information and belief, Scott Moskowitz ("Moskowitz"), one of the applicants for the '472, '700, '494 and '175 patents, had only worked in a low-level business role at Sony Japan in the late 1980s, obtained a bachelor's degree in Political Science, Finance and Japanese in 1991 and formed an import/export and marketing company, which shipped CDs to Japan.  Upon information and belief, the other applicant for the

'472, '700, '494 and '175 patents, Michael Berry ("Berry") obtained a bachelor's degree in Music and Astronomy in 1991, and later obtained a master's degree in Music Composition in 1997 in the San Francisco Bay Area.  Upon information and belief, in the mid-1990s, neither of the applicants nor Blue Spike, Inc. were developing or selling any technology to identify content or signals based on the content or signal itself.

22.     Upon information and belief, Moskowitz claims that he conceived of various inventions regarding "digital watermarking."  Upon information and belief, in 1994, Moskowitz formed the DICE Company to develop a watermarking system called "Argent."  Upon information and belief, he formed that company, which was based in Palo Alto, California, with Marc Cooperman, who had a technical background.  Upon information and belief, Cooperman's job was to create a working digital watermarking system because Moskowitz had no technical ability to do so.  Upon information and belief, Cooperman worked on this project between March 1995 and October 1996, but the two were unable to develop a working system.  Thereafter, as alleged by Cooperman, Moskowitz took the existing assets and intellectual property of the DICE Company, without informing Cooperman, and ultimately moved them to a new company, called "Blue Spike, Inc.," thus freezing out Cooperman.  These acts evidence Moskowitz's practice and strategy of appropriating intellectual property created by others and attempting to take and claim such for himself and Blue Spike, Inc., and as alleged further below, constitutes evidence of Moskowitz's culpable intent in carrying out the same strategy later by withholding material prior art from the PTO.

23.     Cooperman sued Moskowitz and Blue Spike, Inc. in two different lawsuits. Moskowitz asserted in a pleading in federal court that "by October 1996, Cooperman had not completed any workable software of any type for DICE."  Going into 1997, upon information

and belief, Moskowitz was in litigation with Cooperman, had no technical person who could create any product for him, and lacking sufficient technical background to create such software systems, could not do it himself.  As alleged further below, Moskowitz's difficulties in his business is evidence of Moskowitz's culpable motivation to later withhold material prior art from the PTO.

24.     Upon information and belief, at least as early as 1997, while Moskowitz's business was struggling, Moskowitz became aware of the pre-existing Muscle Fish content-based recognition systems.  For example, upon information and belief, in the summer of 1997, Moskowitz contacted Muscle Fish and inquired about Muscle Fish's technology.  At that time, upon information and belief, Muscle Fish representatives told Moskowitz that Muscle Fish had "developed the Audio Information Retrieval (AIR) DataBlade module for the Informix Universal Server."  Similarly, upon information and belief, in a telephone call with Muscle Fish in the summer of 1997, after having learned about Muscle Fish's technology and recognizing its value, Moskowitz told Muscle Fish that it should obtain a trademark on the name of one of its products, "SoundFisher," which was one embodiment of Muscle Fish's content-based recognition technology.  Upon information and belief, after his interactions with Muscle Fish, Moskowitz formally incorporated Blue Spike, Inc. in November 1997.  As alleged further below, Moskowitz did not disclose the foregoing prior art to the PTO.

## The Applicants Failed To Disclose Known, Highly Material Prior Art To The Patent Office, With The Intent To Deceive

25.     Upon information and belief, Moskowitz and Blue Spike, Inc. took ideas from Muscle Fish's old and pre-existing content-based recognition technology, claimed them as their own and the applicants derived ideas in their patent application from that prior art technology. On September 7, 2000, the applicants filed the application for the '472 patent—the oldest patent

20

asserted by Blue Spike in this case.  They failed to disclose any Muscle Fish prior art technology to the examiner during prosecution of that patent.  During prosecution of the '700, '494 and '175 patents, the applicants failed to disclose Muscle Fish public embodiments, systems and documents, which were known to them, including but not limited to SoundFisher and the AIR Datablade systems.

26.     During prosecution of the '472, '700, '494 and '175 patents, the applicants disclosed prior art related to digital watermarking or general technical principles, but did not disclose relevant prior art relating to content-based recognition of content and signals, despite the fact that such was known to them.  During prosecution of the '700, '494 and '175 patents, the later three patent applications, applicants filed an Information Disclosure Statement, disclosing the Muscle Fish '223 patent, but failed to disclose information and documents regarding Muscle Fish's implementations and commercial embodiments of that technology, despite the fact that such was known to them.  The applicants did not disclose the '223 patent during prosecution of the initial '472 patent.  But for the failure to disclose prior art known to the applicants, the '472, '700, '494 and '175 patents would not have issued.

27.     Upon information and belief, the applicants' failure to disclose the foregoing information to the examiner was intended to deceive.  For example, upon information and belief, while the applicants were prosecuting the original '472 patent, in February 2001, Blue Spike, Inc. approached Audible Magic about licensing the Muscle Fish prior art content-based recognition technology that was known to Blue Spike, Inc. years before the filing of the original '472 patent.  In other words, the applicants were prosecuting a patent that Blue Spike now asserts is related to content-based recognition, at the same time that they were attempting to license prior art content-based recognition technology, because, upon information and belief, they did not

21

have any such technology.  Despite this affirmative knowledge and awareness of the Muscle Fish prior art, the applicants failed to disclose it to the PTO.  This demonstrates intent to deceive.

28.     The fact that the applicants selectively withheld all Muscle Fish prior art in the initial '472 patent application and in later applications selectively disclosed only the Muscle Fish '223 patent, despite the fact that, upon information and belief, they knew about much more Muscle Fish prior art information, including commercial embodiments, is evidence that such failure to disclose was intended to deceive.  Upon information and belief, the applicants intentionally or in bad faith withheld, concealed and/or mischaracterized the highly material prior art, with an intent to deceive the PTO.  The applicants' knowledge and selective disclosure of the Muscle Fish patent in later prosecutions, despite knowledge of a much broader set of Muscle Fish prior art, demonstrates that the choice of what to disclose and what to withhold was deliberate.

29.     Upon information and belief, the prior art Muscle Fish technology, which pre-dated the '472, '700, '494 and '175 patents and Blue Spike, Inc. by many years, was acquired by Audible Magic and Blue Spike purports to accuse the Muscle Fish technology in this case.  This fact necessarily renders the prior art Muscle Fish technology highly material to prosecution of the patents in suit, under Blue Spike's own theory.  Despite the high level of materiality of the Muscle Fish prior art, the applicants intentionally withheld that information from the examiner, with the intent to deceive the examiner.

30.     During prosecution of the application leading to the '472 patent, the applicants distinguished over prior art by arguing in a November 22, 2004 response to office action that the patent claimed a signal identifier that is not embedded in the original signal.  Upon information and belief, the Muscle Fish prior art disclosed a signal identifier that is not embedded in the

original signal.  If applicants had disclosed the Muscle Fish prior art that they knew about, they could not have made this argument.  Thus, the Muscle Fish prior art would have been highly material to a reasonable examiner.  Given the applicants' extensive knowledge of the Muscle Fish prior art, the only reasonable inference from this express representation during prosecution is that it was made with intent to deceive the examiner.

31.     During prosecution of the application leading to the '700 patent, the applicants distinguished over prior art by arguing in an October 30, 2008 response to office action that the patent claimed identifying unknown signals, to distinguish over the prior art which allegedly disclosed identifying signals that were "already known."  Upon information and belief, the Muscle Fish prior art disclosed identifying unknown signals.  If the applicants had disclosed the Muscle Fish prior art that they knew about, they could not have made this argument.  Thus, the Muscle Fish prior art would have been highly material to a reasonable examiner.  Given the applicants' extensive knowledge of the Muscle Fish prior art, the only reasonable inference from this express representation during prosecution is that it was made with intent to deceive the examiner.

32.     In the detailed description of the invention section of the '472, '700, '494 and '175 patents, the applicants affirmatively mischaracterized to the PTO the prior art, stating that the claimed invention was novel over the prior art watermarking systems because such watermarking required embedding an identifier into a signal, whereas the claimed invention could identify signals without embedding an identifier.  Upon information and belief, the Muscle Fish prior art disclosed identifying a signal without embedding an identifier.  If the applicants had disclosed the Muscle Fish prior art that they knew about, they could not have mischaracterized the prior art in this way.  Thus, the Muscle Fish prior art would have been

highly material to a reasonable examiner.  Given the applicants' extensive knowledge of the

Muscle Fish prior art, the only reasonable inference from this express representation in the

detailed description of the invention is that it was made with intent to deceive the examiner.

33.     Upon information and belief, by the time that the applicants prosecuted the

applications for the patents, they had previously been involved in patent prosecution activities

and had worked in the area of content recognition.  In particular, the sophistication of Moskowitz

regarding patent prosecution and his prior involvement in this industry is evidence of the lack of

an innocent explanation for withholding and mischaracterizing the Muscle Fish prior art and is

evidence of culpable intent.

34.     During prosecution, the applicants signed and filed oaths with the Patent Office

stating:  "I acknowledge the duty to disclose information which is material to the examination of

this application in accordance with Title 37, Code of Federal Regulations, Section 1.56."  This

explicit understanding of a duty to disclose material prior art is evidence of the lack of any

credible explanation for withholding and mischaracterizing prior art and is evidence of culpable

intent.

35.     Upon information and belief, Moskowitz was motivated to conceal the withheld

prior art and intended to deceive the Patent Office.  Upon information and belief, Moskowitz had

strong financial and non-financial interests in obtaining the patents in suit.  Upon information

and belief, Moskowitz was motivated to conceal the withheld prior art, in order to obtain the

patents, because the Blue Spike, Inc. digital watermarking business was failing and because its

watermarking solution had not been adopted by a standards body working on a proposed digital

watermarking industry standard, called "SDMI."  Upon information and belief, according to an

email from Blue Spike, Inc., the SDMI effort was "in the process of disintegrating."  These

24

economic and non-economic motivations to conceal prior art is evidence of the lack of a credible explanation for the withholding and mischaracterization of prior art and is evidence of culpable intent.

## **COUNTERCLAIMS**

For its counterclaims against Blue Spike, Qlipso alleges as follows:

1.      Qlipso incorporates what is set out in the preceding paragraphs as if fully set forth herein.

2.      During prosecution of the '472, '700, '494 and '175 patents, the applicants failed to disclose, withheld, concealed and/or mischaracterized to the United States Patent and Trademark Office ("PTO") prior art that was highly material to the patentability of the claims of the '472, '700, '494 and '175 patents under prosecution, and which they knew or should have known would have been important to a reasonable examiner.  Upon information and belief, the applicants failed to disclose and mischaracterized the prior art with an intent to deceive the PTO.

3.      Upon information and belief, the applicants of the '472, '700, '494 and '175 patents knew of an enormous amount of highly material prior art regarding content identification technologies.  Despite having full knowledge of this material prior art, the applicants did not share any of it with the PTO.  Upon information and belief, prior to filing and issuance of the '472, '700, '494 and '175 patents, the applicants investigated products or services that competed with or were otherwise relevant to the business of applicant Scott Moskowitz ("Moskowitz") and his company Blue Spike, Inc. ("Blue Spike, Inc.") and to the patent claims being drafted by the applicants.  Upon information and belief, the applicants investigated products and services that carried out the monitoring, analysis and recognition of digital information and signals, including products and services that used content-based fingerprints in order to identify content or signals.

25

4.      Upon information and belief, a consulting company called Muscle Fish, LLC ("Muscle Fish") was found in 1992 in California.  Upon information and belief, Muscle Fish is the predecessor company of Audible Magic Corporation.

5.      Upon information and belief, in the 1990s, Moskowitz was aware of Muscle Fish.

6.      Upon information and belief, prior to the filing of the applications for the '472, '700, '494 and '175 patents, the applicants were aware of prior art technology and systems of Muscle Fish.  Upon information and belief, prior to the filing of the applications for the '472, '700, '494 and '175 patents, the applicants were also aware of prior art technology and systems of Audible Magic.

7.      Upon information and belief, Muscle Fish was founded in Berkeley, California, in 1992, by engineers, mathematicians and musicians Erling Wold, Doug Keislar, Thom Blum and Jim Wheaton.  Upon information and belief, these were some of the most experienced and brightest audio technologists in the world; they had worked with signal processing and sound technologies from the late 1970s through the early 1990s.  Upon information and belief, by 1992, these gentlemen had advanced degrees in electrical engineering, computer science and computer applications to music synthesis and had extensive experience with acoustic models, signal processing, parameter estimation, non-linear and applied mathematics, software engineering, computer architecture, circuit design and computer music.  Upon information and belief, one co-founded the Computer Music Association, and another conducted psycho-acoustical research at Stanford's Center for Computer Research in Music and Acoustics ("CCRMA").  Upon information and belief, all had been engineers for years at a variety of companies, including Yamaha Music Technologies, developing new music analysis and synthesis techniques.

8.     Upon information and belief, beginning in 1992, the Muscle Fish engineers worked on systems for analyzing content and signals.  Upon information and belief, in the 1990s, the Muscle Fish engineers designed a system for looking up and comparing known and unknown content based on a set of features of content called "MFCCs."  Upon information and belief, the Muscle Fish engineers published papers about this technology.  For example, on July 20, 1995, upon information and belief, they published a paper, "Audio Databases with Content-Based Retrieval," about MFCC-based fingerprints and presented it in August 1995 at the IJCAI Workshop on Intelligent Multimedia and also in September 1995, at the International Computer Music Conference.  Upon information and belief, in January and May 1996, respectively, they gave talks to IBM and to the CCRMA called "Content-Based Classification, Search, and Retrieval of Audio."  Upon information and belief, in 1996, Muscle Fish filed application No. 08/681,174 on aspects of its MFCC-based fingerprinting technology; a continuation-in-part application was filed on July 21, 1997, resulting in the issuance of U.S. Patent No. 5,918,223 ('223 Patent) on aspects of the MFCC-based technology on June 29, 1999.

9.     Upon information and belief, in the 1990s, interest in Muscle Fish's pioneering content recognition system was very high and the technology was known in the industry.  Upon information and belief, Muscle Fish disclosed, marketed and sold its technology and systems to numerous companies, including database companies, advertising companies, content owners, performing rights societies, search engines, websites, online music stores, sound effects designers and musicians and multimedia companies.  Upon information and belief, Muscle Fish offered standard code libraries and also developed custom implementations for its clients; these products went under various names, including the Muscle Fish "content-based recognition" system, "CBR," "cbrStream," "SoundFisher" and other names.  Upon information and belief, a

demo of the content-based recognition technology was available on Muscle Fish's website. Upon information and belief, Muscle Fish publicized implementations of these technologies, including Audio Information Retrieval (AIR) DataBlade module for INFORMIX Universal Server, the Video Cataloger product by Virage, Inc., The Bulldog Group's media asset management system, R2, SURF and EAR among others.  Upon information and belief, the applicants for the '472, '700, '494 and '175 patents were aware of Muscle Fish technologies and implementations in the mid-1990s, but did not disclose them to the PTO.

10.     Upon information and belief, in 2000, Muscle Fish was merged into another company called Audible Magic Corp.  Upon information and belief, Audible Magic Corp. had been formed in 1999 and was originally known as Wired Air, LLC.  Upon information and belief, in 2000, Audible Magic Corp. acquired all of Muscle Fish's intellectual property, technology, contracts, assets and employees, and all rights therein.  Upon information and belief, in 1999 and 2000, Audible Magic implemented the Muscle Fish technology in a content recognition system, one implementation of which was called "Clango."  On February 17, 2000, Audible Magic filed the application for U.S. Patent No. 6,834,308, entitled "Method and Apparatus for Identifying Media Content Presented on a Media Playing Device," which issued on December 21, 2004.  Upon information and belief, the applicants for the '472, '700, '494 and '175 patents were aware of the Audible Magic technologies, but did not disclose them to the PTO.

11.     Upon information and belief, in 1992, by contrast to the extensive technical experience of the Muscle Fish engineers, upon information and belief, Scott Moskowitz ("Moskowitz"), one of the applicants for the '472, '700, '494 and '175 patents, had only worked in a low-level business role at Sony Japan in the late 1980s, obtained a bachelor's degree in

Political Science, Finance and Japanese in 1991 and formed an import/export and marketing company, which shipped CDs to Japan.  Upon information and belief, the other applicant for the '472, '700, '494 and '175 patents, Michael Berry ("Berry") obtained a bachelor's degree in Music and Astronomy in 1991, and later obtained a master's degree in Music Composition in 1997 in the San Francisco Bay Area.  Upon information and belief, in the mid-1990s, neither of the applicants nor Blue Spike, Inc. were developing or selling any technology to identify content or signals based on the content or signal itself.

12.     Upon information and belief, Moskowitz claims that he conceived of various inventions regarding "digital watermarking."  Upon information and belief, in 1994, Moskowitz formed the DICE Company to develop a watermarking system called "Argent."  Upon information and belief, he formed that company, which was based in Palo Alto, California, with Marc Cooperman, who had a technical background.  Upon information and belief, Cooperman's job was to create a working digital watermarking system because Moskowitz had no technical ability to do so.  Upon information and belief, Cooperman worked on this project between March 1995 and October 1996, but the two were unable to develop a working system.  Thereafter, as alleged by Cooperman, Moskowitz took the existing assets and intellectual property of the DICE Company, without informing Cooperman, and ultimately moved them to a new company, called "Blue Spike, Inc.," thus freezing out Cooperman.  These acts evidence Moskowitz's practice and strategy of appropriating intellectual property created by others and attempting to take and claim such for himself and Blue Spike, Inc., and as alleged further below, constitutes evidence of Moskowitz's culpable intent in carrying out the same strategy later by withholding material prior art from the PTO.

13.     Cooperman sued Moskowitz and Blue Spike, Inc. in two different lawsuits. Moskowitz asserted in a pleading in federal court that "by October 1996, Cooperman had not completed any workable software of any type for DICE."  Going into 1997, upon information and belief, Moskowitz was in litigation with Cooperman, had no technical person who could create any product for him, and lacking sufficient technical background to create such software systems, could not do it himself.  As alleged further below, Moskowitz's difficulties in his business is evidence of Moskowitz's culpable motivation to later withhold material prior art from the PTO.

14.     Upon information and belief, in the 1990s, Moskowitz communicated with Muscle Fish.

15.     Upon information and belief, in 1997, Muscle Fish was located in California.  In particular, Muscle Fish was located in Berkeley, California.

16.     Upon information and belief, in 1997, Moskowitz was aware that Muscle Fish was located in California.

17.     Upon information and belief, in 1997, Moskowitz directed communications to Muscle Fish.  During the 1997 communications with Muscle Fish, Moskowitz and Muscle Fish communicated about Muscle Fish's content recognition technology.  In particular, during the 1997 communications with Muscle Fish, Moskowitz and Muscle Fish communicated about Muscle Fish's SoundFisher technology.  Further, in particular, during the 1997 communications with Muscle Fish, Moskowitz and Muscle Fish communicated about Muscle Fish's Audio Information Retrieval (AIR) DataBlade technology.

18.     Upon information and belief, in 1997, Moskowitz directed communications to Muscle Fish regarding potential technical work to be done by Muscle Fish.

19.     Upon information and belief, after 1997, Blue Spike directed communications to Muscle Fish regarding potential technical work to be done by Muscle Fish.

20.     Upon information and belief, at least as early as 1997, while Moskowitz's business was struggling, Moskowitz became aware of the pre-existing Muscle Fish content-based recognition systems.  For example, upon information and belief, in the summer of 1997, Moskowitz contacted Muscle Fish and inquired about Muscle Fish's technology.  At that time, upon information and belief, Muscle Fish representatives told Moskowitz that Muscle Fish had "developed the Audio Information Retrieval (AIR) DataBlade module for the Informix Universal Server."  Similarly, upon information and belief, in a telephone call with Muscle Fish in the summer of 1997, after having learned about Muscle Fish's technology and recognizing its value, Moskowitz told Muscle Fish that it should obtain a trademark on the name of one of its products, "SoundFisher," which was one embodiment of Muscle Fish's content-based recognition technology.  Upon information and belief, after his interactions with Muscle Fish, Moskowitz formally incorporated Blue Spike, Inc. in November 1997.  As alleged further below, Moskowitz did not disclose the foregoing prior art to the PTO.

21.     Upon information and belief, Moskowitz and Blue Spike, Inc. took ideas from Muscle Fish's old and pre-existing content-based recognition technology, claimed them as their own and the applicants derived ideas in their patent application from that prior art technology. On September 7, 2000, the applicants filed the application for the '472 patent—the oldest patent asserted by Blue Spike in this case.  They failed to disclose any Muscle Fish prior art technology to the examiner during prosecution of that patent.  During prosecution of the '700, '494 and '175 patents, the applicants failed to disclose Muscle Fish public embodiments, systems and

documents, which were known to them, including but not limited to SoundFisher and the AIR Datablade systems.

22.    During prosecution of the '472, '700, '494 and '175 patents, the applicants disclosed prior art related to digital watermarking or general technical principles, but did not disclose relevant prior art relating to content-based recognition of content and signals, despite the fact that such was known to them.  During prosecution of the '700, '494 and '175 patents, the later three patent applications, applicants filed an Information Disclosure Statement, disclosing the Muscle Fish '223 patent, but failed to disclose information and documents regarding Muscle Fish's implementations and commercial embodiments of that technology, despite the fact that such was known to them.  The applicants did not disclose the '223 patent during prosecution of the initial '472 patent.  But for the failure to disclose prior art known to the applicants, the '472, '700, '494 and '175 patents would not have issued.

23.    Upon information and belief, the applicants' failure to disclose the foregoing information to the examiner was intended to deceive.  For example, upon information and belief, while the applicants were prosecuting the original '472 patent, in February 2001, Blue Spike, Inc. approached Audible Magic about licensing the Muscle Fish prior art content-based recognition technology that was known to Blue Spike, Inc. years before the filing of the original '472 patent.  In other words, the applicants were prosecuting a patent that Blue Spike now asserts is related to content-based recognition, at the same time that they were attempting to license prior art content-based recognition technology, because, upon information and belief, they did not have any such technology.  Despite this affirmative knowledge and awareness of the Muscle Fish prior art, the applicants failed to disclose it to the PTO.  This demonstrates intent to deceive.

24.     The fact that the applicants selectively withheld all Muscle Fish prior art in the initial '472 patent application and in later applications selectively disclosed only the Muscle Fish '223 patent, despite the fact that, upon information and belief, they knew about much more Muscle Fish prior art information, including commercial embodiments, is evidence that such failure to disclose was intended to deceive.  Upon information and belief, the applicants intentionally or in bad faith withheld, concealed and/or mischaracterized the highly material prior art, with an intent to deceive the PTO.  The applicants' knowledge and selective disclosure of the Muscle Fish patent in later prosecutions, despite knowledge of a much broader set of Muscle Fish prior art, demonstrates that the choice of what to disclose and what to withhold was deliberate.

25.     Upon information and belief, the prior art Muscle Fish technology, which pre-dated the '472, '700, '494 and '175 patents and Blue Spike, Inc. by many years, was acquired by Audible Magic and Blue Spike purports to accuse the Muscle Fish technology in this case.  This fact necessarily renders the prior art Muscle Fish technology highly material to prosecution of the patents in suit, under Blue Spike's own theory.  Despite the high level of materiality of the Muscle Fish prior art, the applicants intentionally withheld that information from the examiner, with the intent to deceive the examiner.

26.     During prosecution of the application leading to the '472 patent, the applicants distinguished over prior art by arguing in a November 22, 2004 response to office action that the patent claimed a signal identifier that is not embedded in the original signal.  Upon information and belief, the Muscle Fish prior art disclosed a signal identifier that is not embedded in the original signal.  If applicants had disclosed the Muscle Fish prior art that they knew about, they could not have made this argument.  Thus, the Muscle Fish prior art would have been highly

material to a reasonable examiner.  Given the applicants' extensive knowledge of the Muscle Fish prior art, the only reasonable inference from this express representation during prosecution is that it was made with intent to deceive the examiner.

27.     During prosecution of the application leading to the '700 patent, the applicants distinguished over prior art by arguing in an October 30, 2008 response to office action that the patent claimed identifying unknown signals, to distinguish over the prior art which allegedly disclosed identifying signals that were "already known."  Upon information and belief, the Muscle Fish prior art disclosed identifying unknown signals.  If the applicants had disclosed the Muscle Fish prior art that they knew about, they could not have made this argument.  Thus, the Muscle Fish prior art would have been highly material to a reasonable examiner.  Given the applicants' extensive knowledge of the Muscle Fish prior art, the only reasonable inference from this express representation during prosecution is that it was made with intent to deceive the examiner.

28.     In the detailed description of the invention section of the '472, '700, '494 and '175 patents, the applicants affirmatively mischaracterized to the PTO the prior art, stating that the claimed invention was novel over the prior art watermarking systems because such watermarking required embedding an identifier into a signal, whereas the claimed invention could identify signals without embedding an identifier.  Upon information and belief, the Muscle Fish prior art disclosed identifying a signal without embedding an identifier.  If the applicants had disclosed the Muscle Fish prior art that they knew about, they could not have mischaracterized the prior art in this way.  Thus, the Muscle Fish prior art would have been highly material to a reasonable examiner.  Given the applicants' extensive knowledge of the

Muscle Fish prior art, the only reasonable inference from this express representation in the detailed description of the invention is that it was made with intent to deceive the examiner.

29.     Upon information and belief, by the time that the applicants prosecuted the applications for the patents, they had previously been involved in patent prosecution activities and had worked in the area of content recognition.  In particular, the sophistication of Moskowitz regarding patent prosecution and his prior involvement in this industry is evidence of the lack of an innocent explanation for withholding and mischaracterizing the Muscle Fish prior art and is evidence of culpable intent.

30.     During prosecution, the applicants signed and filed oaths with the Patent Office stating:  "I acknowledge the duty to disclose information which is material to the examination of this application in accordance with Title 37, Code of Federal Regulations, Section 1.56."  This explicit understanding of a duty to disclose material prior art is evidence of the lack of any credible explanation for withholding and mischaracterizing prior art and is evidence of culpable intent.

31.     Upon information and belief, Moskowitz was motivated to conceal the withheld prior art and intended to deceive the Patent Office.  Upon information and belief, Moskowitz had strong financial and non-financial interests in obtaining the patents in suit.  Upon information and belief, Moskowitz was motivated to conceal the withheld prior art, in order to obtain the patents, because the Blue Spike, Inc. digital watermarking business was failing and because its watermarking solution had not been adopted by a standards body working on a proposed digital watermarking industry standard, called "SDMI."  Upon information and belief, according to an email from Blue Spike, Inc., the SDMI effort was "in the process of disintegrating."  These economic and non-economic motivations to conceal prior art is evidence of the lack of a credible

explanation for the withholding and mischaracterization of prior art and is evidence of culpable intent.

32.     Blue Spike's complaint has established an actual and justiciable controversy between Blue Spike and Qlipso with respect to validity and infringement of the '175, '494, '700 or '472 patents.

33.     Qlipso brings these counterclaims without waiving its right to argue that venue in the Eastern District of Texas is improper and inconvenient.

## COUNT ONE

### (Declaratory Judgment of Non-Infringement of the '175 Patent)

34.     Qlipso incorporates paragraphs 1-33 of these counterclaims as if fully set forth herein.

35.     Blue Spike alleges that Qlipso has infringed the '175 patent, contributed to the infringement of and/or actively induced others to literally and/or under the doctrine of equivalents infringe one or more claims of the '175 patent by having made, made on its behalf, offered for sale, sold, provided, used, maintained and supported infringing methods, products and/or systems listed in the Complaint.

36.     Qlipso does not and has not infringed, contributed to the infringement of, or induced others to literally and/or under the doctrine of equivalents infringe any claim of the '175 patent.

37.     Qlipso is entitled to a declaratory judgment that it has not infringed and is not infringing the '175 patent.

## COUNT TWO

### (Declaratory Judgment of Invalidity of the '175 Patent)

38.     Qlipso incorporates paragraphs 1-37 of these counterclaims as if fully set forth herein.

39.     One or more claims of the '175 patent are invalid for failure to comply with the requirements of patentability specified in Title 35 of the United States Code, including Sections 101, 102, 103 and 112.

40.     Qlipso is entitled to a declaratory judgment that one or more claims of the '175 patent are invalid.

## COUNT THREE

### (Declaratory Judgment of Non-Infringement of the '494 Patent)

41.     Qlipso incorporates paragraphs 1-40 of these counterclaims as if fully set forth herein.

42.     Blue Spike alleges that Qlipso has infringed the '494 patent, contributed to the infringement of and/or actively induced others to literally and/or under the doctrine of equivalents infringe one or more claims of the '494 patent by having made, made on its behalf, offered for sale, sold, provided, used, maintained and supported infringing methods, products and/or systems listed in the Complaint.

43.     Qlipso does not and has not infringed, contributed to the infringement of, or induced others to literally and/or under the doctrine of equivalents infringe any claim of the '494 patent.

44.     Qlipso is entitled to a declaratory judgment that it has not infringed and is not infringing the '494 patent.

37

## COUNT FOUR

### (Declaratory Judgment of Invalidity of the '494 Patent)

45.     Qlipso incorporates paragraphs 1-44 of these counterclaims as if fully set forth herein.

46.     One or more claims of the '494 patent are invalid for failure to comply with the requirements of patentability specified in Title 35 of the United States Code, including Sections 101, 102, 103 and 112.

47.     Qlipso is entitled to a declaratory judgment that one or more claims of the '494 patent are invalid.

## COUNT FIVE

### (Declaratory Judgment of Non-Infringement of the '700 Patent)

48.     Qlipso incorporates paragraphs 1-47 of these counterclaims as if fully set forth herein.

49.     Blue Spike alleges that Qlipso has infringed the '700 patent, contributed to the infringement of and/or actively induced others to literally and/or under the doctrine of equivalents infringe one or more claims of the '700 patent by having made, made on its behalf, offered for sale, sold, provided, used, maintained and supported infringing methods, products and/or systems listed in the Complaint.

50.     Qlipso does not and has not infringed, contributed to the infringement of, or induced others to literally and/or under the doctrine of equivalents infringe any claim of the '700 patent.

51.     Qlipso is entitled to a declaratory judgment that it has not infringed and is not infringing the '700 patent.

## COUNT SIX

**(Declaratory Judgment of Invalidity of the '700 Patent)**

52.     Qlipso incorporates paragraphs 1-51 of these counterclaims as if fully set forth herein.

53.     One or more claims of the '700 patent are invalid for failure to comply with the requirements of patentability specified in Title 35 of the United States Code, including Sections 101, 102, 103 and 112.

54.     Qlipso is entitled to a declaratory judgment that one or more claims of the '700 patent are invalid.

## COUNT SEVEN

**(Declaratory Judgment of Non-Infringement of the '472 Patent)**

55.     Qlipso incorporates paragraphs 1-54 of these counterclaims as if fully set forth herein.

56.     Blue Spike alleges that Qlipso has infringed the '472 patent, contributed to the infringement of and/or actively induced others to literally and/or under the doctrine of equivalents infringe one or more claims of the '472 patent by having made, made on its behalf, offered for sale, sold, provided, used, maintained and supported infringing methods, products and/or systems listed in the Complaint.

57.     Qlipso does not and has not infringed, contributed to the infringement of, or induced others to literally and/or under the doctrine of equivalents infringe any claim of the '472 patent.

58.     Qlipso is entitled to a declaratory judgment that it has not infringed and is not infringing the '472 patent.

## COUNT EIGHT

### (Declaratory Judgment of Invalidity of the '472 Patent)

59.     Qlipso incorporates paragraphs 1-58 of these counterclaims as if fully set forth herein.

60.     One or more claims of the '472 patent are invalid for failure to comply with the requirements of patentability specified in Title 35 of the United States Code, including Sections 101, 102, 103 and 112.

61.     Qlipso is entitled to a declaratory judgment that one or more claims of the '472 patent are invalid.

## COUNT NINE

### (Declaratory Judgment Of Unenforceability of '472, '700, '494 and '175 Patents Due to Inequitable Conduct)

62.     Qlipso incorporates paragraphs 1-61 of these counterclaims as if fully set forth herein.

63.     The '472, '700, '494 and '175 patents, and each claim thereof, is unenforceable due to inequitable conduct during the prosecution of the '472, '700, '494 and '175 patents.

64.     During prosecution of the '472, '700, '494 and '175, the applicants failed to disclose, withheld, concealed and/or mischaracterized to the United States Patent and Trademark Office ("PTO") prior art that was highly material to the patentability of the claims of the '472, '700, '494 and '175 patents under prosecution, and that the applicants knew or should have known would have been important to a reasonable examiner.  The applicants failed to disclose and mischaracterized the prior art with an intent to deceive the PTO.  But for the failure to disclose and mischaracterization of the prior art, the '472, '700, '494 and '175 patents would not have issued.

40

65.     The Blue Spike Asserted Patents are unenforceable because they were procured through fraud on the United States Patent and Trademark Office.  All patents and patent applications based on and deriving from the application for the '472 patent, including but not limited to the '472, '700, '494 and '175 patents, are unenforceable because they are infected by this fraud.

66.     Qlipso is entitled to a declaratory judgment that the '472, '700, '494 and '175 patents and all patents and patent applications deriving from the application for the '472 patent are unenforceable on the grounds of inequitable conduct.


## QLIPSO'S PRAYER FOR RELIEF

Qlipso prays for relief as follows:

A.     That the Court enter judgment in favor of Qlipso, and against Blue Spike;

B.     That the Court find the '175, '494, '700 or '472 patents not infringed by Qlipso;

C.     That the Court find the '175, '494, '700 or '472 patents invalid;

D.     That the Court find the '175, '494, '700 or '472 patents and all patents and patent applications based on and deriving from those patents or their applications unenforceable;

E.     That Blue Spike take nothing by its First Amended Complaint for Patent Infringement against Qlipso;

F.     That the Court find this action exceptional under 35 U.S.C. § 285, and award Qlipso its costs and fees in this action, including reasonable attorneys' fees;

G.     That the Court grant Qlipso such other and further relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Qlipso demands a trial by jury on all issues so triable.

Dated:  April 18, 2014

By:                                          */s/ Eric H. Findlay*

Eric H. Findlay (Texas Bar No. 00789886)
Walter W. Lackey, Jr. (Texas Bar No. 24050901)
FINDLAY CRAFT, P.C
102 N. College Ave.
Suite 900
Tyler, TX 75702
Telephone:  (903) 534-1100
Facsimile:  (903) 534-1137
efindlay@findlaycraft.com
wlackey@findlaycraft.com

Gabriel M. Ramsey – *LEAD ATTORNEY*
I. Neel Chatterjee
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401
gramsey@orrick.com
nchatterjee@orrick.com

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE, LLP
777 S. Figueroa St.
Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Facsimile:  (213) 612-2499
acaridis@orrick.com

Christopher J. Higgins
ORRICK, HERRINGTON & SUTCLIFFE, LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005-1706
Telephone:  (202) 339-8400
Facsimile:  (202) 339-8500

chiggins@orrick.com

Attorneys for Defendant
QLIPSO MEDIA NETWORKS, LTD.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served electronically on

opposing counsel pursuant to Local Rule CV-5(a)(7)(C) on April 18, 2014.

*/s/ Eric H. Findlay*
Eric H. Findlay

OHSUSA:757671724.1