# Exhibit 2



ORRICK, HERRINGTON & SUTCLIFFE LLP
COLUMBIA CENTER
1152 15TH STREET, N.W.
WASHINGTON, D.C. 20005-1706

tel +1-202-339-8400
fax +1-202-339-8500
WWW.ORRICK.COM

April 14, 2014

Christopher J. Higgins
(202) 339-8418
chiggins@orrick.com

Randall Garteiser
Garteiser Honea, PC
218 North College Avenue
Tyler, Texas 75702

Re:   *Blue Spike, LLC v. Audible Magic Corporation, et al., 6:12-cv-576 (E.D. Texas)*

Dear Randall:

We are in receipt of Blue Spike's Amended Infringement Contentions to Audible Magic provided on April 9, 2014. Although Blue Spike indicated that these amended contentions would correct the deficiencies identified in Audible Magic's March 14, 2014 letter, the Infringement Contentions remain deficient for the reasons outlined below. In addition, we note that Blue Spike has not provided Amended Infringement Contentions for any of Audible Magic's customer defendants, despite the fact that our objections to the contentions and our meet and confer process extended to Blue Spike's contentions regarding customer defendants. Even though discovery against those defendants has been stayed, the infringement contentions were still due on February 26, 2014. We expect revised contentions for each customer by the April 16, 2014 deadline discussed on the previous meet and confers.

## I.  Blue Spike Has Waived Any Indirect Infringement Allegations

Blue Spike's February 26, 2014 Infringement Contentions and April 9, 2014 Amended Infringement Contentions fail to even mention indirect infringement, which Blue Spike pled in its Complaint. Blue Spike was required to set forth in detail all bases for any alleged infringement in its Infringement Contentions, and the complete absence of such allegations regarding indirect infringement theories would not even meet the initial pleading standard. *See e.g. Clear v. Bergdorf Goodman, Inc.*, 2010 U.S. Dist. LEXIS 92079, *11-12 (E.D. Tex. Mar. 29, 2010) ("Taken as whole, [plaintiff's] indirect infringement allegations—which fail to identify which claims are indirectly infringed, fail to identify which methods or systems indirectly infringe, and fail to identify a direct infringer in reference to its indirect infringement claims—does not state a claim for indirect infringement that is plausible on its face. The complaint simply fails to inform Defendants as to what they must defend. The Court has high expectations of a plaintiff's preparedness before it brings suit. *See Am. Video Graphics, L.P. v. Elec. Arts, Inc.*, 359 F. Supp. 2d 558, 560 (E.D. Tex. 2005) (Davis, J.) ("The Patent Rules demonstrate high expectations as to plaintiffs' preparedness before bringing suit, requiring plaintiffs to disclose their preliminary infringement contentions before discovery has even begun."); *Performance Aftermarket Parts Group v. TI Group Auto. Sys.*, 2007 U.S. Dist. LEXIS 70974, *9 (S.D. Tex.

Randall Garteiser
April 14, 2014
Page 2


Sept. 25, 2007) (where party asserting a patent "does not raise contributory infringement in its Amended Preliminary Infringement Contentions" such claims were waived).  Blue Spike has now waived any indirect infringement theory and Audible Magic will oppose any belated attempt to raise such allegations.

## II.    Blue Spike Has Still Not Identified Actual Audible Magic Products

Blue Spike's Amended Infringement Contentions still fail to comply with P.R. 3-1(b).  In its Amended Infringement Contentions, Blue Spike provides six separate claim charts for each patent directed to the following alleged products: (1) Copyright Compliance Service; (2) CopySense Appliance; (3) Custom Services; (4) Media Identification service; (5) Media Synchronization services; and (6) RepliCheck Application.  Blue Spike alleges that all of these services infringe because they employ "Audible Magic's Automatic Content Recognition (ACR) technology."  What is troubling is that Blue Spike labels this ACR technology as a "system" in some claims (e.g., claim 8 of the '175 patent), but then labels the same ACR technology a "method" in other claims (e.g., claim 3 of the '175 patent).  It cannot be both.  Indeed, Blue Spike points to nothing in its claim charts that corresponds to any element of a system claim.

Even more confusing is Blue Spike's allegation that "design consultation, custom content databases, de-duplication, and litigation support" are somehow "products" that infringe the asserted claims.  If Blue Spike is alleging that a design consultation between Audible Magic and a potential customer practice the asserted claims, then the claims are invalid under 35 U.S.C. §101.  We assume this is not what Blue Spike intended, so it must withdraw its contentions against the Audible Magic Custom Services.

## III.   Blue Spike's Amended Claim Charts and Infringement Allegations Fail to Comply with P.R. 3-1(c)

Blue Spike's amended claim charts still fall woefully short of the high standard required by the Eastern District of Texas.  As indicated in Section II, Blue Spike's claim charts fail to identify where each element of each claim is found within the accused products.  It is clear that Blue Spike has not even attempted to study Audible Magic's publicly available software, SDKs, API documentation, test apps or other technical materials or to engage in any robust analysis or reverse engineering of the products it accuses.  That material has been available since August 2012 when this case was filed.  Such diligent preparation was required prior to filing a complaint and is certainly required as part of the submission of infringement contentions under the Patent Local Rules.  *See e.g. Keranos, LLC v. Silicon Storage Tech., Inc.*, 2013 U.S. Dist. LEXIS 145194 (E.D. Tex. Aug. 2, 2013) ("the burden is on Plaintiff, not Defendants, to search for and identify infringing products to the extent possible based on publically available information."); *Linex Techs. Inc. v. Belkin Int'l, Inc.*, 628 F. Supp. 2s 703, 712 (E.D. Tex. 2008) (noting that "reverse engineering" would "evidence Plaintiff's diligence in preparing the Infringement Contentions" for a complex technology instead of just relying on product manuals).

Instead, Blue Spike just quotes broadly from the same marketing materials (irrespective of products) and seeks to aim in the most general way at a category of technology offered by

Randall Garteiser
April 14, 2014
Page 3

Audible Magic and then embark on an enormous and burdensome fishing expedition, particularly with respect to the asserted dependent claims.  This is precisely what the Patent Local Rules are designed to *prevent*.  *Connectel, LLC v. Cisco Sys.*, 391 F. Supp. 2d 526, 527 (E.D. Tex. 2005) ("Patent Rule 3-1 requires the plaintiff to state "specific theories of infringement" in their PICs.  *STMicroelectronics, Inc. v. Motorola, Inc.*, 308 F. Supp. 2d 754, 755 (E.D. Tex. 2004)(Davis, J.).  Specific theories create a specific trajectory for the case.  When parties accuse hundreds of products of infringing hundreds of claims, and only narrow those accusations after discovery, the case staggers for months without clear direction.  However, when parties formulate, test, and crystallize their infringement theories before stating their preliminary infringement contentions, as the Patent Rules require, the case takes a clear path, focusing discovery on building precise final infringement or invalidity contentions and narrowing issues for *Markman*, summary judgment, trial, and beyond.")

Thus, notwithstanding that it has now studiously removed the words "upon information and belief," from its amended contentions, Blue Spike has still not even come close to meeting its obligations under the Patent Local Rules, has failed to provide proper notice to Audible Magic and has failed to establish any basis for the wide-ranging and burdensome discovery that Blue Spike's broad, unsupported claims would require.  For example:

- with respect to the '494 Patent, Claim 20, 21 and the '700 Patent, Claim 10, 11, 49, 50, Blue Spike fails to point to any evidence at all regarding any purported "cryptographic protocol," "hash" or "digital signature."  Rather, Blue Spike makes an enigmatic citation to language from Audible Magic's website about the size of a database.

- with respect to the '472 Patent, Claim 3, 4, 8 and '175 Patent, Claim 15, Blue Spike fails to point any evidence at all regarding creating a "counter corresponding to one of said at least one reference signals" which is "representative of the number of times a match is found between the abstract of said at least one query signal and the abstract of said at least one reference signal," "recording an occurrence of a match," a "recorder recording a number of times said at least one processor determines a match between a digital query signal abstract and first digital reference signal abstract of said plurality of digital reference signal abstracts" or "generating a report that identifies the reference signal whose abstract matched the abstract of said at least one query signal."  Instead, Blue Spike just points to general language regarding monitoring content.

- with respect to the '472 Patent, Claim 11, Blue Spike fails to point to any evidence regarding "a processor that creates an abstract of a signal using selectable criteria."  Rather, Blue Spike merely points to a general recitation of content recognition technology, that says nothing whatsoever about any criteria that are "selectable" in the creation of any alleged "abstract."

- with respect to the '472 Patent, Claim 11, Blue Spike fails to point to any evidence regarding any alleged "comparing device" that "identifies at least two abstracts in the reference database that match the abstract of said at least one query signal and an index of relatedness to said at least one query signal for each of said at least two matching abstracts."  Again,

Randall Garteiser
April 14, 2014
Page 4

> Blue Spike only points to general material about content recognition technology and there is absolutely zero support for any alleged "index of relatedness."

- with respect to the '494 Patent, Claim 1, 11, 29 and the '700 Patent, Claim 1, 6, 40, Blue Spike fails to point to any evidence regarding differentiation between different "versions" of "signals." Rather, Blue Spike only points to general descriptions of technology to identify content.

- with respect to the '494 Patent, Claim 17 and '700 Patent, Claim 7, Blue Spike fails to point to any evidence regarding any technology involving any alleged "data describing a portion of the characteristics of" any associated "reference signal." Instead, Blue Spike only references a general description of content identification technology.

Similarly, even a basic claim element such as a processor in the '175 patent, Blue Spike asserts only that "it is obvious to anyone skilled in the art that a processor is used to execute the technology's algorithms." Other examples include elements in the '494 patent such as "a comparing device," which Blue Spike points to "a server or other computer" with no specificity, "a first processor" and "a second processor," which Blue Spike contends are both present with no support, and "a first input" and "a second input," which Blue Spike also alleges must necessarily be present in any system in the world. Even the citations that Blue Spike seemingly provides for these elements are completely irrelevant. For example, with respect to "a second input" Blue Spike cites to Audible Magic's website describing the low rate of false positives. *See* Ex. A, p. 12. If Blue Spike cannot identify the most basic elements of an allegedly infringing system, then it must withdraw its contentions as to those claims.

It is also apparent that Blue Spike did not have any basis to allege infringement prior to April 1, 2014. Blue Spike's Amended Infringement Contentions now cite for nearly every claim element documentation that was not procured until at least April 1, 2014, and in some instances April 7, 2014. *See, e.g.,* Exhibits 2, 3, 9, 10, 11, 12, 13 showing a date of April 1, 2014 and Exhibits 6 and 7 with a date of retrieval indicated as April 7, 2014. All of these exhibits are publicly available and were not included in Blue Spike's February 26, 2014 Infringement Contentions. As indicated by the dates on the documents, that is because Blue Spike obviously never even attempted to review them until April. Accordingly, Blue Spike had no Rule 11 basis to allege infringement by any Audible Magic products. Audible Magic will seek all available sanctions and its fees and costs for Blue Spike's violation of Rule 11.

**IV.   Blue Spike Has Waived Any Infringement Allegations Under the Doctrine of Equivalents**

Blue Spike's boilerplate statement in each independent claim that the accused product infringes "either literally or by the doctrine of equivalents" is insufficient. This is not the level of specificity required by P.R. 3-1(d) and courts have routinely struck doctrine of equivalents allegations when they were not properly alleged in a plaintiff's infringement contentions. *See, e.g., Nike, Inc. v. Adidas Am., Inc.*, 479 F. Supp. 2d 664 (E.D. Tex. 2007); *Davis-Lynch, Inc. v. Weatherford Int'l, Inc.*, 2009 U.S. Dist. LEXIS 33414, at*18 (E.D. Tex Jan. 12, 2009) (requiring

Randall Garteiser
April 14, 2014
Page 5

plaintiff to describe in detail its position, on a claim by claim basis, for either literal infringement or the doctrine of equivalents in its infringement contentions); *Nazomi Communs., Inc. v. Samsung Telecomms., Inc.*, 2013 U.S. Dist. LEXIS 112763, at *18 (N.D. Cal. Aug. 8, 2013) ("[a] boilerplate reservation is inadequate, and courts have frequently dismissed claims under the doctrine of equivalents based upon boilerplate language in their infringement contentions."). Blue Spike's response to Audible Magic was that "Blue Spike has adequately plead DOE in our infringement contentions for this stage of the litigation."  *See* April 9, 2014 Email from P. Brasher to Audible Magic counsel.  We are well past the pleading stage and the Patent Rules set the bar much higher.  Audible Magic considers any doctrine of equivalents argument waived and will move to preclude any attempt by Blue Spike to later inject one into the case.

Although we have exhaustively covered these deficiencies in multiple meet and confers, Audible Magic remains willing to discuss with Blue Spike how we can avoid motion practice and court involvement.

Sincerely,

Christopher J. Higgins