# Exhibit 2

# Higgins, Christopher J.

| | |
|---|---|
| **From:** | Ramsey, Gabriel M. |
| **Sent:** | Sunday, May 18, 2014 4:54 AM |
| **To:** | Randall Garteiser |
| **Cc:** | Christopher Honea; Higgins, Christopher J.; Caridis, Alyssa; Eric Findlay; wlackey@findlaycraft.com |
| **Subject:** | RE: Relevance of 'bug logs' |
| **Attachments:** | Audible Magic et al Amended Complaint.pdf; 2014-05-09 Audible Magic letter to BS re Document Production.pdf; Audible Magic Second Amended Answer - Counterclaims.pdf; Further Clarifying Document Regarding Moskowitz and Blue Spike Document Production Obligations.pdf |

Randall,

Your email was in our firm's spam filters. Accordingly, I am responding to you today. You may wish to check with other counsel regarding the status of your emails, as they may also be caught in other firms' spam filters.

**Bug Logs**
In answer to your question below, by bug logs, we mean any document of any type that reflects or relates to testing, bugs, errors, or any form of resolution or correction or other form of addressing of technical matters or issues arising during testing, product review, debugging, error analysis or other similar processes that review the state or functionality of a product. The form of relevant bug logs is all inclusive, encompassing any form of document reflecting or relating to the foregoing, including formal bug tracking systems, such as Bugzilla etc and including any formal or informal notes or emails, or any other type of document. Relevant bug logs would including those relating to the accused Giovanni Abstraction Machine or any product of any Blue Spike entity or Mr. Moskowitz that practices in whole or in part the asserted Blue Spike patents, or carries out in whole or in part any form of identification of content or signals based on the content or signals themselves. Blue Spike and Mr. Moskowitz have offered and sold products of this type and claim to have invented these types of products. Accordingly, they are relevant. I direct your attention to Blue Spike's Amended Complaint, attached, which goes on for many pages describing Mr. Moskowitz' creations in this regard. The bug logs are relevant because they reflect the operation and development of the accused Giovanni Abstraction Machine and they are relevant because they reflect the operation and development of Blue Spike's and/or Mr. Moskowitz' products in the 1990s and 2000s that practiced in whole or in part the asserted Blue Spike patents, or relate to the asserted Blue Spike patents or carry out in whole or in part functionality that identifies content or signals based on the content or signals themselves, and/or relate to Audible Magic's counterclaims.

**Request For Status Of Blue Spike's And Mr. Moskowitz' Agreed Supplemental Production And Clarification Regarding Scope Of Production**
Please inform us of the status of Blue Spike's and Mr. Moskowitz' gathering and supplemental production of the entire corpus of documents that reflects the technical work and business activities of Blue Spike, Inc., Mr. Moskowitz and Blue Spike LLC, as requested in Mr. Higgins letter (attached) and any other relevant matters that your clients are required to produce under the Court's discovery order, and which were the subject of our meet and confer last week. During that meet and confer you agreed to supplement the production. We agreed that you would do so by May 23 and if the production is still deficient, we will immediately have a further meet and confer in order to assist you to meet your production obligations and avoid the necessity of a motion to compel. In order to further assist you in understanding the scope of the relevant material that your clients were supposed to produce on May 1 pursuant to the Court's discovery order, I attach Audible

Magic's Second Amended Answer and Counterclaims and Blue Spike's Amended Complaint. The matters asserted by Blue Spike in its complaint and by Audible Magic in its answer and counterclaims encompass at least the categories of information set forth in the Further Clarifying Document Regarding Moskowitz And Blue Spike Document Production Obligations, attached to this email. Therefore, every document of every type relating to these topics in your clients' possession, custody or control are relevant and must be produced.

I hope that this helps you understand Mr. Moskowitz', Blue Spike, Inc.'s and Blue Spike LLC's production obligations. Given the number of matters put at issue by Blue Spike in bringing this lawsuit and the activities of your clients which have led to Audible Magic's counterclaims, the scope of production effectively means that Mr. Moskowitz and Blue Spike must produce all documents of any kind relating to the business of Blue Spike or Mr. Moskowitz from 1990 to present that touches upon content recognition based on the content itself, watermarking and the business, technology, interactions, competitive landscape and history relating to those things. We expect that, if Blue Spike and Mr. Moskowitz have properly retained evidence of their companies and their activities, this will be millions of pages of material, sufficient to illuminate the many matters at issue in this case. Your team should be retaining, preserving and searching all computers, servers, backup tapes, hard drives, other physical media, paper files no matter where located and emails and electronic documents within the scope of relevance. In sum, Mr. Moskowitz', Blue Spike Inc.'s and Blue Spike LLC's productions should reflect the same scope and comprehensiveness as Audible Magic's, because the same scope of issues are implicated, given the matters being litigated in the claims and counterclaims.

Audible Magic really does not want to have to take this matter to Magistrate Judge Craven, but given that we expected this material to be fully produced by May 1, we are certainly now behind and our ability to prosecute our case against your clients is being unfairly hindered. We are quite concerned that your clients do not fully understand their obligations to preserve and produce, and that they may be witholding, concealing or destroying evidence, and we request that you impress upon them the serious obligations that they are subject to, having an initiated such a serious lawsuit that has raised a wide array of issues. If your clients are not being cooperative, you need to raise that issue with us immediately, so that we can determine a way to ensure that they are meeting their obligations, and not making the situation worse. We believe, based on your statements during the meet and confer, that you understand and agree that a much more full production must be made, and will promptly correct that, so that Audible Magic may proceed with its case.

Please provide an update on your document collection and production efforts for the May 23 deadline, and confirm that you will meet these obligations.

Sincerely,

Gabe

---

**From:** Randall Garteiser [mailto:rgarteiser@ghiplaw.com]
**Sent:** Tuesday, May 13, 2014 5:11 PM
**To:** Ramsey, Gabriel M.
**Cc:** Christopher Honea; Higgins, Christopher J.
**Subject:** Relevance of 'bug logs'

Gabe,

We are planning to chat about your client's requests with our client. But I have a reference in my notes from today's call that your client wants Blue Spike to produce "bug logs."

Just 3 quick follow-up questions:

1. What does the term "bug logs" mean to your client?
2. What is the time frame your clients want such logs?
3. Why are they relevant to this litigation?

Be well,



**Randall Garteiser** / Partner
888.908.4400 x104 / rgarteiser@ghiplaw.com
218 N College Ave, Tyler, TX 75702
44 N San Pedro, San Rafael, CA 94903
http://www.ghiplaw.com

This e-mail message may contain confidential information or information protected by attorney-client privilege, the doctrine of attorney work product or other applicable privileges and protections, and is intended solely for use by the intended recipient. Any unauthorized disclosure, dissemination, distribution, copying or the taking of any action in reliance on the information herein is prohibited. If you are not the intended recipient, please destroy all copies of this message, including your original copy, and contact the sender immediately. We also advise that any federal tax advice provided in this communication is not intended or written to be used, and cannot be used by the recipient or any other taxpayer for the purpose of avoiding tax penalties that may be imposed on the recipient or any other taxpayer, or in promoting, marketing or recommending to another party any transaction or matter addressed herein.



**Scope Of Relevance Of Moskowitz And Blue Spike Document Production In View Of Matters Alleged In Blue Spike's Complaint And Audible Magic's Answer And Counterclaims**

- Every single document related to the activities and business of Mr. Moskowitz and Blue Spike Inc., during the critical period 1997-2001. Obviously there are many more relevant materials beyond this range of dates, but Scott Moskowitz' and Blue Spike's activities in this time are of particular importance. This encompasses not only the communications and documents of Scott Moskowitz, but also Michael Berry and any other employees, consultants, contractors, agents or volunteers working with or for Scott Moskowitz or Blue Spike in this exceedingly relevant timeframe. This includes, but is not limited to, all internal communications regarding the building of the Blue Spike business and assessment of competitors, competing or similar technologies, etc. All analysis, conversation, discussion, documents, emails etc. relating to Muscle Fish and Audible Magic, or any other company providing content-recognition technologies.

- Inventors Scott Moskowitz and Michael Berry and their activities in relation to Blue Spike, LLC, Blue Spike, Inc. (collectively "Blue Spike" here), the asserted patents or any related matters

- The activities of Blue Spike CEO Scott Moskowitz in relation to the alleged more than 66 U.S. Patents related to managing, monitoring, and monetizing digital content and informational assets.

- Blue Spike's, and Scott Moskowitz' activities relating to the allegation that they have "practiced and has continued business plans to practice Moskowitz's patented inventions."

- Blue Spike's use of its technology to catalogue, manage, monitor, and monetize that content.

- Blue Spike's pre-suit investigation of the accused products of Audible Magic and its customers, including all technical analysis and results

- All matters set forth in the "Factual Background" section of Blue Spike's Amended Complaint.

- All matters relating to Scott Moskowitz' and Blue Spike's business and technical background and activities from 1990 to present, including all matters relating to Scott Moskowitz' and Blue Spike's development of and business relating to watermarking technology and business, and the technology in the asserted patents.

- Scott Moskowitz' and Blue Spike's involvement in industry-based tests—such as the MUSE Embedded Signaling Tests, Secure Digital Music Initiative ("SDMI"), and various tests by performance-rights organizations including ASCAP and BMI, as well as Japan's Nomura Research Institute.

- Scott Moskowitz' and Blue Spike's projects to incorporate technologies with leaders in a gamut of industries, including but not limited to work with EMI, Warner Brothers, and Universal Music Group on music-release tracking systems; with AIG on insurance and financial services; with IBM on watermarking its software and managing movie scripts; and with Juniper Networks on measuring and provisioning the bandwidth used on its routers.

- Blue Spike's activities relating to its status as registered with the Federal Government's Central Contractor Registry (managed under the System for Award Management, "SAM") and participation in the Department of Defense Small Business Innovative Research (SBIR) program.

- Scott Moskowitz' and Blue Spike's work on the Giovanni® suite of media security technologies.

- Scott Moskowitz' and Blue Spike's production of digital-watermarking tools and Scrambling technologies, and "end-to-end" solution for music security and encoding of Blue Spike's watermark.

- Scott Moskowitz' and Blue Spike's activities relating to the development and commercialization of "signal abstracting," "signal fingerprinting," "acoustic fingerprinting," or "robust hash functions."

- The differences between and relative benefits of the technology of the asserted patents compared to watermarking, or watermarking compared to the technology of the asserted patents.

- All matters set forth in the "Inequitable Conduct" allegations in Audible Magic's Second Amended Answer And Counterclaims

- All prior art known to Scott Moskowitz and Blue Spike during prosecution of the asserted patents.

- All technology, products or companies or their activities known to Scott Moskowitz and Blue Spike that relate to the substance of the asserted patents

- Prosecution history relating to the asserted patents, including decisions not to disclose prior art

- Scott Moskowitz' and Blue Spike's knowledge of Muscle Fish, Audible Magic, their principals, employees and/or contractors, products, activities or business.

- All documents relating to Michael Berry.

- All documents relating to Muscle Fish, Audible Magic, their principals, employees and/or contractors, products, activities or business.

- All documents relating to the DICE Company and Marc Cooperman, including the dispute between Scott Moskowitz and Marc Cooperman.

- All documents relating to "Argent"

- All documents relating to the development (in whole or in part) and offering of the "Giovanni Abstraction Machine"

- All documents relating to the statements of Mr. Moskowitz and Blue Spike at issue in Audible Magic's counterclaims.

These are not exhaustive categories, but merely representative, and provided to guide Scott Moskowitz' and Blue Spike's document production obligations.