# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC<br>　*Plaintiff*,<br><br>v.<br><br>TEXAS INSTRUMENTS, INC.<br>　*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:12-CV-499 MHS<br><br>LEAD CASE |
| BLUE SPIKE, LLC,<br>　*Plaintiff*,<br>v.<br><br>AUDIBLE MAGIC CORPORATION, FACEBOOK, INC., MYSPACE, LLC, SPECIFIC MEDIA, LLC, PHOTOBUCKET.COM, INC., DAILYMOTION, INC., DAILYMOTION S.A., SOUNDCLOUD, INC., SOUNDCLOUD LTD., MYXER, INC., QLIPSO, INC., QLIPSO MEDIA NETWORKS LTD., YAP.TV, INC., GOMISO, INC., IMESH, INC., METACAFE, INC., BOODABEE TECHNOLOGIES, INC., TUNECORE, INC., ZEDGE HOLDINGS, INC., BRIGHTCOVE INC., COINCIDENT.TV, INC., ACCEDO BROADBAND NORTH AMERICA, INC., ACCEDO BROADBAND AB, AND MEDIAFIRE, LLC<br>　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:12-CV-576 MHS<br><br>CONSOLIDATED CASE |

**AUDIBLE MAGIC CORPORATION'S OPENING CLAIM
CONSTRUCTION BRIEF ON U.S. PATENT NO. 6,834,308**

**TABLE OF CONTENTS**

I.  INTRODUCTION ...............................................................................................1

II.  BACKGROUND ON AUDIBLE MAGIC'S PATENTED TECHNOLOGY ..............1

III.  CLAIM CONSTRUCTION LEGAL PRINCIPLES .....................................................4

IV.  THE PROPER CONSTRUCTIONS FOR THE DISPUTED CLAIM TERMS ..........6

    A.    Comparing said analytical representation to a collection of analytical representation of reference sampled media content .....................7

        1.    Analytical Representation ...................................................................7

        2.    Reference Sampled Media Content .....................................................8

    B.    Measuring acoustical/perceptual features of said segment .........................9

    C.    Digital/ Digital Fingerprint .........................................................................10

    D.    Client Media Player ....................................................................................11

    E.    Segment......................................................................................................13

    F.    Presenting said content-related data on said client media player ..............14

I.      INTRODUCTION

Audible Magic asserts that Blue Spike, LLC and Blue Spike, Inc. (collectively "Blue Spike") infringe at least claim 1 of U.S. Patent No. 6,834,308 ("'308 Patent").  Exhibit A to the Declaration of Christopher Higgins in Support of Audible Magic's Opening Claim Construction Brief ("Higgins Decl.").  The '308 Patent describes and claims systems and techniques for identifying media content.

Only six terms and phrases are disputed among the parties.  *See* Exhibit B to the parties' Joint Claim Construction Statement ("JCCS") (Dkt. 1630-2).  However, the meaning of each of these terms is plain to persons skilled in the art.  As discussed below, the language of the asserted claims and the intrinsic evidence dictate that each of the disputed terms be construed in accordance with such plain meaning.

Blue Spike's attempt at claim construction is nothing more than substituting words or phrases for terms that are otherwise clear on their face.  Moreover, Blue Spike's constructions fail to comply with the rules of English grammar, let alone comport with the principles of claim construction.  Instead, Blue Spike seeks to rewrite the claim language to suit its noninfringement positions for a product about which it has refused to provide any discovery.  Blue Spike's nonsensical constructions should be rejected.

II.     BACKGROUND ON AUDIBLE MAGIC'S PATENTED TECHNOLOGY

Audible Magic was an early player in the content recognition space and holds numerous patents on its content recognition technology dating back to the mid 1990s.

Audible Magic (originally called "Wired Air LLC") was founded in 1999 by Vance Ikezoye and Jim Schrempp to enable a radically new user experience with innovative audio identification technology.  Recognizing the burgeoning ease of access to digital media, Messrs. Ikezoye and Schrempp started Audible Magic to address the growing need for digital copyright

1

tracking, monetization and management. Audible Magic pioneered the use of Automatic Content Recognition ("ACR") in a range of applications. *See* Higgins Decl., Exs. C and D(Audible Magic website excerpts); *see also* Clango Application Demo In 7/25/2014 Technology Tutorial.

By 1999, Messrs. Ikezoye and Schrempp had deep technical and product development experience in the field of personal computing. Mr. Ikezoye obtained a bachelor's degree in engineering from U.C. Berkeley and an MBA from the University of Pennsylvania, Wharton School. Higgins Decl., Ex. C. He began his career at Hewlett-Packard, where he served in various roles, including technical positions within the computer systems and medical products businesses over a 13-year period. *Id.* Mr. Ikezoye then joined Trade Reporting and Data Exchange Inc., a software start-up that provided data search, analysis and reporting solutions. *Id.* Mr. Schrempp obtained a Bachelor of Science degree in computer science from California Polytechnic State University, San Luis Obispo. *Id.* He was a 19-year veteran of Hewlett-Packard, managing system-software development for the company's mid-range computer-systems business unit, managing R&D for HP's proprietary relational database management system and overseeing development of benchmarks that predict performance and provide tuning recommendations for new system hardware and software products. *Id.*

In 1999 and 2000, Audible Magic had already developed and commercialized at least two content recognition systems, including the "Wired Air" e-commerce system based on detection of sound played on the radio and the "Clango" desktop application, which detected and identified music being played on or through a computer. Higgins Decl., Ex. D. In 1999, Audible Magic also began working with an audio consulting firm known as Muscle Fish LLC, which licensed audio fingerprinting algorithms and libraries to other technology companies. *Id.* In late 2000 Audible Magic acquired Muscle Fish LLC. *Id*.

2

On February 17, 2000, Audible Magic filed Application No. 09/511,632 ("the '632 Application"), entitled "Method and Apparatus for Identifying Media Content Presented on a Media Playing Device."  The '632 Application issued as the '308 Patent on December 21, 2004. The '632 Application and resulting patent largely tracked the Clango content recognition system.

The asserted claim in the '308 patent recites:

1. A method for identifying media content presented on a client media player comprising:

creating an analytical representation from a segment of media content of a recording presented on said client media player, wherein said media content is audio data for a song, said segment of said media content is a predetermined portion of said media content present on said media player and said analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment;

comparing said analytical representation to a collection of analytical representation of reference sampled media content to obtain content-related data from said collection of analytical representations of reference sampled media content wherein said content related data includes at least one of a group consisting of a song title, artist performing said song, and title of an album including said song; and

presenting said content-related data on said client media player.

Fundamentally, the '308 Patent is directed to a system and method that identifies media content (e.g., a song) made available on a media player.  *See generally* '308 Patent, Brief Description of the Invention, col. 2:48-5:9.  To accomplish this, the '308 Patent teaches taking media content available on a client media player and creating a representation of that content according to certain characteristics, which characteristics can include acoustic features over a given time period.  *Id.*  As set forth in the claim, the analytical representation of the received content comprises a digital fingerprint that is compared to a collection of fingerprints in order to identify the content in question.  *Id.*  Based on this comparison, the '308 Patent teaches obtaining content related data, such as the name of the song or name of the artist performing the song.  *Id.*  That content related data is then presented to the client media player, ultimately for display or other

3

actions. *Id.*

Put more simply, the invention claimed in the '308 Patent receives a song, creates a fingerprint of that song, and compares that fingerprint to a collection of fingerprints that were previously created from a reference set of songs. If a fingerprint match is found, identifying features (e.g. title, name, album) of the song-in-question is displayed. In this way, the '308 Patent describes identifying audio content.

### III. CLAIM CONSTRUCTION LEGAL PRINCIPLES

Claim construction is a matter of law for the Court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). As set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the court should consider the language of the claims themselves, the specification, and (where in evidence) the prosecution history. *Phillips*, 415 F.3d at 1312-1316. Further, the words of a claim should be given their ordinary and customary meaning to "person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1313.

Claim terms do not require construction when the ordinary meaning is evident and unambiguous. The Federal Circuit has frequently remarked that it is not necessary to construe every term that may be presented. Claim construction is "a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *U.S. Surgical* v. *Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997).

While claim terms must be construed as they would be understood by a person of ordinary skill in the art to which the invention pertains, if a person of ordinary skill in the art would understand the term in its ordinary, everyday sense, there is no need to construe the term.

4

*See, e.g., Biotec Biologische Naturverpackungen GmbH v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001). Judicial definition of claim terms that have acquired no special meaning is mere wasted effort and can only serve to confuse the jury by adding language for its consideration. *02 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

### A.     Construction first centers on the claims and then on other intrinsic evidence

The Court must first determine what the ordinary and customary meaning of a disputed term is to one of ordinary skill in the art. *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 345 F.3d 1318, 1326 (Fed. Cir. 2003). Only then does the Court look to the intrinsic record to determine whether anything in that record overcomes the presumption that a term has its ordinary meaning. *Id.* When reviewing the intrinsic record, the specification "'is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conception, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). However, the Federal Circuit has repeatedly warned that claims should not be limited to the embodiments disclosed in the specification. *Id.* at 1323. Further, "[t]he court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention…. An invention may possess a number of advantages or purposes, and there is no requirement that every claim directed to that invention be limited to encompass all of them." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003).

After reviewing the claim language and patent specification, a court also may consider the prosecution history, which "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317. Again, though, the Federal Circuit has also warned that "because the prosecution history represents an ongoing negotiation between the PTO and the

5

applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.*

### B. Dictionary and treatises may be consulted but only if they do not contradict the intrinsic evidence

Additionally, while not a form of intrinsic evidence, "judges are free to consult dictionaries and technical treatises 'at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" *Id.* at 1322-23 (quoting *Vitronics*, 90 F.3d at 1584 n.6).

### IV. THE PROPER CONSTRUCTIONS FOR THE DISPUTED CLAIM TERMS

Six terms from the '308 Patent have been proposed for construction:

| |
|---|
| Comparing said analytical representation to a collection of analytical representation[s] of reference sampled media content |
| Measuring acoustical/perceptual features of said segment |
| Client Media Player |
| Digital / Digital Fingerprint |
| Segment |
| Presenting said content-related data on said client media player |

These disputed terms require no particular construction because their meanings are plain from the language of the claims themselves. Nonetheless, while a person skilled in the art could easily discern the boundaries of the claim language, in the event the Court finds it necessary to construe these terms, Audible Magic has proposed constructions that are consistent with the claim language, the patent specification, other patent claims, and the prosecution history. Blue Spike, on the other hand, randomly substitutes words, changes parts of speech, and otherwise renders simple claim terms confusing. Nearly all of the terms proposed for construction by Blue Spike are expressly defined in the claim and there is no need for the Court to construe them. Accordingly, the Court should decline to construe terms that are easily understood as originally

6

drafted.

### A. Comparing said analytical representation to a collection of analytical representation of reference sampled media content

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Comparing said analytical representation to a collection of analytical representation of reference sampled media content | "comparing said analytical representation to a collection of analytical representation[s] of reference sampled media content" | **"Analytical representation**: A digital fingerprint of a particular segment measuring acoustical/perceptual features of said segment"<br><br>**"Referenced [sic] sampled media**: The collection of stored reference samples" |

Blue Spike proposed the entire phrase for construction, yet it only provides a construction for the terms "analytical representation" and "referenced [sic] sampled media" which are already expressly defined in the claim language. Audible Magic's construction simply corrects a typographical error in the patent, but otherwise remains true to the unambiguous language.

#### 1. Analytical Representation

The term "analytical representation" is expressly defined later in the claim as:

said analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment

'308 Patent, claim 1. Because "analytical representation" is already expressly defined in the claim, there is no need to separately construe that term in this phrase. Nevertheless, Blue Spike repeats this exact language as its construction, while changing the word "said" to "a particular." This is not an exercise in claim construction, and neither Blue Spike nor a jury would be confused with the word "said." Moreover, Blue Spike's attempt to rewrite the claim is simply wrong. It is well understood that the use of "said" in a claim refers to the earlier recitation of that element, not a random "particular" element, divorced from the earlier claim limitations. *See e.g. Bell Comm'ns Research v. Vitalink Comm'ns Corp.*, 55 F.3d 615, 621 (Fed. Cir. 1995) (use

7

of the word "said" in a claim refers to an earlier use of the term in the claim). The claim language is clear and the court need not construe this term.

### 2. Reference Sampled Media

In the context of the claim language, the complete term is "a collection of analytical representations of reference sampled media content." Blue Spike misquotes the actual term and truncates "content" from the phrase. This is improper because claim terms must be analyzed in their proper context, rather than divorcing individual words from complete phrases. *See, e.g., Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1328 (Fed. Cir. 2006) (noting that constructions cannot ignore surrounding words and construe singular terms out of context); *Allergan, Inc. v. Sandoz Inc.,* 2013 WL 139350, at *5-*6 (E.D. Tex. 2013) (finding that defendant's construction failed to consider the term in the context of the entirety of the claim and was therefore improper).

The entire phrase is also defined in the prior claim element. Accordingly, there is nothing for the court to construe.

The prior claim element reads as follows:

> creating an analytical representation from a segment of media content of a recording presented on said client media player, wherein said **media content is audio data for a song**, said segment of said media content is a predetermined portion of said media content present on said media player and <span style="color:red">**said analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment**</span>

In red text, and as described in Section A above, "analytical representation" is expressly defined. Therefore, the only remaining term in the phrase is "reference sampled media content," which similarly draws its definition from the claim language.[1]

---

[1] The phrase being "a collection", which is easily understood and which Blue Spike does not argue has any special meaning.

8

Claim 1 defines "media content" as "audio data for a song." Simply adding the words "reference sampled" does nothing more than describe that this "collection of analytical representations" is of a "reference" set that may be compared to the analytical representation created in the previous claim element. *See also,* '308 Patent, Abstract; Col. 8:39-42; Col. 11:26-30. The claim language is clear, and this term, as well as the longer phrase in which it appears, requires no construction.

Blue Spike's construction is wrong. Substituting Blue Spike's proposed construction into the claim language yields the following unworkable result:

> comparing said analytical representation to a collection of analytical representations of **[the collection of stored reference samples]** content to obtain content-related data from said collection of analytical representations of reference sampled media content…

Blue Spike's construction shown in the red text above renders the term "a collection of analytical representations" superfluous, notwithstanding that it also renders the entire claim element nonsensical. Such a result has consistently been rejected by the Federal Circuit. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 781 (Fed. Cir. 2010) (restating the principle that the "notice function would be undermined, however, if courts construed claims so as to render physical structures and characteristics specifically described in those claims superfluous.")

Blue Spike's proposed construction does nothing more than demonstrate that the plain language of the claims is clear and unambiguous. There is no need to change individual words of a claim in a confusing manner just to put on a charade of claim construction. The jury can easily understand the language as is. There is no need to change it.

### B. Measuring acoustical/perceptual features of said segment

| Term | Audible Magic | Blue Spike |
|---|---|---|
| "said analytical representation is a | Plain and ordinary meaning. | "To make a measurement of acoustical/perceptual features |

9

| | | |
|---|---|---|
| digital fingerprint of said segment **measuring acoustical/ perceptual features of said segment**" | | of said segment" |

The plain language of the claim makes clear that the '308 patent's digital fingerprint has the quality of measuring acoustical/perceptual features of a segment of audio. A jury will understand the plain English words "measuring acoustical/perceptual features" and Blue Spike's proposed construction concedes that fact. Blue Spike's entire proposed construction is substituting the phrase "to make" for the term "measuring." But the word "measuring" is not a verb in the claim. Rather it is a present participle describing "said analytical representation." Because Blue Spike's only proposal is based upon a flawed premise, its construction must be rejected. *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983) ("A claim must be read in accordance with the precepts of English grammar.")[2] This term requires no construction.

C. **Digital/ Digital Fingerprint**

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Digital | Plain and ordinary meaning. | "a series of binary digits—1's and 0's." |
| Digital Fingerprint | Digital identifier. | "coded string of binary digits that uniquely identifies a signal" |

The term "digital" appears nowhere by itself in claim 1. Blue Spike, however, proposed both "digital" and the phrase "digital fingerprint" for construction. Accordingly, Audible Magic addresses "digital" with respect to that phrase.

---

[2] Furthermore, Blue Spike's attempt to insert "to make" has no support in the specification. The phrase "to make" is only used once in the specification: "For example, it is common for a station disk jockey to make real-time adjustments to the playlist order and timing." '308 Patent, col. 2:5-8

10

A "digital fingerprint" is an identifier for a particular media sample. The sample is in digital form (as opposed to the potentially digital or analog content that is sampled), so the fingerprint is also in digital form. *See* '308 Patent, Abstract. Blue Spike appears to agree that a fingerprint is an identifier and is digital. The only apparent dispute is over the meaning of "digital" and whether the fingerprint must be "unique."

The term "digital" has no special meaning in the '308 Patent, and therefore, its plain meaning applies. That plain meaning, however, is not "a series of binary digits - 1's and 0's." As an example, the following text would be included in Blue Spike's definition of digital – "101001010101." That is a series of binary digits and all digits are ones and zeroes. There can be no argument, however, that a simple recitation of ones and zeroes on this page equates to "digital." Blue Spike's construction of "digital" and ultimately its construction of "digital fingerprint" are therefore incorrect.

Blue Spike also appears to contend that a digital fingerprint must be unique. The word "unique" is not used at all in the specification of the '308 Patent, and Blue Spike cannot cite any language in the specification that would support the notion of uniqueness. Indeed, the patent talks about defining relative "thresholds" of similarity to define a match, ('308 Patent, Col. 8:55-59), which is contrary to any concept of absolute uniqueness. Thus, Blue Spike's construction should be rejected.

D. <u>**Client Media Player**</u>

| Term | Audible Magic | **Blue Spike** |
|---|---|---|
| Client Media Player | Plain and ordinary meaning. | "End user's media player"<br><br>Not the media player of a person or entity providing the service. |

The specification explicitly defines a media player through open-ended exemplary language. And "client" is not an "end-user" but rather any device used to carry out the claimed invention. Blue Spike takes a straightforward claim term, substitutes one word for another, only

11

to then provide an extra negative limitation that is improper as a matter of fact and law. Its construction must be rejected because it is contrary to the intrinsic record and understanding of one of ordinary skill in the art.

### 1. "Client Media Player" Requires No Construction

When the specification provides a clear definition for a claim term that does not contradict the ordinary meaning, that ends the inquiry. *See Nazomi Comm'cns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005). Here, the '308 Patent specification provides:

> The system 10 comprises a lookup server 12 and at least one client media player 14.

'308 patent, col. 5:53-55. The specification notes that in another embodiment, the database of media content may reside on the client device rather than on a separate lookup server. *Id.* at col. 4:53-64. In addition, the specification notes that "client" means nothing more than the device, e.g. a media player that is connected to the lookup server:

> **Client media player** 14, may comprise a standard computer such as a minicomputer, a microcomputer, a UNIX® machine, mainframe machine, personal computer (PC) such as INTEL®, APPLE®, or SUN® based processing computer or clone thereof, or other appropriate computer. As such, client media player 14 is normally embodied in a conventional desktop or "tower" machine, but can alternatively be embodied in a portable or "laptop" computer, a handheld personal digital assistant (PDA), a cellular phone capable of playing media content, a dumb terminal playing media content, a specialized device such as Tivo® player, or an internet terminal playing media content such as WEBTV®, among others. As described above, client media player 14 may also comprise other media playing devices such as portable stereo system, fixed stereo systems, and televisions suitable for use with embedded systems carrying out the operations of the client engine as described further below.

*Id.* at col. 6:11-29 (emphasis added).

Neither the specification, nor claim 1, limits the "client media player" to one operated by an "end-user." Indeed, claim 14 demonstrates that the patentee knew how to claim "user-initiated" actions with respect to the "client media player." Claim 1 contains no such limitation.

12

### 2. Blue Spike's Construction Has No Support and Improperly Attempts to Include a Negative Limitation

Blue Spike's construction does nothing more than substitute "end user's" for "client" in an attempt to improperly narrow the claim scope. Indeed, Blue Spike's construction is inconsistent with the specification, and therefore, erroneous. *See, e.g., C.R. Bard., Inc. v. M2 Systems, Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998) (finding error when district court limited claim inconsistently with the specification). The specification here is clear that a "client media player" can be *any* device coupled to the lookup server that is capable of executing the client engine. *See, e.g.,* '308 Patent, col. 3:1-4:4:52. That is all that "client" signifies in the phrase "client media player," and Blue Spike's attempt to import a "user" limitation must be rejected.

In addition to its proposed construction, Blue Spike adds an additional negative limitation that the client media player is "[n]ot the media player of a person or entity providing the service." This statement is incorrect for several reasons. First, it is not clear what "the service" is referring to and how "a person or entity" provides such a service. Indeed, the word "service" does not appear anywhere in the claims of the '308 Patent. Second, if Blue Spike is trying to argue that a single entity cannot perform the entire method, that argument has no support in either the claim language or the specification. The "client media player" can perform the "creating," "comparing," and "presenting" steps of the claim.[3] Nothing more is required by the claim and nothing more is required by the specification.

### E. Segment

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Segment | Plain and ordinary meaning. | "Any of the parts into which something can be divided"<br><br>A segment is less than the whole. |

---

[3] As noted above, the specification provides an embodiment in which all components reside on the client media player. '308 patent, col. 4:53-64.

13

The term "segment" has no special meaning to one of ordinary skill in the art. The term "segment" is easily understood by a lay person, let alone by one of ordinary skill in the art. Accordingly, its plain meaning controls and this term requires no construction by the Court.

Even if Blue Spike could argue that segment has a specialized meaning, the term is defined in the claim in the context of its larger phrase:

> creating an analytical representation from **a segment of media content** of a recording presented on said client media player, wherein said media content is audio data for a song, **said segment of said media content is a predetermined portion of said media content** present on said media player and said analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment

Blue Spike once again attempts to truncate a phrase and construe only a singular term. But "segment of media content" is specifically defined in the claim as "a predetermined portion of said media content." Such a clear definition needs no construction by the Court. Further, contrary to Blue Spike's suggestion, a "segment" need not be less than the whole of the media content. It could be less than the entire media content, or it could be all of it. Even Blue Spike's own proposed construction that a segment is "any part" of something concedes that point. Blue Spike's assertion that a segment is "less than the whole" should be rejected.

### F. <u>Presenting said content-related data on said client media player</u>

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Presenting said content-related data on said client media player | "causing the content-related data to be displayed on the client media player" | "The act of displaying song information on an end user's media player" |

The dispute for this phrase should center only on the word "presenting." The other two terms in the phrase "content-related data" and "client media player" are either expressly defined in the claim (content-related data) or have been addressed in a previous section (client media player).

14

The plain meaning of "presenting" is "giving something to" or "making (something) available to be used."  *See* Higgins Decl. Ex. B (Merriam-Webster.com. Merriam-Webster, n.d. Web. 21 Aug. 2014, "present" http://www.merriam-webster.com/dictionary/present).  The claim language and the intrinsic record support Audible Magic's proposed construction that "presenting" means "causing….to be displayed."

The claim language states that the content-related data is for "presenting…on" the client media player.  Unlike other claims in the '308 patent, there is no requirement that the content-related data actually be displayed on the client media player.  *See, e.g.,* '308 patent claim 12 ("configured to display said content information").  Indeed, the word "presented" is used in the preamble of claim 1 with respect to "media content *presented* on a client media player…" Because media content is audio data, such content is never displayed on a client media player because it has no visual component.  Thus, "presenting" similarly cannot impart any requirement of actual display.  It is just a precursor that causes an action to happen.  With respect to "content-related data," that information has a visual component, so the ultimate act (which is not claimed) is the display of that information on the client media player.  Audible Magic's construction captures this ordinary meaning of "presenting" and should be adopted.

Blue Spike's proposed construction is flawed for myriad reasons.  First, as explained above, client media player is not an "end user's media player."  Second, "content-related data" is expressly defined in the claim addressed here as "said content related data includes at least one of a group consisting of a song title, artist performing said song, and title of an album including said song."  Even that definition is not limited to the particular types of information enumerated (but rather "includes" those types of data), and the specification makes clear that, generally, content-related data may encompass other types of information beyond song title, artist performing said song and title of an album.  *See e.g.* '308 patent, Col. 8:60-9:2.  Blue Spike

15

replaces "content-related data" with "song information," which appears nowhere in the claims, specification, or intrinsic record.  Third, Blue Spike replaces "presenting" with "the act of displaying."  Simply plugging Blue Spike's proposed construction into the claim language (in red text below) highlights its erroneous nature:

> 1. A method for identifying media content presented on a client media player comprising:
>
> creating an analytical representation …. ;
>
> comparing said analytical representation to a collection of analytical representations of reference sampled media content …. ; and
>
> **[The act of displaying song information on an end user's media player]**.

Once again, Blue Spike's proposed construction is nonsensical because it confuses parts of speech.  "Presenting" is a verb meant to convey an action in a process claim.  "The act of displaying" is a noun "act" combined with a gerund "displaying."  On this basis alone, Blue Spike's construction is improper and should be rejected.  *See In re Hyatt*, 708 F.2d at 714.  And even if Blue Spike were to correct its grammatical mistake, "presenting" does not mean "displaying."  As explained above, the "content-related data" is either transmitted to, or retrieved from within, the client media player, which causes its ultimate display.  The actual displaying of the content-related data, however, is specifically not claimed in claim 1.  Blue Spike's construction, therefore, is improper and should be rejected.


Dated:  August 22, 2014

By:

*/s/ Eric H. Findlay*
Eric H. Findlay (Texas Bar No. 00789886)
Walter W. Lackey, Jr. (Texas Bar No. 24050901)
FINDLAY CRAFT, P.C.
102 N. College Ave., Suite 900

16

        Tyler, TX 75702
Telephone:  (903) 534-1100
Facsimile:  (903) 534-1137
efindlay@findlaycraft.com
wlackey@findlaycraft.com

Gabriel M. Ramsey– *LEAD ATTORNEY*
I. Neel Chatterjee
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone:  (650) 614-7400
Facsimile:  (650) 614-7401
gramsey@orrick.com
nchatterjee@orrick.com

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE, LLP
777 S. Figueroa St.
Suite 3200
Los Angeles, CA 90017
Telephone:  (213) 629-2020
Facsimile:  (213) 612-2499
acaridis@orrick.com

Christopher J. Higgins
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8418
chiggins@orrick.com

Attorneys for Defendants Audible Magic, Corp., Facebook, Inc., Myspace LLC, Specific Media LLC, Photobucket.com, Inc., DailyMotion, Inc., DailyMotion S.A., SoundCloud, Inc., SoundCloud Ltd., Myxer, Inc., Qlipso, Inc., Qlipso Media Networks, Ltd., Yap.tv, Inc., GoMiso, Inc., iMesh, Inc., Metacafe, Inc., Boodabee Technologies, Inc., Zedge Holdings, Inc., Brightcove Inc., Coincident.TV, Inc., Accedo Broadband North America, Inc., Accedo Broadband AB, MediaFire, LLC, WiOffer LLC, and Harmonix Music Systems, Inc.

### **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served electronically on opposing counsel pursuant to Local Rule CV-5(a)(7)(C) on August 22, 2014.

                                                */s/ Eric H. Findlay*
                                                Eric H. Findlay