# EXHIBIT 5



## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Appl. No. | : | 12/005,229    Confirmation No. 2556 |
| Applicant | : | Scott A. Moskowitz et al. |
| Filed | : | December 26, 2007 |
| TC/A.U. | : | 2857 |
| Examiner | : | Carol S. W. TSAI |
| Docket No. | : | 066112.0132CONT |

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

## REQUEST FOR EXTENSION OF TIME & AMENDMENT/REPLY

Applicants hereby request a two (2) month extension of time to reply to the Office Action dated May 30, 2008. The time for response is therefore extended up to and including October 30, 2008. A credit card payment form in the amount of $245.00 to cover the required fee is enclosed with this filing.

In response to the Office Action of May 30, 2008, Applicants provide the following remarks for consideration:

10/31/2008 MBELETE1 00000040 12005229
02 FC:2252                           245.00 OP

BLU000993

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## 1) Rejections under Double Patenting

### § 101 Rejections based on a judicially created doctrine of provisional obviousness-type double-patenting

Applicants respectfully traverse the Office's contention that the instant invention's Claim 21 (and all claims depending therefrom) is not patently distinct from the parent Application No. 09/657,181, which issued as U.S. Patent No. 7,346,472, Claim 1. While Applicants may disagree with the premise of the rejection, Applicants have included a terminal disclaimer and the associated fee herewith.

2

BLU000994

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## Rejections under 35 USC § 101

An "abstract" is clearly "useful, concrete and tangible" even in cases where the "abstract" is stored in a computer media. This conclusion is supported by the Federal Circuit's decision in *State Street*. *Please see*, e.g., *State Street Bank & Trust Co. v. Signature Financial Group Inc.*, 149 F. 3d 1368, 1373, 47 USPQ2d 1596, 1601 (Fed. Cir. 1998). ("[T]ransformation of data, representing discrete dollar amounts, by a machine through a series of mathematical calculations into a final share price, constitutes a practical application of a mathematical algorithm, formula, or calculation, because it produces 'a useful, concrete and tangible result' -- a final share price momentarily fixed for recording and reporting purposes and even accepted and relied upon by regulatory authorities and in subsequent trades."). Abstracts *are* transformed data relied upon by parties and regulatory agencies (e.g., under the standard of broadest reasonable interpretation, without limitation - enforcing copyright or performance rights, determining derivative rights, fair use, analyzing attribution over information, enhancing recognition and analysis of signals, etc.). Notably, *State Street* addressed a "software program", though Applicants maintain the instant claims include different elements. *Please see*, for instance, MPEP § 2107.01I in this regard:

> Practical utility is a shorthand way of attributing "real-world" value to claimed subject matter. In other words, one skilled in the art can use a claimed discovery in a manner which provides some immediate benefit to the public.
>
> *Nelson v. Bowler*, 626 F.2d 853, 856, 206 USPQ 881, 883 (CCPA 1980).
>
> Practical considerations require the Office to rely on the inventor's understanding of his or her invention in determining whether and in what regard an invention is believed to be "useful." Because of this, Office personnel should focus on and be receptive to assertions made by the applicant that an invention is "useful" for a particular reason.

Perhaps fortuitously, one of the very patents relied upon by the Office in the May 30, 2008 non-final Office Action has claims directed to a "method and apparatus for selectively reproducing segments of broadcast programming" even though the claims include different elements. *Please see* Claims 1 – 9 of U.S. Patent No. 6,088,455 (issued to Logan et al.). The more salient point, however, is that Claims 33 – 52 & 54 clearly produce "a useful, concrete and tangible *result*." Applicants respectfully point to the parent Application (now U.S. Patent No. 7,346,472) Paper No. 20070918, which concedes how the subject matter of the instant claims *patentably* distinguish over Logan. Logan is apparently directed at identification of a *known broadcast segment* for editing according to a known preference of a user – but does not anticipate or suggest the subject matter of the claims as will be presented below. For at least these reasons, Applicant respectfully requests the Office to withdraw the rejections based on 35 U.S.C. § 101. Last, Applicants respectfully submit that none of the references disclose, anticipate or suggest the elements of the claims; thus, the rejections based on anticipation and/or

BLU000995

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

suggestion must respectfully be withdrawn.

**Signals Per Se**

The May 30, 2008 Office Action contends that claims 33 - 52 and 54 are directed to non-statutory subject matter based on the contention that claims 33 - 52 and 54 "... appear to be directed to an electronic system for monitoring and analyzing at least one signal that are nothing more than a thought or computation within a processor, rather than a real world result (i.e., merely manipulating data without causing a physical transformation to occur outside of the system) upon various types of data, and have no 'useful, concrete, and tangible' result, such as causing a device to perform a function" (*please see* non-final Office Action of May 30, 2008 at Page 3). Applicants submit that the Office Action has not met its burden "of presenting a prima facie case of unpatentability." The claimed inventions do, in fact, produce a "useful, concrete and tangible" result[s] and therefore, have practical applications, as argued above. Further, the "totality of the evidence" clearly & expressly establishes patentable subject matter. As presented previously with regards to at least Claim 21 (and all the claims that depend therefrom), *allowable claims have already been identified by the Office previously, namely in the original patent application* – U.S. Application No. 09/657,181, now U.S. Patent 7,346,472 – for which a Terminal Disclaimer is being filed with traverse. Perhaps fortuitously several of the Office Action contentions support the Applicants' traversal. Claims 33 - 52 and 54 concern methods of monitoring and analyzing signals into or in a computer application &/or systems or articles of manufacture that provide useful results such reducing unauthorized use, distribution or manipulation of signals using abstracts.

As presented above, the Office Action provides no reasonable explanation for a prima facie case for unpatentability. First, Applicants seek clarification on the Office's interpretation of Independent Claim 43 (and all claims depending therefrom) in view of the 35 U.S.C. § 101 rejections in connection with Independent Claim 33 (all claims depending therefrom). Second, respectfully, the Applicants would like to bring to the Office's attention the inconsistency raised in "6. Signals Per se" (*please see* Office Action dated May 30, 2008 at Page 3 & 4). Notably, Claim 33 (and all claims depending therefrom) *does* recite, "... data structure (signals) stored in a memory are statutory subject matter because of the statutory nature of the memory". Confusingly, the Office appears to concede the Applicants contention as Claim 33 recites the following element: "comparing the created data signal abstract to at least one database of data signal abstracts, each abstract in the at least one database corresponding to a data signal having a known distribution status". Please note, Applicants are not lawyers or patent agents and, are proceeding *pro se*, thus this argument is based on a reasonable interpretation of the language presented below corresponding to the case being cited in the non-final Office Action at Page 4. Third, it appears that the Office's reliance and reference to *AT&T*, 172 F.3d at 1358, 50 USPQ2d at 1452, at "7" (*please see* Page 4 of non-final Office Action of May 30, 2008) is inconsistent with the Supreme Court ruling – Applicants maintain, abstracts as claimed have "specific meaning" and yield "useful, concrete, tangible result" – "not a mathematical abstraction" as is being argued in the non-final Office Action [emphasis added] – at "C. Para 6":

> This understanding of transformation is consistent with
> our earlier decision in *Arrhythmia*, 958 F.2d 1053, 22

BLU000996

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

USPQ2d 1033 (Fed. Cir. 1992). *Arrhythmia's* process claims included various mathematical formulae to analyze electrocardiograph signals to determine a specified heart activity. See *id.* at 1059, 22 USPQ2d at 1037. The *Arrhythmia* court reasoned that the method claims qualified as statutory subject matter by noting that the steps transformed physical, electrical signals from one form into another form – a number representing a signal related to the patient's heart activity, a non-abstract output. See *id.*, 22 USPQ2d at 1038. **The finding that the claimed process "transformed" data from one "form" to another simply confirmed that Arrhythmia's method claims satisfied Section 101 because the mathematical algorithm included within the process was applied to produce a number which had specific meaning – a useful, concrete, tangible result – not a mathematical abstraction.** See *id.* at 1060, 22 USPQ2d at 1039.

Respectfully, Applicants traverse the additional assertion by the Office at "8" (*please see* non-final Office Action at Page 4 dated May 30, 2008). Determining "distribution status" is "… being conveyed to someone or something for making its usefulness immediately apparent to those familiar with the technological field of the invention" – significantly, the public, including users who are unsure of the status of a given signal that may be possessed or part of user-generated content, as well as those who own rights, be it copyright, trademark, trade secret, confidential, sensitive data, or similar rights – clearly beneficial to an information economy. Applicants maintain it is not the Office standard that the claim be read in the abstract (pardon the unintended pun) but in view of the Specification including any originally filed claims. A person having ordinary skill in the art understands "distribution status" &/or any associated terms or conditions associated with said status. In fact, abstracts as claimed herein are useful in application of Copyright Law and Fair Use amongst other monitoring and analysis as described in the Specification and understood by one possessing ordinary skill in the art. The Specification too includes several sample embodiments.

Last, Applicants respectfully point to MPEP 2106 II:

It is essential that patent applicants obtain a prompt yet complete examination of their applications. Under the principles of compact prosecution, each claim should be reviewed for compliance with every statutory requirement for patentability in the initial review of the application, even if one or more claims are found to be deficient with respect to some statutory requirement. Thus, USPTO personnel should state all reasons and bases for rejecting claims in the first Office action. Deficiencies should be explained clearly, particularly when they serve as a basis for a rejection. Whenever practicable, USPTO personnel should indicate how rejections may be overcome and how problems may be resolved. A failure to follow this approach can lead to unnecessary delays in the prosecution of the application.

BLU000997

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

Prior to focusing on specific statutory requirements, USPTO personnel must begin examination by determining what, precisely, the applicant has invented and is seeking to patent, and how the claims relate to and define that invention. (As the courts have repeatedly reminded the USPTO: 'The goal is to answer the question 'What did applicants invent?" *In re Abele*, 684 F.2d 902, 907, 214 USPQ 682, 687 (CCPA 1982). Accord, e.g., *Arrhythmia Research Tech. v. Corazonix Corp.*, 958 F.2d 1053, 1059, 22 USPQ2d 1033, 1038 (Fed. Cir. 1992).) USPTO personnel will review the complete specification, including the detailed description of the invention, any specific embodiments that have been disclosed, the claims and any specific, substantial, and credible utilities that have been asserted for the invention.

...

## A.   Identify and Understand Any Utility and/or Practical Application Asserted for the Invention

The claimed invention as a whole must be useful and accomplish a practical application. That is, it must produce a 'useful, concrete and tangible result.' **>*State Street Bank & Trust Co. v. Signature Financial Group Inc.*, 149 F.3d 1368, 1373-74, 47 USPQ2d 1596, 1601-02 (Fed. Cir. 1998).< The purpose of this requirement is to limit patent protection to inventions that possess a certain level of 'real world' value, as opposed to subject matter that represents nothing more than an idea or concept, or is simply a starting point for future investigation or research (*Brenner v. Manson*, 383 U.S. 519, 528-36, 148 USPQ 689, 693-96 (1966); *In re Fisher*, 421 F.3d 1365, 76 USPQ2d 1225 (Fed. Cir. 2005); *In re Ziegler*, 992 F.2d 1197, 1200-03, 26 USPQ2d 1600, 1603-06 (Fed. Cir. 1993)).

USPTO personnel should review the application to identify any asserted use. The applicant is in the best position to explain why an invention is believed useful. Accordingly, a complete disclosure should contain some indication of the practical application for the claimed invention, i.e., why the applicant believes the claimed invention is useful. Such a statement will usually explain the purpose of the invention or how the invention may be used (e.g., a compound is believed to be useful in the treatment of a particular disorder). Regardless of the form of statement of utility, it must enable one ordinarily skilled in the art to understand why the applicant believes the claimed invention is useful. See MPEP § 2107 for utility examination guidelines. An applicant may assert more than one utility and practical application, but only one is necessary.

6

BLU000998

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

**B.   Review the Detailed Disclosure and Specific Embodiments of the Invention To Understand What the Applicant Has Invented**

The written description will provide the clearest explanation of the applicant's invention, by exemplifying the invention, explaining how it relates to the prior art and explaining the relative significance of various features of the invention. Accordingly, USPTO personnel should continue their evaluation by

(A) determining the function of the invention, that is, what the invention does when used as disclosed (e.g., the functionality of the programmed computer) (Arrhythmia, 958 F.2d at 1057, 22 *>USPQ2d< at 1036, "It is of course true that a modern digital computer manipulates data, usually in binary form, by performing mathematical operations, such as addition, subtraction, multiplication, division, or bit shifting, on the data. But this is only how the computer does what it does. Of importance is the significance of the data and their manipulation in the real world, i.e., what the computer is doing."); and

(B) determining the features necessary to accomplish at least one asserted practical application.

More particularly, MPEP § 2106D states:

USPTO personnel should review the totality of the evidence (e.g., the specification, claims, relevant prior art) before reaching a conclusion with regard to whether the claimed invention sets forth patent eligible subject matter. USPTO personnel must weigh the determinations made above to reach a conclusion as to whether it is more likely than not that the claimed invention as a whole either falls outside of one of the enumerated statutory classes or within one of the exceptions to statutory subject matter. 'The examiner bears the initial burden ... of presenting a *prima facie* case of unpatentability.' *In re Oetiker*, 977 F.2d 1443, 1445, 24 USPQ2d 1443, 1444 (Fed. Cir. 1992). If the record as a whole suggests that it is more likely than not that the claimed invention would be considered a practical application of an abstract idea, natural phenomenon, or law of nature, then USPTO personnel should not reject the claim.

After USPTO personnel identify and explain in the record the reasons why a claim is for an abstract idea with no practical application, then the burden shifts to the applicant to either amend the claim or make a showing of why the claim is eligible for patent protection. See, e.g., *In re Brana*, 51 F.3d 1560, 1566, 34 USPQ2d 1436, 1441

7

BLU000999

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

(Fed. Cir. 1995).

BLU0001000

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## Amendment to the Claims

### In the Claims:

Claims 1 – 20 & 25 were previously canceled without prejudice or disclaimer. Applicants reserve the right to pursue the subject matter of the original claims in this application and in other applications. This listing of claims will replace all prior versions, and listings, of claims in the application:

### Claims:

Claims 1 – 20 & 25 (canceled without prejudice or disclaimer)

21. (previously presented) An electronic system for monitoring and analyzing at least one signal, comprising:

a first input that receives at least one reference signal to be monitored,

a first processor that creates an abstract of each reference signal input to said first processor through said first input;

a second input that receives at least one query signal to be analyzed,

a second processor that creates an abstract of each query signal;

a reference database that stores abstracts of each at least one reference signal;

a comparing device that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts.

22. (original) The system of claim 21, wherein said second input is remotely coupled to the system.

23. (original)  The system of claim 21, wherein said second processor is remotely coupled to the system.

24. (original)  The system of claim 21, wherein the system transmits the criteria that are being used by the first processor to the second processor.

BLU001001

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

25. (canceled)

26. (previously presented) The system of claim 21, wherein the stored abstracts comprise a self-similar representation of at least one reference signal.

27. (previously presented) The system of claim 21, wherein at least two of the stored abstracts comprise information corresponding to two versions of at least one reference signal.

28. (previously presented) The system of claim 21, wherein the stored abstracts comprise data describing a portion of the characteristics of its associated reference signal.

29. (previously presented) The system of claim 28, wherein the characteristics of the reference signal being described comprise at least one of a perceptible characteristic, a cognitive characteristic, a subjective characteristic, a perceptual quality, a recognizable characteristic or combinations thereof.

30. (previously presented) The system of claim 21, wherein each stored abstract comprises data unique to each variation of its corresponding reference signal.

31. (previously presented) The system of claim 21, wherein the system applies a cryptographic protocol to the abstract of said reference signal, said query signal, or both said reference signal and said query signal.

32. (previously presented) The system of claim 31, wherein the cryptographic protocol is one of at least a hash or digital signature and further comprising storing the hashed abstract and/or digitally signed abstract.

33. (previously presented) A method for monitoring the distribution of data signals, comprising:

    creating an abstract for a data signal, the data signal having an unknown distribution status;

·10

**BLU001002**

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

comparing the created data signal abstract to at least one database of data signal abstracts, each abstract in the at least one database corresponding to a data signal having a known distribution status; and

determining the distribution status for the created data signal abstract based on the comparison.

34. (previously presented) The method of claim 33, wherein the database is created by at least one of a music company, a movie studio, an image archive, an owner of a general computing device, a user of the data signal, an internet service provider, an information technology company, a body politic, a telecommunications company and combinations thereof.

35. (previously presented) The method of claim 33, wherein the data signals comprise at least one of images, audio, video, and combinations thereof.

36. (previously presented) The method of claim 33, wherein the stored data signal abstracts are derived from one of a cognitive feature or a perceptible characteristic of the associated data signals.

37. (previously presented) The method of claim 33, furthering comprising applying a cryptographic protocol to at least one created signal abstract, at least one database signal abstract or both at least one created signal abstract and at least one database signal abstract.

38. (previously presented) The method of claim 37, wherein the cryptographic protocol comprises one of a hash or digital signature.

39. (previously presented) The method of claim 33, wherein the stored signal abstracts comprise data to differentiate versions of the corresponding data signals.

40. (previously presented) The method of claim 33, wherein each of the stored data signal abstracts comprise information configured to differentiate variations of each referenced

11

BLU001003

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

corresponding data signal.

41. (previously presented) The method of claim 33, further comprising storing information associated with the comparison step to enable at least one of a re-calibration of the database, a heuristic-based adjustment of the database, a computational efficiency adjustment of the database, an adjustment for database collisions and/or null cases, changes to the recognition or use parameters governing the database and combinations thereof.

42. (previously presented) The method of claim 33, further comprising applying one of a relatedness index or measure of similarity to generate uniquely identifiable information to determine distribution status.

43. (previously presented) A system for identifying and distributing signals, comprising:

a first input that receives a query abstract of a signal to identify;

a database containing a plurality of signal abstracts, the plurality of signal abstracts each associated with a corresponding signal;

a comparing device that compares the query abstract to the plurality of abstracts stored in the reference database to identify a matching signal abstract; and

a device for retrieving the signal corresponding to the matching signal abstract; and

a device for conducting a transaction, the transaction selected from the group consisting of a download and a subscription.

44. (previously presented) The system of claim 43, wherein each signal abstract comprises a link to its corresponding signal.

45. (previously presented) The system of claim 43, wherein the comparing device determines if the signal abstracts stored in the database are authorized.

46. (previously presented) The system of claim 43, wherein the comparing device determines if the link is an authorized link.

12

BLU001004

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

47. (previously presented) The system of claim 43, wherein the reference database is governed by heuristics or experience-based parameters.

48. (previously presented) The system of claim 43, wherein the plurality of abstracts stored in the reference database are derived from one of data reduced versions of said corresponding signals, compressed variations of said corresponding signals, bit-addressable relationships between said corresponding signals, and a least amount of data required to uniquely identify each corresponding signal, and combinations thereof.

49. (previously presented) The system of claim 43, wherein the device for conducting transactions or the device for retrieving the signal is remotely coupled to the system.

50. (previously presented) The system of claim 43, wherein the device for conducting transactions or the device for retrieving the signal is controlled by the database.

51. (previously presented) The system of claim 43, wherein the device for retrieving the signal and the device for conducting transactions comprise the same device.

52. (previously presented) The system of claim 43, further comprising an embedder to watermark signals with uniquely identifiable information.

53. (previously presented) The system of claim 21, further comprising an embedder to embed uniquely identifiable data into at least one of the received reference signal, the received query signal or both the received reference signal and the received query signal.

54. (previously presented) The method of claim 33, further comprising encoding information into the data signal with a watermarking technique.

BLU001005

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## REMARKS/ARGUMENTS

Applicants thank Primary Examiner Tsai for the telephonic interview, which took place on or about August 25, 2008. During the interview with Primary Examiner Tsai Claims 21 - 67 and the asserted references were discussed. As per the Interview Summary, dated September 9, 2008 (Paper No. 20080903), "The Examiner will arrange an interview to discuss the case with Mr. Moskowitz after the Examiner take a more detailed look at application, cited reference, and arguments". Applicants have taken steps to expedite the prosecution of this application and place it in condition for allowance. If the Office believes that prosecution might be furthered by discussing the application with the Applicants, in person or by telephone, we would welcome the opportunity to do so as agreed in the Interview Summary.

As briefly discussed, there are particular inconsistencies with regards to the 35 U.S.C. § 101 rejections, outlined above. Further, the Logan reference, as agreed in the prosecution of the parent application (Appln No. 09/657,181, now U.S. Patent No. 7,346,472), Logan does not anticipate or suggest (i.e., a 102(e) rejection has been asserted in the instant case) an abstract as claimed. Applicants maintain the brief summary of the arguments as presented in the parent application:

> 1) The reference cited in the 102 rejections (namely, U.S. Patent No. 6,088,455 issued to Logan et al.) do not disclose or anticipate Claims 1, 6, 8, 12, 13, 18, 19 and 21-23, for at least the reason that Logan fails to disclose the step of creating an abstract of said at least one reference signal. Logan allegedly discloses additive information, the "informational signal", having no relationship with the perceptual nature of the reference signal. The present invention[s] is not so limited. Logan fails to teach or anticipate, providing instead a means for editing known data: "... modifying a broadcast programming signal to generate a proprietary program signal that can be more suited to the individual users tastes and preferences... [to] identify known segments of the broadcast programming signal" (Logan at Col. 5 ll. 63-67). Logan thus apparently modifies a "known segment" of a radio broadcast to generate proprietary programming based on combining other "known segments" (see Col. 1 ll. 7-11; Col. 2 ll. 10-17; and, FIG. 2 "I.P.I Attributes"). It would be internally inconsistent for Logan to create an abstract for a reference signal for later comparison with an abstract from a query signal, required by the claim elements, as Logan teaches selection of *known segments* of a given broadcast to edit the material to suit a particular taste. Applicants respectfully submit that none of the references disclose or anticipate the elements of the claims; thus, the rejections based on anticipation must be respectfully withdrawn.

Logan fails to anticipate or suggest analysis of a signal – let alone creating an abstract for said analysis and monitoring. Last, the references appear directed at audio signals and may not be analogous art under MPEP § 2141.01 for application to other

14

BLU001006

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

signal types or data in more than one dimension. Additionally, Applicants have requested clarification on several points in the interests of compact prosecution. More on this will be presented below.

*Please see* MPEP § 904.01 "The breadth of the claims in the application should always be carefully noted; that is, the examiner should be fully aware of what the claims do not call for, as well as what they do require. During patent examination, the claims are given the broadest reasonable interpretation consistent with the specification. See *In re Morris*, 127 F.3d 1048, 44 USPQ2d 1023 (Fed. Cir. 1997). "

*Please see* MPEP § 2173.01  "A fundamental principle contained in 35 U.S.C. 112, second paragraph is that applicants are their own lexicographers. They can define in the claims what they regard as their invention essentially in whatever terms they choose so long as **>any special meaning assigned to a term is clearly set forth in the specification. *See* MPEP § 2111.01.< Applicant may use functional language, alternative expressions, negative limitations, or any style of expression or format of claim which makes clear the boundaries of the subject matter for which protection is sought. As noted by the court in *In re Swinehart*, 439 F.2d 210, 160 USPQ 226 (CCPA 1971), a claim may not be rejected solely because of the type of language used to define the subject matter for which patent protection is sought."

*Please see* MPEP 707.07(j) "When, during the examination of a *pro se* application it becomes apparent to the examiner that there is patentable subject matter disclosed in the application, the examiner should draft one or more claims for the applicant and indicate in his or her action that claims would be allowed if incorporated in the application by amendment." Applicants are proceeding *pro se* and request clarification on how the cited claims can be rewritten should the term "distribution status", discussed during the August 25, 2008 Interview, continue to be objectionable.

BLU001007

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## Rejections under 35 U.S.C. § 102

### 1) § 102(e) Rejections based on U.S. Patent No. 6,088,455 ("Logan")

Claims 22-24, 26-40, 43-46, 48-52 and 54 stand rejected as allegedly anticipated or suggested (i.e., 102(e)) by U.S. Patent No. 6,088,455 by Logan et al. (thereafter "Logan"). Please see Page 5 of May 30, 2008 non-final Office Action. Please note that Claim 21 is not cited in "10" but is cited in "11" – clarification is thus respectfully sought on this point.

### Claims 22 - 24, 26 - 40, 43 - 46, 48 - 52 and 54

In order for a reference to anticipate a claim, the reference must disclose each and every feature of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation. *See Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 USPQ2d 1943, 1947 (Fed. Cir. 1999); *In re Paulsen*, 30 F.3d 1475, 1479, 31 USPQ2d 1671, 1673 (Fed. Cir. 1994). "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros. v. Union Oil Co. of California*, 814 F.2d 628, 631, 2 USPQ2d 1051, 1053 (Fed. Cir. 1987). Independent Claim 21 recites: "An electronic system for monitoring and analyzing at least one signal, comprising: (1) a first input that receives at least one reference signal to be monitored, (2) a first processor that creates an abstract of each reference signal input to said first processor through said first input; (3) a second input that receives at least one query signal to be analyzed, (4) a second processor that creates an abstract of each query signal; (5) a reference database that stores abstracts of each at least one reference signal; (6) a comparing device that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts." The Section 102 rejection for Independent Claim 21 (and all claims depending therefrom) is improper for at least the reason that Logan fails to disclose or suggest at least "a first processor that creates an abstract of each reference signal input to said first processor through said first input". Logically speaking, Logan cannot anticipate or suggest, "a second processor that creates an abstract of each query signal". This claim element, namely, the second input and the abstract created therefrom provides significant and pioneering benefits over the Logan reference and the art as will be explained further below. For at least these reasons, Applicants respectfully request the 102 rejections be withdrawn.

The non-final Office Action states [emphasis added]: "a first input (compression buffer **(not shown)**) that receives at least one reference signal (identification signal **(not shown)**) to be monitored (see col. 2, lines 51-53 and col. 6 lines 24-27), a first processor (data processor 28 shown on Fig. 1) that creates an abstract of each reference signal input to said first processor through said first input (see col. 7, lines 30-43) ... that receives at least one query signal (broadcast signal **(not shown)**)" (*please see* Page 5 & 6). Applicants respectfully traverse and point out that the Office Action has failed to present a prima facie case of anticipation or suggestion (i.e., 102(e)) by failing to point out all of the elements of Claim 21. In the interests of compact prosecution (MPEP § 707.07(g)), it is respectfully pointed out that according to C.F.R. § 1.104(c)(2): "In rejecting claims for want of novelty or for obviousness, the examiner must cite the best references at his or her command. When a reference is complex or shows or describes inventions other than that claimed by the applicant, the particular part relied on must be

**BLU001008**

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

designated as nearly as practicable. The pertinence of each reference, if not apparent, must be clearly explained and each rejected claim specified." Significantly, Logan unnecessarily exposes original data. Logan teaches away from the pending claims the following non-limiting example is cited here for convenience but not to limit the scope of the pending claims (Specification at Para [0040] – [0041]):

> As a general improvement over the art, the present invention incorporates what could best be described as "computer-acoustic" and "computer-visual" modeling, where the signal abstracts are created using data reduction techniques to determine the smallest amount of data, at least a single bit, which can represent and differentiate two digitized signal representations for a given predefined signal set. Each of such representations must have at least a one bit difference with all other members of the database to differentiate each such representation from the others in the database. The predefined signal set is the object being analyzed. The signal identifier/detector should receive its parameters from a database engine. The engine will identify those characteristics (for example, the differences) that can be used to distinguish one digital signal from all other digital signals that are stored in its collection. For those digital signals or objects which are seemingly identical, excepting that the signal may have different performance or utilization in the newly created object, benefits over additive or text-based identifiers are achieved. Additionally, decisions regarding the success or failure of an accurate detection of any given object may be flexibly implemented or changed to reflect market-based demands of the engine. Appropriate examples are songs or works or art which have been sampled or re-produced by others who are not the original creator.

> In some cases, the engine will also consider the NULL case for a generalized item not in its database, or perhaps in situations where data objects may have collisions. For some applications, the NULL case is not necessary, thus making the whole system faster. For instance, databases which have fewer repetitions of objects or those systems which are intended to recognize signals with time constraints or capture all data objects. Greater efficiency in processing a relational database can be obtained because the rules for comparison are selected for the maximum efficiency of the processing hardware and/or software, whether or not the processing is based on psychoacoustic or psychovisual models. The benefits of massive data reduction, flexibility in constructing appropriate signal recognition protocols and incorporation of cryptographic techniques to further add

17

BLU001009

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

> accuracy and confidence in the system are clearly
> improvements over the art. For example, where the data
> reduced abstract needs to have further uniqueness, a
> hash or signature may be required.   And for objects
> which have further uniqueness requirements, two
> identical instances of the object could be made unique
> with cryptographic techniques.

Second, Logan cannot anticipate or suggest "abstracts", let alone a second input for query signals, as Logan's "comparator" expressly requires: 1) "identification signal"; 2) "attribute signal"; & 3) "known segment of the broadcast programming signal". Abstracts as claimed do not cause original data to be exposed unnecessarily. Detail is provided by Logan and supports the contention that Logan expressly teaches away from the subject matter of the pending claims. Logan, at Col. 8 ll. 35 – Col. 9 ll. 26, states [emphasis added]:

> The identification signal memory 64 can store for any one
> of the segments, an identification signal that has
> information suitable for identifying the occurrence of that
> known segment within the data signal provided by the
> receiver element 12. **Accordingly, the comparator 50
> searches the data signal representative of the
> broadcast programming signal for the occurrence of
> one or more of those known segments by identifying
> an identification signal stored within the
> identification signal memory 64 and representative of
> the known segment.**

> As depicted in FIG. 2, the correlator element 62 connects
> between the buffer processor 60 and the identification
> signal memory 64. The controller 48 will direct the
> compression buffer 42 to download a portion of the data
> signal stored in a compressed format within the memory
> 46 to the buffer processor 60. **The correlator 62 can
> then process the portion of the data signal within the
> buffer. Processor 60 can correlate that downloaded
> portion with one or more of the identification signals
> stored within the identification signal memory 64. If
> the correlator 62 determines no match to exist
> between that portion of the data signal and any one
> of the identification signals within the memory 64,
> the comparator 50, via the depicted bi-directional
> transmission path, informs the controller 48 and the
> controller 48 directs the compression buffer 42 to
> download another segment of the data signal.**

> The comparator 50 depicted in FIG. 2 can employ any
> correlation device or technique for processing an
> identification signal to detect the occurrence of a known
> segment of a data signal. In one embodiment, the
> comparator 50 includes a correlator 62 of the type

18

BLU001010

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

disclosed in U.S. Pat. No. 4,843,562 issued to Kenyon et al., the teachings of which are incorporated herein by reference. The comparator 50 can be an electrical circuit card assembly or a software module executing on the data processor 16. In the embodiment depicted in FIG. 2, **the comparator 50 includes an identification signal memory 64 that has identification signals and attribute signals associated with the program segment identified by the respective identification signal.**

In one embodiment, the attribute signal is representative of the length of the segment being identified. More particularly, the attribute signal provides a preceding signal length and a succeeding signal length, each of which respectively describes the period of time that the known segment runs respective to the portion of the segment that is associated with the identification signal. Consequently, the correlator 62, upon detecting a match between the data signal in the buffer processor 60 and one of the identification signals, can delimit a beginning and end for the segment associated with the respective identification signal. For example, an identification signal within memory 64 can include an attribute signal that identifies the length of time that the program segment runs before the occurrence of the identifying portion and similarly the length of time that the program segment continues for after the occurrence of the identifying portion. The buffer processor 60 can include a computer program that can employ these attribute signals to generate a mark signal that delimits the beginning and end of the program segment to mark one segment of the broadcast programming signal.

Third, Applicants respectfully seek clarification as Logan's 1) "identification signal"; 2) "attribute signal"; & 3) "known segment of the broadcast programming signal" *are* not a compact representation derived from a signal let alone the reference signal and/or query signal abstract[s] of the claims. Signal abstracts retain a perceptual relationship with the signal from which it was created or derived. Like one way functions that are robust for identifying and analyzing signal (e.g., robust hashes) while minimizing exposure of original data to limit subsequent tampering or misuse, Logan teaches away, instead, disclosing: "[t]he invention will be understood in one aspect as systems for editing a radio broadcast signal so as to make it more suited to an individual audience member's tastes" (Col. 2 ll. 24-27). That the broadcast is "known" it logically follows that Logan cannot anticipate or suggest abstracts as claimed herein, especially that Logan requires at least three ("3") datum, *including the original known data*.

Independent Claim 33 includes the following element absent in Logan and the art "creating an abstract for a data signal, the data signal having an unknown distribution status". Because Logan is apparently teaching edits of *known signals in broadcasts*, there cannot be an "unknown distribution status." There would be no need, Logan expressly teaches away addressing instead signals that have "known" distribution status,

19

**BLU001011**

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

namely, radio broadcast. Indeed, at least one benefit over Logan is that a previously received known radio broadcast segment may have been stripped of its associated "identification signal," a user can use the signal alone and its associated abstract for "comparing the created data signal abstract to at least one database of data signal abstracts, each abstract in the at least one database corresponding to a data signal having a known distribution status; and determining the distribution status for the created data signal abstract based on the comparison." None of these elements are anticipated or suggested by Logan or the cited references.

Independent Claim 43 recites the following feature absent in Logan and the art "a first input that receives a query abstract of a signal to identify." Again, Logan discloses "a device according to the invention for modifying a broadcast programming signal to generate a proprietary program signal that can be more suited to the individual users tastes and preferences" (Logan at Col. 5 ll. 64 - 67).

Simply, unlike the claims as stated herein, Logan cannot anticipate or suggest abstracts as understood by one possessing ordinary skill in the art. Under Logan it is expressly disclosed that the signal is "known" and thus Logan as argued by the Office cannot be used to make a *prima facie* case for anticipation or suggestion, at Col. 13 ll. 30 – 58: [emphasis added]:

> In an optional embodiment of the invention, **the systems include a playback controller, as described above, that further includes a system for providing identification information for selected segments of the broadcast programming signal.** For example, the system could identify attributes for particular segments, such as the title of the segment, the artist performing the segment, one or more albums that have a recording of this segment, and other such information.
>
> In one embodiment, the system can employ the identification signals stored in the identification memory 64. **Each identification signal can include a set of attributes which provides information useful to the user to identify the program segment associated with the respective identification signal. Upon identification of a program segment, the system can provide, for example, by displaying on a video screen of data processor 16, the user with attribute information that identifies the program segment.**
>
> In an alternative embodiment of the invention, **the system can access a remote site having access to a large database of identification signals and associated attributes.** At this remote site, a portion of the broadcast sent by the system can be compared to the identification signals that are stored within the database to identify a known segment of the broadcast. Upon identification of one or more program segments, the attribute signals associated with these program segments can be transferred to the

20

BLU001012

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

> user's system to provide the user with information that is descriptive of the identity of the respective program segments.

### Cryptographic Protocol

The Office states at "19" on Page 7 of the non-final Office Action: "It is, however, considered inherent that Logan et al. includes a cryptographic protocol to the abstract of said references signal, said query signal, or both said reference and said query signal (see col. 9, lines 49-60), because such element is known to be necessary in order that cryptographic information can be used when the video signal component is encrypted." Applicants respectfully traverse this assertion. Applicants too seek clarification on both the Office's position that cryptographic protocol is "inherent" in Logan either by affidavit or similar support such as Official Notice. As well, Applicants are unclear how the cited section – Col. 9 ll 49 - 60, or the Logan reference in general, is being interpreted in view of the claims. Namely, the claims disclose cryptographic functions to enhance uniqueness and identification -- Logan expressly discloses encrypting signals. Encrypted signals *inherently* appear as random data (*Please note*, Logan discloses only audio material) that is computationally infeasible to analyze or monitor as understood by one possessing ordinary skill in the art.

### Watermarking

The Office states at "27" on Page 8 of the non-final Office Action: "Logan et al. also disclose an embedder to watermark signals with uniquely identifiable information (see col. 9, lines 47-60)". Applicants traverse the assertion that Logan anticipates or suggests watermarking. It is unclear what is meant by the Office's reliance on the disclosed "[u]pon marking a known segment" as applied to the instant claims. Thus, Applicants respectfully seek clarification as the cited section in Logan does not disclose, anticipate, or suggest steganography, watermarking or data hiding, let alone the claim element "embedder" &/or "watermarking technique" of claims 52 – 54.

### Summary

Because Logan does not disclose, anticipate or suggest: (1) a first processor that creates an abstract of each reference signal input to said first processor through said first input; (2) a second processor that creates an abstract of each query signal; & (3) a comparing device that compares an abstract of said at least one query signal to the abstracts stored in the reference database to determine if the abstract of said at least one query signal matches any of the stored abstracts, Logan cannot be considered prior art. Similarly, Independent Claim 33 includes the following element absent in Logan and the art "creating an abstract for a data signal, the data signal having an unknown distribution status." Independent Claim 43 recites the following feature absent in Logan and the art "a first input that receives a query abstract of a signal to identify." In view of the above comments, it is respectfully submitted that the cited reference does not anticipate or suggest the claims. Thus, the Applicant respectfully requests the Section 102 rejections be withdrawn for Independent Claims 21, 33 & 43 (and all claims depending therefrom). The claims that depend therefrom, namely, Claims 22 - 24, 26 – 40, 44 – 46, 48 – 52, & 54 are also allowable. The Applicants' silence as to the Examiner's comments is not indicative of acquiescence to the stated grounds of rejection.

21

BLU001013

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## Rejections under 35 U.S.C. § 103

In order to "establish a prima facie case of obviousness" MPEP § 706.02(j):

> [T]he examiner should set forth in the Office action:
>
> (A) the relevant teachings of the prior art relied upon, preferably with reference to the relevant column or page number(s) and line number(s) where appropriate,
> (B) the difference or differences in the claim over the applied reference(s),
> (C) the proposed modification of the applied reference(s) necessary to arrive at the claimed subject matter, and
> (D) an explanation >as to< why >the claimed invention would have been obvious to< one of ordinary skill in the art at the time the invention was made**.
>
> **
>
> "To support the conclusion that the claimed invention is directed to obvious subject matter, either the references must expressly or impliedly suggest the claimed invention or the examiner must present a convincing line of reasoning as to why the artisan would have found the claimed invention to have been obvious in light of the teachings of the references." *Ex parte Clapp*, 227 USPQ 972, 973 (Bd. Pat. App. & Inter. 1985). **
>
> Where a reference is relied on to support a rejection, whether or not in a minor capacity, that reference should be positively included in the statement of the rejection. See *In re Hoch*, 428 F.2d 1341, 1342 n.3 166 USPQ 406, 407 n. 3 (CCPA 1970).
>
> It is important for an examiner to properly communicate the basis for a rejection so that the issues can be identified early and the applicant can be given fair opportunity to reply. Furthermore, if an initially rejected application issues as a patent, the rationale behind an earlier rejection may be important in interpreting the scope of the patent claims. Since issued patents are presumed valid (35 U.S.C. 282) and constitute a property right (35 U.S.C. 261), the written record must be clear as to the basis for the grant. Since patent examiners cannot normally be compelled to testify in legal proceedings regarding their mental processes (see MPEP § 1701.01), it is important that the written record clearly explain the rationale for decisions made during prosecution of the application. Next, "First, there must be some suggestion or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to

22

BLU001014

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

> combine reference teachings. Second, there must be a reasonable expectation of success. Finally, the prior art reference (or references when combined) must teach or suggest all the claim limitations. The teaching or suggestion to make the claimed combination and the reasonable expectation of success must both be found in the prior art and not based on applicant's disclosure. *In re Vaeck,* 947 F.2d 488, 20 USPQ2d 1438 (Fed. Cir. 1991).

Applicants submit that the Office Action has failed to establish a *prima facie* case of obviousness to the extent that the citations do not teach or suggest all of the claim elements. The arguments in connection with Logan as discussed in the Interview on or about August 25, 2008, are cited above. The Ogawa et al. reference (US Publication No. 2001/0043594, hereinafter "Ogawa") and Kenyon reference (U.S. Patent No. 5,210,820, hereinafter "Kenyon") will be further addressed below.

Second, there is no motivation or suggestion to make the proposed combinations of the citations as directed by the Office. More particularly, there is no motivation to combine Logan with Ogawa or Logan with Kenyon. The Federal Circuit has emphasized the importance of providing evidence of motivation to combine in *Winner Int'l Royalty Corp. v. Ching-Rong Wang,* 202 F. 3d 1340, 1348-49 (Fed. Cir. Jan. 27, 2000). "Although a reference need not expressly teach that the disclosure contained therein should be combined with another . . . the showing of combinability, in whatever form, must nevertheless be 'clear and particular.'" *Winner,* 202 F. 3d at 1348-49 (citations omitted). Further, the "absence of such a suggestion to combine is dispositive in an obviousness determination." *Gambro Lundia AB v. Baxter Healthcare Corp.,* 11 F.3d 1573, 1579 (Fed. Cir. 1997).

Instead, it appears that the Office Action identifies citations without reference to the elements of the claims, and has combined them. Even assuming *arguendo* that the references contained all elements of the claimed invention, it is still impermissible to reject a claim that would *allegedly* have been obvious simply "by locating references which describe various aspects of a patent applicant's invention without also providing evidence of the motivating force which would impel one skilled in the art to do what the patent applicant has done." *Ex parte Levengood,* 28 USPQ2d 1300, 1303 (Bd. Pat. App. & Inter. 1993) [emphasis added]. Applicants submit that the Office has not satisfied the initial burden "to provide some suggestion of the desirability of doing what the inventor has done", *please see* further MPEP § 2141III.

> Although the Supreme Court in *KSR* cautioned against an overly rigid application of TSM, it also recognized that TSM was one of a number of valid rationales that could be used to determine obviousness. (According to the Supreme Court, establishment of the TSM approach to the question of obviousness "captured a helpful insight." 550 U.S. at ___, 82 USPQ2d at 1396 (citing *In re Bergel,* 292 F.2d 955, 956-57, 130 USPQ 206, 207-208 (1961)). Furthermore, the Court explained that "[t]here is no necessary inconsistency between the idea underlying the TSM test and the *Graham* analysis." 550 U.S. at ___, 82 USPQ2d at 1396.

23

BLU001015

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

    Last, *for argument's sake*, even if the claim elements did teach or suggest all of the claim elements there is no reasonable expectation of success in combining the citations as suggested by the Office Action. The suggested combination[s] are not a "predictable use of prior art elements according to their established functions" (*KSR* Opinion at Page 13). For at least these reasons, Applicants respectfully request the Section 103 rejections of Claims 41, 42, 47, & 53 be withdrawn. Additional discussion will be presented below.

BLU001016

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

**1. a) 35 USC § 103(a) Rejections based on U.S. Patent No. 6,088,455 Logan et al. ("Logan") in view of U.S. Publication 2001/0043594 by Ogawa et al. ("Ogawa") as applied to Claims 41 and 47**

Claims 41 & 47 have been rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Logan in view of Ogawa. Applicants respectfully traverse. The references do not disclose or suggest an "abstract" as claimed. In fact, Logan expressly states "[s]ystems and methods for editing broadcast programming signals which allow a user to compile a proprietary signal tailored to the user's individual preferences are provided" (Logan at Abstract). Without conceding the propriety of the asserted combination, Applicants submit that the asserted combination does not disclose at least the following feature of Independent Claim 33 (from which Claim 41 depends), among other features, "creating an abstract for a data signal, the data signal having an unknown distribution status", for at least the following reasons, Logan apparently teaches edits of a known broadcast segment. Similar to Claim 33, pending Independent Claim 43 (from which Claim 47 depends) recites, "a comparing device that compares the query abstract to the plurality of abstracts stored in the reference database to identify a matching signal abstract".

Ogawa is cited for its alleged disclosure of various features of Claim 41 and Claim 47. Applicants respectfully submit that Ogawa does not add anything to Logan that would remedy the deficiencies cited above. Ogawa allegedly teaches (Ogawa at Abstract): "[a] code for uniquely identifying, for example, a telephone terminal and a computer terminal may be formed with the codes corresponding to operators of a telephone terminal". Ogawa's "code" is *not* the "information associated with the comparison step" as contended in the Office Action. In fact, Ogawa teaches away from the claim[s] by disclosing "using codes corresponding to an operator of a telephone terminal" (Ogawa at [0002]) for the purpose of "... making access to the information network, for example, from telephone terminals" (Ogawa at [0009]) – not the analysis or monitoring of the information *itself*.

Second, the Office has not presented "clear and particular" evidence of a motivating force. The Office Action appears to identify citations that allegedly disclose elements of the claims. This gives rise to impermissible hindsight, as there is clearly no motivation to combine Logan and Ogawa. Even assuming, *for argument's sake*, there was a motivation to make the proposed combination of Logan and Ogawa, the combination fails to disclose or suggest all of the terms of Independent Claim 33 (and all claims depending therefrom, namely, claim 41) and Independent Claim 43 (and all claims depending therefrom, namely, claim 47). Combining Logan and Ogawa would be improper as Logan's known broadcast segments are not access-restricted terminals. That Ogawa does restrict access to terminals raises the issue that Ogawa may be non-analogous art (*Please see* MPEP § 2141.01). Instead of encouraging broader access to information while monitoring and analyzing the provenance of said information, Ogawa appears directed at a different issue. In fact, the combination of Logan and Ogawa would likely increase the computational complexity of monitoring and analyzing signals with "access restricted terminals" without any established benefit.

Third, there is no reasonable likelihood of success. Applying Ogawa's "access restricted" terminals would logically result in more restrictions of Logan's "known broadcast segments", teaching away from the claims. It is thus respectfully submitted

BLU001017

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

that there is no reasonable likelihood of success in combining these two citations, at least as suggested by the Office.

Last, a review of the Office Action makes clear that in each rejection, Logan and Ogawa are relied upon for those elements that are present in the independent claims as well as the dependent claims. Because the cited citations, either alone or in combination fail to disclose all of the claim elements, the Office has failed to establish a prima facie case for obviousness for <u>all</u> claims that depend from Independent Claims 33 and 43. *See* MPEP § 2143.03: "To establish *prima facie* obviousness of a claimed invention, all the claim limitations must be taught or suggested by the prior art. *In re Royka*, 490 F.2d 981, 180 USPQ 580 (CCPA 1974). "All words in a claim must be considered in judging the patentability of that claim against the prior art." *In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970). For at least this reason, the Office has failed to establish a prima facie case of obviousness for all claims that depend from Claims 33 and 43. *See* MPEP § 2143.03 ("If an independent claim is nonobvious under 35 U.S.C. § 103, then any claim depending therefrom is nonobvious."). Accordingly, for at least these reasons, Applicants respectfully request withdrawal of the Section 103 rejection for Claims 41 and 47.

**b) 35 USC § 103(a) Rejections based on U.S. Patent No. 6,088,455 Logan et al. ("Logan") in view of U.S. Patent No. 5,210,820 to Kenyon ("Kenyon") as applied to Claims 42 and 53**

Claims 42 & 53 have been rejected under 35 U.S.C. § 103(a) as being allegedly unpatentable over Logan in view of Kenyon. Applicants respectfully traverse. The references do not disclose or suggest an "abstract" as claimed. In fact, Logan expressly discloses "[s]ystems and methods for editing broadcast programming signals which allow a user to compile a proprietary signal tailored to the user's individual preferences are provided" (Logan at Abstract). Without conceding the propriety of the asserted combination, Applicants submit that the asserted combination does not disclose at least the following feature of Independent Claim 33 (from which Claim 42 depends), among other features, "creating an abstract for a data signal, the data signal having an unknown distribution status", for at least the following reasons, Logan apparently teaches edits of a known broadcast segment. Similar to Claim 33, pending Independent Claim 43 (from which Claim 53 depends) recites, "a comparing device that compares the query abstract to the plurality of abstracts stored in the reference database to identify a matching signal abstract".

Kenyon is cited for its alleged disclosure of various features of Claim 42 and Claim 53. Applicants respectfully submit that Kenyon does not add anything to Logan that would remedy the deficiencies cited above. Kenyon allegedly teaches (Kenyon at Abstract): "[a] statistical moment". Kenyon's "statistical moment" is *not* the "relatedness index or measure of similarity to generate uniquely identifiable information to determine distribution status" as contended in the Office Action at Page 9 – "33". In fact, Kenyon teaches away from the claim[s] by disclosing "for each song in the list, correlate the corresponding reference pattern with the time warped input waveform S211" (Kenyon at Fig. 18). Unlike abstracts, Kenyon's "statistical moment" is "... *used as an address to access a data base wherein a pointer is stored, the pointer pointing to a further data base location where the target signal's identification code is stored.*" (Kenyon at Column 5 ll. 55 – 60) not the analysis or monitoring of the information itself.

26

**BLU001018**

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

Second, the Office has not presented "clear and particular" evidence of a motivating force. The Office Action appears to identify citations that allegedly disclose elements of the claims. This gives rise to impermissible hindsight, as there is clearly no motivation to combine Logan and Kenyon. Even assuming, *for argument's sake*, there was a motivation to make the proposed combination of Logan and Kenyon, the combination fails to disclose or suggest all of the terms of Independent Claim 33 (and all claims depending therefrom, namely, claim 42) and Independent Claim 43 (and all claims depending therefrom, namely, claim 53). Combining Logan and Kenyon would be improper as Logan's known broadcast segments are not already "identifiable". Logan too requires access to original signal. Again, this teaches away from encouraging broader access to information and differentiating between similar content. In fact, the combination of Logan and Kenyon would likely increase the computational complexity of monitoring and analyzing signals as original signal material is already provided under Logan, Kenyon does not provide any established benefit.

Third, there is no reasonable likelihood of success. Applying Kenyon's "statistical moment" would logically result in apparently exact comparisons as Logan's alleged monitoring and analysis is of "known broadcast segments" – teaching away from the claims. It is thus respectfully submitted that there is no reasonable likelihood of success in combining these two citations, at least as suggested by the Office.

Last, a review of the Office Action makes clear that in each rejection, Logan and Kenyon are relied upon for those elements that are present in the independent claims as well as the dependent claims. Because the cited citations, either alone or in combination, fail to disclose all of the claim elements, the Office has failed to establish a prima facie case for obviousness for all claims that depend from Independent Claims 33 and 43. *See* MPEP § 2143.03: "To establish *prima facie* obviousness of a claimed invention, all the claim limitations must be taught or suggested by the prior art. *In re Royka*, 490 F.2d 981, 180 USPQ 580 (CCPA 1974). "All words in a claim must be considered in judging the patentability of that claim against the prior art." *In re Wilson*, 424 F.2d 1382, 1385, 165 USPQ 494, 496 (CCPA 1970). For at least this reason, the Office has failed to establish a prima facie case of obviousness for all claims that depend from Claims 33 and 43. *See* MPEP § 2143.03 ("If an independent claim is nonobvious under 35 U.S.C. § 103, then any claim depending therefrom is nonobvious."). Accordingly, for at least these reasons, Applicants respectfully request withdrawal of the Section 103 rejection for Claims 42 and 53.

BLU001019

Application No. 12/005,229
Reply to Office Action of May 30, 2008 dated October 30, 2008

## CONCLUSION

Applicants maintain that this application is in condition for allowance, and such disposition is earnestly solicited. Applicants' silence as to the Examiner's comments is not indicative of an acquiescence to the stated grounds of rejection. If the Examiner believes that an interview with the Applicants, either by telephone or in person, would further prosecution of this application, we would welcome the opportunity for such an interview.

It is believed that no other fees are required to ensure entry and consideration of this response.

Respectfully submitted,

Date:  October 30, 2008

By: _____
Scott A. Moskowitz
Tel (305) 956-9041
Fax (305) 956-9042

For Blue Spike, Inc.

By: _____
Scott A. Moskowitz
President

28

**BLU001020**

PTO/SB/21 (09-08)
Approved for use through 10/31/2008, OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| | |
|---|---|
| | **Application Number** 12/005,229 |
| **TRANSMITTAL FORM** | **Filing Date** December 26, 2007 |
| | **First Named Inventor** Scott A. MOSKOWITZ |
| | **Art Unit** 2857 |
| | **Examiner Name** Carol S.W. TSAI |
| *(to be used for all correspondence after initial filing)* | |
| Total Number of Pages in This Submission | **Attorney Docket Number** 066112.0132CONT |

## ENCLOSURES   *(Check all that apply)*

| | | |
|---|---|---|
| ☑ Fee Transmittal Form | ☐ Drawing(s) | ☐ After Allowance Communication to TC |
| ☑ Fee Attached | ☐ Licensing-related Papers | ☐ Appeal Communication to Board of Appeals and Interferences |
| ☑ Amendment/Reply | ☐ Petition | ☐ Appeal Communication to TC (Appeal Notice, Brief, Reply Brief) |
| ☐ After Final | ☐ Petition to Convert to a Provisional Application | ☐ Proprietary Information |
| ☐ Affidavits/declaration(s) | ☐ Power of Attorney, Revocation Change of Correspondence Address | ☐ Status Letter |
| ☑ Extension of Time Request | ☑ Terminal Disclaimer | ☐ Other Enclosure(s) (please identify below): |
| ☐ Express Abandonment Request | ☐ Request for Refund | |
| ☐ Information Disclosure Statement | ☐ CD, Number of CD(s) | |
| | ☐ Landscape Table on CD | |
| ☐ Certified Copy of Priority Document(s) | **Remarks** | |
| ☐ Reply to Missing Parts/ Incomplete Application | | |
| ☐ Reply to Missing Parts under 37 CFR 1.52 or 1.53 | | |

## SIGNATURE OF APPLICANT, ATTORNEY, OR AGENT

| | |
|---|---|
| Firm Name | |
| Signature | *[signature]* |
| Printed name | Scott A. MOSKOWITZ |
| Date | October 30, 2008 | Reg. No. |

## CERTIFICATE OF TRANSMISSION/MAILING

I hereby certify that this correspondence is being facsimile transmitted to the USPTO or deposited with the United States Postal Service with sufficient postage as first class mail in an envelope addressed to: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450 on the date shown below:

| | | | |
|---|---|---|---|
| Signature | *[signature]* | | |
| Typed or printed name | Scott A. MOSKOWITZ | Date | October 30, 2008 |

This collection of information is required by 37 CFR 1.5. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: **Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

BLU001021

PTO/SB/17 (10-08)
Approved for use through 06/30/2010. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995  no persons are required to respond to a collection of information unless it displays a valid OMB control number

*Effective on 12/08/2004.*
*Fees pursuant to the Consolidated Appropriations Act, 2005 (H.R. 4818).*

# FEE TRANSMITTAL
## For FY 2009

☑ Applicant claims small entity status. See 37 CFR 1.27

| **TOTAL AMOUNT OF PAYMENT** | ($) | $315.00 |

| **Complete if Known** | |
|---|---|
| Application Number | 12/005,229 |
| Filing Date | December 26, 2007 |
| First Named Inventor | Scott A. MOSKOWITZ |
| Examiner Name | Carol S.W. TSAI |
| Art Unit | 2857 |
| Attorney Docket No. | 066112.0132CONT |

## METHOD OF PAYMENT (check all that apply)

☐ Check  ☑ Credit Card  ☐ Money Order  ☐ None  ☐ Other (please identify): _____

☐ Deposit Account   Deposit Account Number: _____   Deposit Account Name: _____

For the above-identified deposit account, the Director is hereby authorized to: (check all that apply)

☐ Charge fee(s) indicated below      ☐ Charge fee(s) indicated below, **except for the filing fee**

☐ Charge any additional fee(s) or underpayments of fee(s) under 37 CFR 1.16 and 1.17      ☐ Credit any overpayments

**WARNING:** Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.

## FEE CALCULATION

### 1. BASIC FILING, SEARCH, AND EXAMINATION FEES

| Application Type | FILING FEES Fee ($) | Small Entity Fee ($) | SEARCH FEES Fee ($) | Small Entity Fee ($) | EXAMINATION FEES Fee ($) | Small Entity Fee ($) | Fees Paid ($) |
|---|---|---|---|---|---|---|---|
| Utility | 330 | 165 | 540 | 270 | 220 | 110 | _____ |
| Design | 220 | 110 | 100 | 50 | 140 | 70 | _____ |
| Plant | 220 | 110 | 330 | 165 | 170 | 85 | _____ |
| Reissue | 330 | 165 | 540 | 270 | 650 | 325 | _____ |
| Provisional | 220 | 110 | 0 | 0 | 0 | 0 | _____ |

### 2. EXCESS CLAIM FEES

| Fee Description | Fee ($) | Small Entity Fee ($) |
|---|---|---|
| Each claim over 20 (including Reissues) | 52 | 26 |
| Each independent claim over 3 (including Reissues) | 220 | 110 |
| Multiple dependent claims | 390 | 195 |

| Total Claims | Extra Claims | Fee ($) | Fee Paid ($) |
|---|---|---|---|
| _____ - 20 or HP = | _____ | x _____ = | _____ |

HP = highest number of total claims paid for, if greater than 20.

| Indep. Claims | Extra Claims | Fee ($) | Fee Paid ($) |
|---|---|---|---|
| _____ - 3 or HP = | _____ | x _____ = | _____ |

HP = highest number of independent claims paid for, if greater than 3.

**Multiple Dependent Claims**

| Fee ($) | Fee Paid ($) |
|---|---|
| _____ | _____ |

### 3. APPLICATION SIZE FEE

If the specification and drawings exceed 100 sheets of paper (excluding electronically filed sequence or computer listings under 37 CFR 1.52(e)), the application size fee due is $270 ($135 for small entity) for each additional 50 sheets or fraction thereof.  See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s).

| Total Sheets | Extra Sheets | Number of each additional 50 or fraction thereof | Fee ($) | Fee Paid ($) |
|---|---|---|---|---|
| _____ - 100 = | _____ | / 50 = _____ (round up to a whole number)  x | _____ = | _____ |

### 4. OTHER FEE(S)

Non-English Specification,   $130 fee (no small entity discount)

Other (e.g., late filing surcharge): TD Fee (1.20(d)) ($70) & Request for Extension Two ("2") Month ($245)

| Fees Paid ($) |
|---|
| $315.00 |

| **SUBMITTED BY** | | | |
|---|---|---|---|
| Signature | *Scott Moskowitz* | Registration No. (Attorney/Agent) | Telephone 305 956 9041 |
| Name (Print/Type) | Scott A. MOSKOWITZ | | Date October 30, 2008 |

This collection of information is required by 37 CFR 1.136. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 30 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

BLU001022

PTO/SB/26 (09-08)
Approved for use through 10/31/2008. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| TERMINAL DISCLAIMER TO OBVIATE A DOUBLE PATENTING REJECTION OVER A "PRIOR" PATENT | Docket Number (Optional) 066112.0132CONT |
|---|---|

In re Application of:  Moskowitz et al.

Application No.:  12/005,229

Filed:  December 26, 2007

For:  Method and Device for Monitoring and Analyzing Signals

The owner*, Blue Spike, Inc._____, of _____100_____ percent interest in the instant application hereby disclaims, except as provided below, the terminal part of the statutory term of any patent granted on the instant application which would extend beyond the expiration date of the full statutory term **prior patent** No. 7,346,472_____ as the term of said prior patent is defined in 35 U.S.C. 154 and 173, and as the term of said **prior patent** is presently shortened by any terminal disclaimer. The owner hereby agrees that any patent so granted on the instant application shall be enforceable only for and during such period that it and the **prior patent** are commonly owned. This agreement runs with any patent granted on the instant application and is binding upon the grantee, its successors or assigns.

In making the above disclaimer, the owner does not disclaim the terminal part of the term of any patent granted on the instant application that would extend to the expiration date of the full statutory term as defined in 35 U.S.C. 154 and 173 of the **prior patent**, "as the term of said **prior patent** is presently shortened by any terminal disclaimer," in the event that said **prior patent** later:
 expires for failure to pay a maintenance fee;
 is held unenforceable;
 is found invalid by a court of competent jurisdiction;
 is statutorily disclaimed in whole or terminally disclaimed under 37 CFR 1.321;
 has all claims canceled by a reexamination certificate;
 is reissued; or
 is in any manner terminated prior to the expiration of its full statutory term as presently shortened by any terminal disclaimer.

Check either box 1 or 2 below, if appropriate.

1. [✔] For submissions on behalf of a business/organization (e.g., corporation, partnership, university, government agency, etc.), the undersigned is empowered to act on behalf of the business/organization.

  I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued thereon.

2. [ ] The undersigned is an attorney or agent of record.  Reg. No._____

| _____ | _____ |
|---|---|
| Signature | October 30, 2008 Date |

| _____ | |
|---|---|
| Scott A. MOSKOWITZ Typed or printed name | |

| | _____ |
|---|---|
| | 305 956 9041 Telephone Number |

[✔] Terminal disclaimer fee under 37 CFR 1.20(d) included.

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

10/31/2008 MBELETE1 00000040 12005229

01 FC:2814    70.00 OP

*Statement under 37 CFR 3.73(b) is required if terminal disclaimer is signed by the assignee (owner).
Form PTO/SB/96 may be used for making this certification. See MEPP § 324.

This collection of information is required by 37 CFR 1.321. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.11 and 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2. **BLU001023**