**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| BLUE SPIKE, LLC<br>　　*Plaintiff*,<br><br>v.<br><br>TEXAS INSTRUMENTS, INC.<br>　　*Defendants* | §<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:12-CV-499 MHS<br><br>LEAD CASE |
| BLUE SPIKE, LLC,<br>　　*Plaintiff*,<br>v.<br><br>AUDIBLE MAGIC CORPORATION, FACEBOOK, INC., MYSPACE, LLC, SPECIFIC MEDIA, LLC, PHOTOBUCKET.COM, INC., DAILYMOTION, INC., DAILYMOTION S.A., SOUNDCLOUD, INC., SOUNDCLOUD LTD., MYXER, INC., QLIPSO, INC., QLIPSO MEDIA NETWORKS LTD., YAP.TV, INC., GOMISO, INC., IMESH, INC., METACAFE, INC., BOODABEE TECHNOLOGIES, INC., TUNECORE, INC., ZEDGE HOLDINGS, INC., BRIGHTCOVE INC., COINCIDENT.TV, INC., ACCEDO BROADBAND NORTH AMERICA, INC., ACCEDO BROADBAND AB, AND MEDIAFIRE, LLC<br>　　*Defendants*. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 6:12-CV-576 MHS<br><br>CONSOLIDATED CASE |

**AUDIBLE MAGIC CORPORATION'S REPLY CLAIM
<u>CONSTRUCTION BRIEF ON U.S. PATENT NO. 6,834,308</u>**

## I. INTRODUCTION

Blue Spike's claim constructions and supporting arguments repeatedly violate two fundamental tenets of claim construction.

1. Blue Spike proposes substituting random words into the claims of the '308 Patent in order to construe commonly understood terms. But claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical* v. *Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997).

2. Blue Spike attempts to limit the claims of the '308 Patent to disclosed embodiments. But "[i]t is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must 'clearly express an intent' to redefine the term." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).[1]

Blue Spike is not challenging the validity of the '308 Patent.[2] Through its claim construction positions, Blue Spike attempts to artificially limit the scope of the '308 Patent to avoid infringement.[3] For the reasons articulated in Audible Magic's opening claim construction brief, and as further explained below, Audible Magic respectfully requests that this Court adopt Audible Magic's proposed constructions for the disputed terms in the '308 Patent.

---

[1] As set forth below, Blue Spike also repeatedly cites to evidence (both intrinsic and extrinsic) that it did not include in the parties' LPR 4-3 Claim Construction Statement. Consistent with this Court's rules, such evidence and argument should be disregarded.

[2] In fact, Audible Magic contends that the '308 Patent invalidates many claims of the Blue Spike Asserted Patents.

[3] Blue Spike begins its claim construction brief by making statements about the operation of the Accused Instrumentality (the Giovanni Abstraction Machine). Audible Magic finds these statements suspect, given that Blue Spike, even to this day, has not produced a single document about the functionality of the Giovanni Abstraction Machine. Thus, Audible Magic has asserted that Blue Spike's *offer for sale* of the Giovanni Abstraction Machine infringes the '308 Patent, based on publicly available information.

## II. DISPUTED CLAIM TERMS[4]

### a. "client media player"

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Client Media Player | Plain and ordinary meaning. | "End user's media player"<br><br>Not the media player of a person or entity providing the service. |

Blue Spike desperately tries to convince the Court to change "client" to "end user's." To be clear, the '308 Patent never uses the term "end user." Indeed, the specification explains that "the media player may comprise *any data processing means or computer* executing the present invention including devices carrying out the invention via an embedded system." '308 Patent at 3:1-4 (emphasis added).

Blue Spike's cited passages do not undermine this broad recitation of a client media player. First, Blue Spike argues that when the '308 Patent discusses a computer, that computer must be operated by an end user. Dkt. 1753 at 6. It goes without saying, though, that a computer need not be operated by an end user (for example, computers may be operated by other computers). Next, Blue Spike argues that because the '308 Patent teaches that the media player "*may comprise* cellular or mobile phones, portable media players, and fixed media players," all claimed client media players must be operated by an end user. *Id*. (citing '308 Patent at 3:4-8) (emphasis added). Not only does the '308 Patent expressly note that those embodiments are "[b]y way of example only, and not of limitation" ('308 Patent at 3:1), but it is improper for Blue Spike to limit the claims of the '308 Patent to specific embodiments. *See Thorner*, 669 F.3d at 1365. Finally, Blue Spike cites passages and figures describing disclosed embodiments of the '308 Patent. Dkt. 1753 at 6-7. Even if these embodiments were describing a device of an end

---

[4] In its responsive claim construction brief, Blue Spike re-ordered the terms in dispute without explanation. For the Court's convenience, Audible Magic responds to Blue Spike's arguments in the order raised in Blue Spike's brief.

2

user (and again, they are not), it would be improper to limit the claims to any particular embodiment, absent a clear disavowal. *See Thorner*, 669 F.3d at 1365.

Because Blue Spike cannot find credible support in the specification for its "end user" limitation, it must resort to a dictionary. Dkt. 1753 at 8, Exhibit 1. But rather than cite to a definition of "client," Blue Spike selectively quotes from the definition of "client/server architecture." *Id.* A client/server architecture is not at issue here. Moreover, Blue Spike's cited dictionary provides a definition of the actual term at issue, and that definition supports Audible Magic. The Microsoft Computer Dictionary makes clear that a client can be *either* a process/program (definitions 1 and 2 of "client") *or* a computer connected to a network (definition 3 of "client"). *Id.*, Exhibit 1 at 102. It does not say that the client must be a device of an end user. Blue Spike cannot escape that both the '308 Patent and Blue Spike's own dictionary support Audible Magic's proposed construction.

b. **"presenting said content-related data on said client media player"**

| c. Term | Audible Magic | Blue Spike |
|---|---|---|
| Presenting said content-related data on said client media player | "causing the content-related data to be displayed on the client media player" | "The act of displaying song information on an end user's media player" |

Blue Spike needlessly breaks this disputed phrase into three parts. Dkt. 1753 at 10. The term in question is the entire phrase[5] – and Audible Magic's proposed construction – "causing the content-related data to be displayed on the client media player" – accurately sets forth the meaning of the disputed phrase in light of the specification and the plain meaning of ordinary English words. *See* Dkt. 1698 at 14-16. But in order to assist the Court, Audible Magic addresses each of Blue Spike 'sub-terms' below.

---

[5] Blue Spike never proposed that the separate terms needed their own constructions during the local rule 4-1 process.

3

> i. "content-related data"

Blue Spike agrees that "[c]laim one expressly construes the term [content-related data]." Dkt. 1753 at 10. But despite this express construction, Blue Spike proposes a different construction of "content-related data." Claim construction "is not an obligatory exercise in redundancy." *U.S. Surgical,* 103 F.3d at 1568. There is no need to provide a separate construction of a term that Blue Spike admits is already expressly construed in the claim.

Moreover, Blue Spike's attempt to limit the term to "song information" is unduly narrow. While claim 1 notes that content-related data includes at least one of the song title, artist, or album, there is nothing in the intrinsic record that limits the data to song information. To the contrary, the specification uses the general description of "information related to the sample" and "media content-related information." *See* '308 patent at 2:55-58. The content-related data can be *any information* related to the media – not just song information. For example, an identification of the record label or a biography of the artist is most certainly "information related to the sample," but would be excluded under Blue Spike's narrow construction.[6]

> ii. "presenting"

In its opening brief, Audible Magic explained that the act of *displaying* the content related data is not claimed in claim 1 of the '308 Patent. Dkt. 1698 at 15-16. Rather, claim 1 merely requires that the content related data be presented to the media player. *Id.* Furthermore, Audible Magic explained that the term "presented" has a plain and ordinary meaning, and

---

[6] Blue Spike also cites to the prosecution history. Dkt. 1753 at 11. Blue Spike failed to include cites to this intrinsic evidence in its LPR 4-3 disclosure, and thus this argument should be disregarded. To the extent the Court considers this evidence, it is unclear what argument Blue Spike is attempting to make. It is undisputed that the "content-related data" must include at least one of the song title, artist, or album, but the nothing in the prosecution history suggests that content related data cannot include other "information related to the sample" as the specification teaches. *See* '308 Patent at 2:55-58.

4

presented a dictionary definition in support. *Id.* Blue Spike completely ignores both points in its responsive brief. Instead, Blue Spike simply tries to replace "presenting" with "displaying." But "merely rephrasing or paraphrasing the plain language of a claim by substituting synonyms does not represent genuine claim construction." *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 863 (Fed. Cir. 2004).

Through its construction, Blue Spike once again attempts to limit the claim to a disclosed embodiment. *See* Dkt. 1753 at 11-13 (arguing that "presenting" must mean "displaying" because in the disclosed embodiments, the content-related data is displayed on the media player). This is improper. *See Thorner*, 669 F.3d at 1365. Moreover, there is no dispute that a media player may ultimately display the content-related data. Indeed, Audible Magic's construction results in the step of causing the data to be displayed on the media player. Dkt. 1698 at 14. The question is whether the claim itself includes the ultimate displaying step. It does not, and Blue Spike does not point to any evidence to the contrary.

### iii. "client media player"

As explained in section II.a. above, Blue Spike's construction of client media player is erroneously narrow and should be rejected.

### c. "reference sampled media"[7]

| d. Term | Audible Magic | Blue Spike |
|---|---|---|
| Comparing said analytical representation to a collection of analytical representation of reference sampled media content | "comparing said analytical representation to a collection of analytical representation[s] of reference sampled media content" | **"Referenced [sic] sampled media**: The collection of stored reference samples" |

---

[7] As part of the larger phrase "comparing said analytical representation to a collection of analytical representation of reference sampled media content."

5

Blue Spike's only support for its construction of "reference sampled media" is two embodiments disclosed in the '308 Patent. Dkt. 1753 at 14. This is yet another attempt of Blue Spike to limit the scope of the '308 Patent to disclosed embodiments. Federal Circuit precedent makes it clear that such limitation is improper without clear disavowal. *See Thorner*, 669 F.3d at 1365. Blue Spike does not even attempt to argue that any such disavowal is present here.

As explained in Audible Magic's opening brief, the term "reference sampled media" should be construed in the context of the larger phrase in which it appears (at least "reference sampled media content"). Dkt. 1698 at 7-8. In the larger phrase, "media content" is already defined by the claim language itself, and "reference sampled" describes a reference set that can serve as the basis of comparisons. *Id.*, '308 Patent at abstract; 8:39-42; 11:26-32.

d. **"analytical representation"**[8]

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Comparing said analytical representation to a collection of analytical representation of reference sampled media content | "comparing said analytical representation to a collection of analytical representation[s] of reference sampled media content" | **"Analytical representation**: A digital fingerprint of a particular segment measuring acoustical/perceptual features of said segment" |

As Blue Spike notes "[t]he parties are in agreement that the term 'analytical representation' is expressly defined in claim one." Dkt. 1753 at 15. Given this agreement, it is unclear why Blue Spike proposes any construction at all, let alone one that diverges from the express definition in the claim. Again, Blue Spike asks this Court to undertake a meaningless exercise in redundancy.

Blue Spike's attempt to change "said" to "particular" is nonsensical. The full claim term

---

[8] As part of the larger phrase "comparing said analytical representation to a collection of analytical representation of reference sampled media content."

6

in dispute is "comparing said analytical representation to a collection of analytical representation of reference sampled media content." Blue Spike did not seek to construe the term "analytical representation" outside of this larger phrase. *See* Dkt. 1630-2 (LPR 4-3 chart). In the context of the phrase in dispute (where "an analytical representation" and "a segment" are already introduced earlier in the claim), the use of "said" is appropriate and needs no clarification.

    e. "segment"

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Segment | Plain and ordinary meaning. | "Any of the parts into which something can be divided"<br><br>A segment is less than the whole. |

In support of its unduly narrow construction of "segment" Blue Spike points to the prosecution history of the '308 Patent.[9] Dkt. 1753 at 16-17 (citing Exhibit 2, AUDMAG162). The prosecution history does not support Blue Spike's argument. In the cited portion of the file history, the applicant attempts to traverse a rejection based on the Roberts patent (U.S.P.N. 6,330,593). Dkt. 1753 at Exhibit 2 (AUDMAG00000162). The applicant notes that "Roberts does not teach sampling a segment of <u>media content of a recording</u>. Roberts teaches a sample as the <u>entirety of the media content</u> (col. 2, lines 45-50)." *Id.* (emphasis added). As explained immediately thereafter, the applicant was making the distinction between sampling a segment of a single *recording* versus sampling a segment of a CD or other physical media with multiple tracks. *Id*. ("the cited passage [of Roberts] merely teaches a process of capturing measurements of the physical embodiments . . . of an entire CD.") This is confirmed by the passage of Roberts cited by the applicant: "a method is provided for determining or assigning a substantially unique identifier to *CD or other distributed media content consisting of a number of tracks*." Exhibit E

---

[9] Again, Blue Spike did not disclose this passage in its LPR 4-3 Claim Construction and Prehearing Statement. *See* Dkt. 1630-2. Accordingly, this Court should not consider Blue Spike's late argument.

7

(attached hereto) at 2:45-50 (emphasis added). The applicant did not disclaim that a segment could not be an entire *recording*, but rather clarified that a segment could not be an entire multi-track *album*.

In its opening brief, Audible Magic noted that "segment" is already defined in the claim language itself: "said segment of said media content is a predetermined portion of said media content." Dkt. 1698 at 14. Blue Spike does not rebut this.[10] Thus, no construction is necessary.

### f. "digital"

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Digital | Plain and ordinary meaning. | "a series of binary digits—1's and 0's." |

The term "digital" only appears in the '308 Patent as part of the phrase "digital fingerprint." Blue Spike has provided no rational why "digital" should be given a separate and distinct construction from "digital fingerprint." There is no need for a gratuitous construction of "digital."

### g. "digital fingerprint"

| Term | Audible Magic | Blue Spike |
|---|---|---|
| Digital Fingerprint | Digital identifier. | "coded string of binary digits that uniquely identifies a signal |

Blue Spike urges this Court to insert the limitation of "uniqueness" into the term "digital fingerprint." In support of such limitation, Blue Spike cites only to the abstract of the '308

---

[10] Blue Spike does purportedly cite to a dictionary definition of "segment." Dkt. 1753 at 17. Again, this dictionary was not disclosed in the parties' claim construction statement and should be disregarded. *See* Dkt. 1630-2 at 2. Furthermore, the exhibit attached to Blue Spike's brief contains no identifying information to establish its authenticity or publication date. *See* Dkt. 1753, Ex. 3. Regardless, where the claim language itself already defines the term, there is no need for this Court to waste its resources positing another construction. Moreover, the cited dictionary definition "[a]ny of the parts into which something can be divided" supports Audible Magic's position that a "segment" could be either the entirety of a recording, or less than the entirety, because the entirety of a recording constitutes one of the parts into which such could be divided.

Patent. Dkt. 1753 at 19. Blue Spike claims that because the abstract explains that "a media sample is compared to other media samples in order to identify it and to ascertain information related to the sample," the patent purportedly teaches solely a one-to-one matching of samples. *Id*. But nothing in the abstract, or the remainder of the specification, requires that the system result in a one-to-one match; there is no requirement that precludes multiple matches to a single reference. To be sure, the patent specifically discloses one-to-many matching, where an unknown sample is compared to reference samples and the system "compute[s] a 'distance' between each frame and the reference sample" and then "[i]f this distance is below a predefined threshold, a match is considered to be found." '308 Patent at 8:47-59. Thus, depending on the sensitivity of the "threshold," multiple "matches" could result for a single sample. Thus, Blue Spike's logical leap from "identifying" to an unwarranted limitation of the patent to perfect "one-to-one match" is unfounded, and it thus follows that Blue Spike's construction of "digital fingerprint" is therefore unsupported. And, of course, the abstract of the '308 Patent upon which Blue Spike relies never even mentions the term "digital fingerprint."

Blue Spike also cites extrinsic evidence (again not disclosed in its LPR 4-3 disclosure) to support its construction. *See* Dkt. 1753, Exhibit 5. This third-party patent has no relation to any of the patents in this case and is dated *8.5 years after the filing date* of the '308 Patent. Courts look to the meaning that the term would have to a person of ordinary skill in the art "at the time of the invention, *i.e.*, as of the effective filing date of the patent application." *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Here, Blue Spike's extrinsic evidence post-dates the filing date of the '308 Patent by nearly a decade and should be ignored. Furthermore, Blue Spike merely cites this patent without any attempt to qualify the patent as an authoritative source that a court could or should rely on. *Cf. Lodsys, LLC v. Brother Int'l Corp.*, 2013 U.S.

9

Dist. LEXIS 85614, *162 (E.D. Tex. June 14, 2013) (rejecting reliance on third-party textbook where no attempt to establish it as an authoritative source or any relevance to the patents in suit). Accordingly, Blue Spike's arguments should be disregarded and its construction rejected.

### h. "measuring acoustical/perceptual features of said segment"

| i.    Term | Audible Magic | Blue Spike |
|---|---|---|
| "said analytical representation is a digital fingerprint of said segment **measuring acoustical/ perceptual features of said segment**" | Plain and ordinary meaning. | "To make a measurement of acoustical/perceptual features of said segment" |

Blue Spike's arguments are nonsensical. It claims that the Court should adopt its construction because "in order for the *analytical representation* to exist, *it* needs 'to make a measurement of acoustical/perceptual features of said segment.'" Dkt. 1753 at 20 (emphasis added). It is unclear how the analytical representation can make a measurement of acoustical/perceptual features.

Blue Spike asserts that this term "is technically acting as an adjective." Dkt. 1753 at 20. But Blue Spike seeks to construe this term as a verb because "at some point, a measurement occurred." *Id.* Even if this premise were true, it does not support Blue Spike construction. The claim language merely recites the element of a digital fingerprint having the attribute of measuring features. The claim does not recite the step(s) wherein those fingerprints were created and generated. Blue Spike's proposed claim construction would result in an entirely new step of "making a measurement" being introduced into this claim. This is an improper attempt to read a limitation into the claim and should be rejected.

Dated: September 16, 2014

By:

          */s/ Eric H. Findlay*
Eric H. Findlay (Texas Bar No. 00789886)
Walter W. Lackey, Jr. (Texas Bar No. 24050901)
FINDLAY CRAFT, P.C.
102 N. College Ave., Suite 900
Tyler, TX 75702
Telephone: (903) 534-1100
Facsimile: (903) 534-1137
efindlay@findlaycraft.com
wlackey@findlaycraft.com

Gabriel M. Ramsey– *LEAD ATTORNEY*
I. Neel Chatterjee
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1000 Marsh Road
Menlo Park, CA 94025
Telephone: (650) 614-7400
Facsimile: (650) 614-7401
gramsey@orrick.com
nchatterjee@orrick.com

Alyssa M. Caridis
ORRICK, HERRINGTON & SUTCLIFFE, LLP
777 S. Figueroa St.
Suite 3200
Los Angeles, CA 90017
Telephone: (213) 629-2020
Facsimile: (213) 612-2499
acaridis@orrick.com

Christopher J. Higgins
ORRICK, HERRINGTON & SUTCLIFFE, LLP
1152 15th Street, NW
Washington, DC 20005
Telephone: (202) 339-8418
chiggins@orrick.com

Attorneys for Defendants Audible Magic, Corp., Facebook, Inc., Myspace LLC, Specific Media LLC, Photobucket.com, Inc., DailyMotion, Inc., DailyMotion S.A., SoundCloud, Inc., SoundCloud Ltd., Myxer, Inc., Qlipso, Inc., Qlipso Media Networks, Ltd., Yap.tv, Inc., GoMiso, Inc., iMesh, Inc., Metacafe, Inc., Boodabee Technologies, Inc., Zedge Holdings, Inc., Brightcove Inc., Coincident.TV, Inc., Accedo Broadband North America, Inc., Accedo Broadband AB, MediaFire, LLC, WiOffer LLC, and Harmonix Music Systems, Inc.

## **CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served electronically on opposing counsel pursuant to Local Rule CV-5(a)(7)(C) on September 16, 2014.

*/s/ Eric H. Findlay*
Eric H. Findlay
