# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| BLUE SPIKE, LLC, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 6:12-cv-499-MHS-CMC |
| TEXAS INSTRUMENTS, INC., et al., | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Before the Court are Audible Magic's Opening Claim Construction Brief (Dkt. No. 1698), Blue Spike's response (Dkt. No. 1753), and Audible Magic's reply (Dkt. No. 1774). Also before the Court are the parties' Local Patent Rule ("P.R.") 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 1674) and P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 1789).

A claim construction hearing, in accordance with *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996), was held in Tyler on October 1, 2014. After hearing the arguments of counsel and reviewing the relevant pleadings, presentation materials, other papers, and case law, the Court finds the disputed terms of the patents-in-suit should be construed as set forth herein.

# TABLE OF CONTENTS

I.     BACKGROUND .................................................................................................. 3

II.    APPLICABLE LAW ........................................................................................... 4

III.   LEVEL OF ORDINARY SKILL IN THE ART ................................................. 5

IV.    CONSTRUCTION OF AGREED TERMS ......................................................... 7

V.     CONSTRUCTION OF DISPUTED TERMS ................................................... 10

       A.     "client media player" ........................................................................... 10

       B.     "content-related data" and "presenting said content-related data on said client
              media player" ........................................................................................ 15

       C.     "comparing said analytical representation to a collection of analytical
              representation of reference sampled media content" ........................... 22

       D.     "digital" and "digital fingerprint" ....................................................... 24

VI.    CONCLUSION ................................................................................................. 29

# I.       BACKGROUND

Audible Magic asserts that Blue Spike infringes claim 1 of United States Patent No. 6,834,308 ("the '308 Patent"). The '308 Patent is titled "Method and Apparatus for Identifying Media Content Presented on a Media Playing Device," and was filed on February 17, 2000. The '308 Patent generally relates to a system and method that identifies media content (*e.g.*, a song) made available on a media player.[1] The specification discloses taking media content available on a client media player and creating an analytical representation of that content according to certain characteristics, which can include acoustic features over a given time period. '308 Patent at 2:48–5:9. As set forth in claim 1, the analytical representation of the received content comprises a digital fingerprint that is compared to a collection of fingerprints in order to identify the content in question. *Id.* Based on this comparison, the '308 Patent discloses obtaining content related data, such as the name of the song or name of the artist performing the song. *Id.* That content related data is then displayed on the client media player. *Id.*

Audible Magic contends that Blue Spike infringes claim 1 of the '308 Patent. Claim 1 recites the following elements (disputed terms in italics):

> 1. A method for identifying media content presented on a *client media player* comprising:
> creating an analytical representation from a segment of media content of a recording presented on said *client media player*, wherein said media content is audio data for a

---

[1] The Abstract of the '308 Patent follows:
> A system and method for identifying media content presented over a media playing device. The media content, such as, such as audio and/or video, is either available digitally or digitally sampled. The media content is sampled to generate a media sample or analytical representation of the media content. The media sample is compared to a collection of sampled (or represented) media content to identify it and to ascertain information related to the sample. This media content-related information is then presented to the user via a display means on the media player. The media player then presents the user specific and related actions that are based upon the information presented and allows the user to directly execute their choice of actions.

song, said segment of said media content is a predetermined portion of said media content present on said media player and said analytical representation is a *digital fingerprint* of said segment measuring acoustical/perceptual features of said segment;

*comparing said analytical representation to a collection of analytical representation of reference sampled media content* to obtain content-related data from said collection of analytical representations of reference sampled media content wherein said content related data includes at least one of a group consisting of a song title, artist performing said song, and title of an album including said song; and

*presenting said content-related data on said client media player.*

## II.  APPLICABLE LAW

The claims of a patent define the invention to which the patentee is entitled the right to exclude. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Claim terms are given their ordinary and customary meaning to one of ordinary skill in the art at the time of the invention, unless there is clear evidence in the patent's specification or prosecution history that the patentee intended a different meaning. *Id.* at 1312-13. Claim construction is informed by the intrinsic evidence: the patents' specifications and file histories. *Id.* at 1315-17. Courts may also consider evidence such as dictionary definitions and treatises to aid in determining the ordinary and customary meaning of claim terms. *Id.* at 1322. Further, "[o]ther claims, asserted and unasserted, can provide additional instruction because 'terms are normally used consistently throughout the patent.'" *SmartPhone Techs. LLC v. Research in Motion Corp.*, No. 6:10-CV-74-LED-JDL, 2012 WL 489112, at *2 (E.D. Tex. Feb. 13, 2012) (citing *Phillips*, 415 F.3d at 1314). "Differences among claims, such as additional limitations in dependent claims, can provide further guidance." *SmartPhone*, 2012 WL 489112, at *2.

A court should "avoid the danger of reading limitations from the specification into the claim[s]." *Phillips*, 415 F.3d at 1323. For example, "although the specification often describes

very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Id.* The Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Id.* This is not only because of the requirements of Section 112 of the Patent Act, but also because "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.* Limitations from the specification should only be read into the claims if the patentee "acted as his own lexicographer and imbued the claim terms with a particular meaning or disavowed or disclaimed scope of coverage, by using words or expressions of manifest exclusion or restriction." *E-Pass Techs., Inc. v. 3Com Corp.*, 343 F.3d 1364, 1369 (Fed. Cir. 2003) (citations omitted); *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012).

Similarly, the prosecution history may not be used to infer the intentional narrowing of a claim absent the applicant's clear disavowal of claim coverage. *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (citations omitted). "To be given effect, such a disclaimer must be made with reasonable clarity and deliberateness." *Id.*

Guided by these principles of claim construction, this Court directs its attention to the patent-in-suit and the disputed claim terms.

### III. LEVEL OF ORDINARY SKILL IN THE ART

It is well established that patents are interpreted from the perspective of one of ordinary skill in the art. *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application."). The

Federal Circuit has advised that the "[f]actors that may be considered in determining the level of skill in the art include: (1) the educational level of the inventors; (2) the type of problems encountered in the art; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; (5) sophistication of the technology; and (6) education level of active workers in the field." *Env'tl Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 696 (Fed. Cir. 1983). "These factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

In the claim construction briefing related to Blue Spike's Patents, Blue Spike proposes that a person of ordinary skill in the art would have a Master's degree in computer science or computer engineering, or equivalent experience, as well as two years experience in the field of digital fingerprinting and cryptography. (Dkt. No. 1700 at 7.)[2] In a related motion, Defendants submitted declarations of three experts, each of which opine on the level of ordinary skill in the art.[3] *See* Dkt. No. 1752-4 (Declaration of Kevin Bowyer, PH.D.); Dkt. No. 1752-6 (Declaration of John Snell); Dkt. No. 1752-8 (Declaration of Dr. Matthew Turk). Dr. Bowyer opines that a person of ordinary skill in the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science, or an equivalent degree, with a background and at least two years' experience in the fields of signal or image processing, biometric identification, and/or related fields. (Dkt. No. 1752-4 at 7.) Mr. Snell opines that a person of ordinary skill in the art would have at least a Bachelor's degree in Electrical Engineering, Computer Science or an equivalent degree, with at least two years of signal or image processing experience. (Dkt. No.

[2] Unless otherwise indicated, all citations to documents filed with the Court are to the ECF page number assigned by the Court's filing system.

[3] The related motion is Defendants' Motion for Summary Judgment of Invalidity Based on Indefiniteness Under 35 U.S.C. § 112(b) (Dkt. No. 1752).

1752-6 at 9.)  Finally, Dr. Turk opines that a person of ordinary skill in the art would have at least a bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field. (Dkt. No. 1752-8 at 8.)

Having considered the parties' proposals and the factors that may be considered in determining the level of skill in the art, the Court finds that a person of ordinary skill in the art would have at least a Bachelor's degree in electrical engineering, computer science, or equivalent degree, with a background and at least two years' experience in signal processing, image processing, biometric identification, or a related field.

## IV.  CONSTRUCTION OF AGREED TERMS

During the claim construction hearing, the Court provided the parties with proposed constructions for the disputed terms/phrases.  The parties agreed to the Court's proposed construction for the following terms:

| Claim Term/Phrase | Agreed Construction |
| --- | --- |
| "reference sampled media content" | plain and ordinary meaning |
| "segment of media content" | plain and ordinary meaning |
| "measuring acoustical/perceptual features of said segment" | including measurements of acoustical/perceptual features of said segment |

Regarding the term **"reference sampled media content,"** the term appears in claims 1, 2, 9-11, and 15 of the '308 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  The Court further finds that the claim language explicitly construes "media content" to mean "audio data for a song," and that the specification further identifies the sample media content as reference samples. *See, e.g.,* '308 Patent at 8:39–46 ("The lookup unit 42 carries out the operation of receiving media samples

from the client media player 14 and comparing the media samples to a collection of sampled media content (reference samples).").

The Court also finds that Blue Spike's original construction confused the issue by considering only the words "reference sampled media," and not the entire element in which the words appear (*i.e.*, a collection of analytical representation of reference sampled media content"). Moreover, the Court rejects Blue Spike's argument that the term should be construed to require "stored" reference sample. There is no requirement that the claim recite every possible aspect of the disclosed embodiments. Accordingly, the Court agrees with the parties that the term **"reference sampled media content"** should be given its **plain and ordinary meaning.** To the extent that Blue Spike contends that the plain and ordinary meaning requires "stored" reference samples, the Court rejects this argument.

Regarding the phrase **"segment of media content,"** the phrase appears in claims 1-6, 9, 11, 13, and 15 of the '308 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language explicitly construes "segment of media content" to mean "predetermined portion of said media content." Thus, a "segment" must be a "predetermined portion."

The Court further finds that the patentees did not make a clear and unmistakable disclaimer that a segment could not be an entire recording. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-1326 (Fed. Cir. 2003) ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."); *see also Home Diagnostics, Inc. v. LifeScan, Inc.,* 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.") Instead, in distinguishing the

prior art, the patentees disclaimed using measurements to identify an entire audio CD. (Dkt. No. 1753, Ex. 2 at AUDMAG00000163). Specifically, the patentees stated the following:

> In Roberts, Figure 2 block 34 describes a "unique CD ID", unique to the entire CD (col. 2, lines 45-50). Roberts uses these measurements to identify an entire audio CD (col. 2, lines 47-50). For instance, if the same media content is burned onto another CD, then the identifiers used by Roberts are completely changed.

(Dkt. No. 1753, Ex. 2 at AUDMAG00000163). Thus, the patentees distinguished the prior art based on its requirement of physical embodiments. Indeed, the patentees argued that "[o]ne advantage of the Applicants' step of creating the analytical representation is that the identification relies on the data that is the media content and does not change in the re-mastering process. Rather than identifying an entire CD as a unit, Applicants' step of creating the analytical representation identifies the media content regardless of the physical embodiments" (Dkt. No. 1753, Ex. 2 at AUDMAG00000163). Thus, the Court is not persuaded that the patentees made a clear and unmistakable disclaimer that a segment could not be an entire recording. Accordingly, the Court agrees with the parties that the phrase **"segment of media content"** should be given its **plain and ordinary meaning.** To the extent that Blue Spike contends that the plain and ordinary meaning excludes a segment from being an entire recording, the Court rejects this argument.

Regarding the phrase **"measuring acoustical/perceptual features of said segment,"** the phrase appears in claims 1, 9, 11, 13, and 15 of the '308 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that claim 1 indicates that the recited "digital fingerprint" includes measurements of acoustical/perceptual features of the recited "segment." If the digital fingerprint did not include these measurements, then the "comparing said analytical representation to a collection of analytical representation" could not occur because the

"analytical representation" that is compared in this step includes the recited "digital fingerprint." *See* Claim 1 ("said analytical representation is a digital fingerprint of said segment.").

Likewise, the specification states that "the media sample created by the sampling unit comprises a 'digital fingerprint,'" which in an exemplary embodiment includes sampling a sound file "according to its acoustic/perceptual features over time." '308 Patent at 3:56–60. In other words, the recited "digital fingerprint" includes measurements of acoustical/perceptual features of the segment. For at least these reasons, the Court agrees with the parties that the phrase **"measuring acoustical/perceptual features of said segment"** should be construed as **"including measurements of acoustical/perceptual features of said segment."**

With this understanding, the Court hereby adopts the agreed-upon constructions listed in the table above.

## V.    CONSTRUCTION OF DISPUTED TERMS

### A.  *"client media player"*

| Disputed Term | Audible Magic's Proposal | Blue Spike's Proposal |
|---|---|---|
| "client media player" | Plain and ordinary meaning. | "End user's media player" Not the media player of a person or entity providing the service. |

### 1.  The Parties' Position

The parties dispute whether the term "client media player" should be construed as an "end user's" media player. Audible Magic contends that the specification explicitly defines a media player through open-ended exemplary language. (Dkt. No. 1698 at 13.) Thus, according to Audible Magic, the term "client" is not an "end-user" but rather any device used to carry out the claimed invention. (Dkt. No. 1698 at 13.) Audible Magic notes that the specification describes a first embodiment that includes "lookup server 12 and at least one client media player 14." (Dkt. No. 1698 at 14) (quoting '308 Patent at 5:53–55). Audible Magic further notes that

the specification also provides a second embodiment where the database of media content may reside on the client device rather than on a separate lookup server. (Dkt. No. 1698 at 14) (citing '308 Patent at 4:53–64). Audible Magic further argues that the specification notes that "client" means nothing more than the device. (Dkt. No. 1698 at 14) (citing '308 Patent at 6:11–29). Thus, according to Audible Magic, neither the specification, nor claim 1, limits the "client media player" to one operated by an "end-user." Audible Magic further argues that claim 14 demonstrates that the patentee knew how to claim "user initiated" actions with respect to the "client media player," and that claim 1 contains no such limitation. (Dkt. No. 1698 at 14.)

Regarding Blue Spike's construction, Audible Magic argues that it improperly substitutes "end user's" for "client." (Dkt. No. 1698 at 15.) Audible Magic contends that the specification is clear that a "client media player" can be any device coupled to the lookup server that is capable of executing the client engine. (Dkt. No. 1698 at 15.) Audible Magic further argues that Blue Spike's construction is incorrect because it is not clear what "the service" is referring to and how "a person or entity" provides such a service. (Dkt. No. 1698 at 15.) Audible Magic notes that the word "service" does not appear anywhere in the claims of the '308 Patent. (Dkt. No. 1698 at 15.) Audible Magic further argues that is no support for an argument that a single entity cannot perform the entire method. (Dkt. No. 1698 at 15.) According to Audible Magic, the "client media player" can perform the "creating," "comparing," and "presenting" steps of claim 1. (Dkt. No. 1698 at 15.)

Blue Spike responds that the '308 Patent is entirely dependent on an end user's client media player. (Dkt. No. 1753 at 6.) Blue Spike argues that the specification describes the "client media player" as a computer or PDA in the prior art—both of which would be operated by an end user. (Dkt. No. 1753 at 6) (citing '308 Patent at 1:17–20). Blue Spike further argues that the

specification's description of the invention indicates that the "client media player" may be "cellular or mobile phones, portable media players, and fixed media players including analog broadcast receivers (such as car stereo, home stereos, televisions, for example)"—devices operated by an end user. (Dkt. No. 1753 at 6) (quoting '308 Patent at 3:4–8).

Regarding the two embodiments disclosed in the specification, Blue Spike argues that the first embodiment describes an end user's computer system. (Dkt. No. 1753 at 6) ('308 Patent at 3:27–29). Blue Spike then argues that the second embodiment differs from the first only in that the database is also stored on the end user's client media player. (Dkt. No. 1753 at 7) ('308 Patent at 4:53–55). Thus, according to Blue Spike, all of these descriptions indicate that an end user operates the client media player. (Dkt. No. 1753 at 7.) Blue Spike also argues that the '308 Patent's diagrams indicate that the client media player is operated by an end user. (Dkt. No. 1753 at 7) (citing '308 Patent at Figures 1 and 2, 8:12–14, 9:23–33). Blue Spike further contends that the Microsoft Computer Dictionary 102 (5th ed. 2002) defines a client as "complete, standalone personal computer (not a "dumb" terminal), and it offers the user its full range of power and features for running applications." (Dkt. No. 1753-1 at 4.)

In addition, Blue Spike contends that Audible Magic confuses the issue by arguing that "client" is not an "end user." (Dkt. No. 1753 at 8.) Blue Spike argues that it does not propose that "client" and "end user" are synonymous. Instead, Blue Spike contends that its construction uses the possessive "end user's" to show that the media player is operated by an end user. (Dkt. No. 1753 at 8.) Blue Spike further argues that claim 14 substantiates its position by noting that the client media player has a "user interface" operated by a "user of said client media player." (Dkt. No. 1753 at 9.) Blue Spike also argues that Audible Magic's citation to the specification only contains one sentence that refers to a "client engine." (Dkt. No. 1753 at 9.) Blue Spike

contends that this citation refers to a user interface, and that the "client media player" has a user interface because it is operated by an end user. (Dkt. No. 1753 at 9.) Finally, Blue Spike argues that the proposed phrase "[n]ot the media player of a person or entity providing the service," is not an additional limitation, but a further clarification that the intrinsic evidence defines "client media player" as an end user's media player. (Dkt. No. 1753 at 9–10.)

Audible Magic replies that the '308 Patent never uses the term "end user," and the specification states that "the media player may comprise any data processing means or computer executing the present invention including devices carrying out the invention via an embedded system." (Dkt. No. 1774 at 3) (quoting '308 Patent at 3:1–4). Audible Magic contends that there is no requirement that a computer must be operated by an end user, and argues that computers may be operated by other computers. (Dkt. No. 1774 at 3.) Audible Magic further argues that Blue Spike's construction improperly limits the claims to specific embodiments. (Dkt. No. 1774 at 3–4). Finally, Audible Magic argues that the Microsoft Computer Dictionary actually supports its construction because it makes clear that a client can be either a process/program (definitions 1 and 2 of "client") or a computer connected to a network (definition 3 of "client"). (Dkt. No. 1774 at 4) (citing 1753-1 at 4).

### 2. Analysis

The term "client media player" appears in claims 1, 2, 6, 8-11, and 13-15 of the '308 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that, in light of the specification, the term is unambiguous, is easily understandable by a jury, and requires no construction. Indeed, the parties' do not dispute the meaning of "media player" and the specification provides a number of examples of types of media players and types of media. *See, e.g.,* '308 Patent at 1:19–55, 3:1–8, 4:47–55, 6:12–29. Thus, the parties' dispute is focused on the term "client."

However, the intrinsic and extrinsic evidence cited by Blue Spike does not warrant redrafting the term "client" as an "end user's."

The term "end user's" appears nowhere in the intrinsic evidence. Moreover, Blue Spike's negative limitation is confusing and would potentially exclude a single entity from performing the entire method (i.e., "creating," "comparing," "presenting"). This is contrary to the intrinsic evidence, which explicitly discloses the scenario where a single entity performs the entire method. Specifically, the specification states that in a second embodiment "the database of sampled media content resides within the client computer" and that "under this arrangement, the database query is carried out 'locally' on the computer playing the media content." '308 Patent at 4:53–59. Thus, not only is it unclear what "service" Blue Spike's negative limitation is referring to, but this exemplary embodiment indicate that the "service" recited in the claims may be performed by a single entity. Finally, as Audible Magic argues, the Microsoft Computer Dictionary provides more than one definition for "client," and none of them indicate that the term "client" should be redrafted as "end user's."

In sum, the intrinsic evidence indicates that "client media player" is a device that is capable of playing media content to a user. Indeed, all of the examples of media players included in the specification discuss playing or being capable of playing media. Moreover, as discussed further below, the claim language captures this aspect with the phrase "presenting said content-related data on said client media player." For these reasons, the Court is not persuaded that it should redraft this unambiguous term and read a negative limitation into the claim.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"client media player"** will be given its **plain and ordinary meaning**.

### B. "content-related data" and "presenting said content-related data on said client media player"

| Disputed Term | Audible Magic's Proposal | Blue Spike's Proposal |
| --- | --- | --- |
| "presenting said content-related data on said client media player" | "causing the content-related data to be displayed on the client media player" | "The act of displaying song information on an end user's media player" |

### 1. The Parties' Position

The parties dispute whether the entire phrase "presenting said content-related data on said client media player" requires construction.[4]  Audible Magic contends that the dispute for this phrase should center only on the word "presenting," because the other two terms in the phrase "content-related data" and "client media player" are either expressly defined in the claim or have been addressed in a previous section. (Dkt. No. 1698 at 14.)  Audible Magic argues that the plain meaning of "presenting" is "giving something to" or "making (something) available to be used." (Dkt. No. 1698 at 17) (citing Dkt. 1698-3 at 5) (Merriam-Webster.com).  Audible Magic notes that the claim language states that the content-related data is for "presenting…on" the client media player.  Audible Magic then argues that unlike other claims in the '308 Patent, there is no requirement that the content related data actually be displayed on the client media player. (Dkt. No. 1698 at 17) (citing '308 Patent, claim 12 ("configured to display said content information")).

Audible Magic further contends that the word "presented" is used in the preamble of claim 1 with respect to "media content presented on a client media player." (Dkt. No. 1698 at 17.)  Audible Magic argues that because media content is audio data, such content is never displayed on a client media player because it has no visual component. (Dkt. No. 1698 at 17.)

---

[4]  Both Audible Magic and Blue Spike do not present any new arguments regarding the term "client media player" included in this phrase.  In fact, the parties direct the Court to the respective section of each brief that addressed the term "client media player." (*See* Dkt. Nos. 1698 at 16; 1753 at 10; 1774 at 6.)  The Court has considered and resolved the parties' dispute related to the term "client media player" and will not restate or readdress those arguments here.

Thus, according to Audible Magic, "presenting" similarly cannot impart any requirement of actual display, it is just a precursor that causes an action to happen. (Dkt. No. 1698 at 17.) Audible Magic also contends that the ultimate act of displaying the "content-related data" of that information on the client media player is not claimed. (Dkt. No. 1698 at 17.)

Regarding Blue Spike's construction, Audible Magic contends that it is incorrect because the recited "client media player" is not an "end user's media player." (Dkt. No. 1698 at 17.) Audible Magic also argues that "content-related data" is expressly defined in the claim as "said content related data includes at least one of a group consisting of a song title, artist performing said song, and title of an album including said song." (Dkt. No. 1698 at 17.) Audible Magic further argues that even that definition is not limited to the particular types of information enumerated, but rather "includes" those types of data. (Dkt. No. 1698 at 17.) Audible Magic contends that the specification makes clear that content-related data may encompass other types of information beyond song title, artist performing the song, and title of an album. (Dkt. No. 1698 at 17) (citing '308 Patent at 8:60–9:2). Thus, according to Audible Magic, Blue Spike's construction incorrectly replaces "content-related data" with "song information," which appears nowhere in the claims, specification, or intrinsic record. (Dkt. No. 1698 at 18.)

Audible Magic also argues that Blue Spike's construction is nonsensical when inserted into the claims because it replaces the verb "presenting" with a noun "act" combined with a gerund "displaying." (Dkt. No. 1698 at 18.) Finally, Audible Magic contends that "presenting" does not mean "displaying." (Dkt. No. 1698 at 18.) Audible Magic contends that the "content-related data" is either transmitted to, or retrieved from within, the client media player, which causes its ultimate display, but the actual displaying of the content-related data is specifically not claimed in claim 1. (Dkt. No. 1698 at 18.)

Blue Spike responds that "content-related data" should be construed as "song information." (Dkt. No. 1753 at 10.) Blue Spike notes that claim one expressly construes the term as "includ[ing] at least one of a group consisting of a song title, artist performing said song, and title of an album including said song." (Dkt. No. 1753 at 10.) Blue Spike argues that each of these items is information about a song—"song information." (Dkt. No. 1753 at 10–11.) Blue Spike also contends that its interpretation is consistent with the prosecution history. (Dkt. No. 1753 at 11.) Blue Spike further argues that the term "presenting" is vague, and that the specification is clear that song information will be displayed on a media device. (Dkt. No. 1753 at 11.) Blue Spike notes that the Abstract indicates that "media content-related information is then presented to the user via a display means." (Dkt. No. 1753 at 11) (quoting '308 Patent at Abstract).

Blue Spike further argues that the Figures indicate that "presenting" is more appropriately construed as "displaying." (Dkt. No. 1753 at 11.) Blue Spike contends that Figure 1 illustrates that a display (26) is attached to a media player (14), and that the related description states that "[t]he user interface 38 carries out the operation of . . . displaying content-related information to the user." (Dkt. No. 1753 at 11–12) (quoting '308 Patent at 8:12–14.) Blue Spike also argues that Figure 3 notes that once content related information is received from the lookup server (150), the next step is to "display content-related information to user" (160). (Dkt. No. 1753 at 12.) Blue Spike also argues that it is clear that "display" is the proper word choice because even Audible Magic's proposed construction replaces "presenting" with the phrase "causing … to be displayed." (Dkt. No. 1753 at 13.)

Regarding Audible Magic's construction, Blue Spike argues that it is flawed because of its passive, rather than active, construction (*i.e.*, "causing to be displayed" instead of

"displaying." (Dkt. No. 1753 at 13.) Blue Spike argues that the problem with this proposal is that it makes the server the device in charge of the display rather than the client, which Blue Spike contends is inconsistent with the intrinsic record. (Dkt. No. 1753 at 13.) Blue Spike argues that the specification indicates that an end user's media player creates an analytical representation of a song, forwards that analytical representation to a lookup server, and displays what it receives from the lookup server. (Dkt. No. 1753 at 13) (citing '308 Patent at 3:66–4:1). Thus, according to Blue Spike, its construction clarifies, rather than modifies, the patent. (Dkt. No. 1753 at 13.) Regarding Audible Magic's improper part of speech argument, Blue Spike states that their construction can be modified to "displaying song information on an end user's media player." (Dkt. No. 1753 at 13.)

Audible Magic replies that Blue Spike needlessly breaks this disputed phrase into three parts. (Dkt. No. 1774 at 4.) Regarding the term "content-related data," Audible Magic argues that Blue Spike agreed that the claim expressly construes the term, thus there is no need to provide a separate construction. (Dkt. No. 1774 at 5.) Audible Magic also argues that limiting the term to "song information" is unduly narrow because claim 1 recites that it includes at least the recited information, and there is nothing in the intrinsic record that limits the data to song information. (Dkt. No. 1774 at 5.) Audible Magic further argues that content-related data can be any information related to the media – not just song information. (Dkt. No. 1774 at 5) (citing '308 Patent at 2:55–58).

Regarding the term "presenting," Audible Magic argues that claim 1 merely requires that the content related data be presented to the media player. (Dkt. No. 1774 at 5–6.) Audible Magic argues that Blue Spike's construction improperly limits the claim to a disclosed embodiment. (Dkt. No. 1774 at 6.) Audible Magic further contends that there is no dispute that a media player

may ultimately display the content-related data. (Dkt. No. 1774 at 6.) Thus, according to Audible Magic, the question is whether the claim itself includes the ultimate displaying step, which it contends it does not. (Dkt. No. 1774 at 6.)

### 2. Analysis

The phrase "presenting said content-related data on said client media player" appears in claims 1 and 9 of the '308 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claim language explicitly construes "content-related data" to mean "at least one of a group consisting of a song title, artist performing said song, and title of an album including said song." Blue Spike has not persuaded the Court to change this to "song information." Indeed, as Audible Magic argued, the specification indicates that the "content-related information" may also "include product fulfillment information, such as how and where to purchase media containing the media sample, advertising banners, and/or promotional offers, for example." '308 Patent at 4:35–38. Accordingly, the Court finds that the term "content-related data" should be given its plain and ordinary meaning.

Regarding the term "presenting," the Court is not persuaded by Audible Magic's argument that this does not require actually displaying the content-related information on the client media player. Specifically, Audible Magic argues that claim 12 distinguishes "presenting" from "displaying" because claim 12 recites "configured to display said content information." (Dkt. No. 1698 at 17.) First, claim 12 depends from claim 11, not claim 1. Moreover, claim 11 recites that before the "content-related information" is displayed, it is first transmitted to the client media player. Thus, unlike claim 1, claim 11 includes both a transmitting and displaying step. Here, claim 1 only recites a "presenting" step, which indicates that the content-related data is displayed or played "on said client media player." Indeed, claim 2, which depends from claim

1, recites that when a lookup server is include, the content-related data is transmitted to the client media player before it is presented.

Audible Magic also argues that media content includes audio data, which has no visual component, and thus can never be displayed. (Dkt. No. 1698 at 17.)  The Court agrees and finds that the term "presenting" should not be limited to "displaying," but can also include "playing" the content-related information.  For example, the specification states that "[c]lient media player 14 further includes a conventional sound card 20 connected to speakers 22" and "the media client application 18 will generally play audio signals through the sound card device 20 and speakers 22." '308 Patent at 6:47–50.  Likewise, the specification states that "[c]lient media player 14 also includes a conventional video card 24 connected to a display means 26" and that "the media client 18 will generally play video content through the video card 24, which then produces an appropriate video signal suitable for display on the display means 26." '308 Patent at 6:55–59.  Thus, the specification indicates that the media player is capable of either displaying or playing the content-related information.

Furthermore, Audible Magic's contention that the content-related data does not have to be actually displayed on the client media player is inconsistent with the specification's description of the present invention.  Specifically, in the Brief Description of the Invention section, the specification states the following:

> *The present invention* is a system and method for identifying media content presented over a media playing device, such as a computer. The system generates a media sample or analytical representation of the media content, such as audio and/or video, played on the media player. The media sample or representation is compared to a database of sampled media content or representations to query and ascertain information related to the sample. *This media content-related information is then displayed on the media player.*

'308 Patent at 2:49–58 (emphasis added).  Displaying the content-related information is further repeated through-out the specification and illustrated in the Figures. *See, e.g.*, '308 Patent at

8:12–14 ("The user interface 38 carries out the operation of receiving commands from a user of the client media player 14, and displaying content-related information to the user."); 8:28–32 ("In response, the lookup server 12 provides the information related to the media sample, if available, to the client media player. This content-related information is received by the user interface 38 which then displays the received information to the user of the client media player 14."); 10:37–41 ("At box 160, the user interface 38 presents the content-related information to the user via video card 24 and display 26, or other display device such as an LCD screen, or standard broadcast television."); Figure 3 (step 160 labeled "Display Content-Related Information To User").

Thus, the intrinsic record indicates that "presenting" the content-related data is "displaying or playing" the content related data. Indeed, the Abstract states that the "media content-related information is then *presented* to the user via *a display means on the media player*." '308 Patent at Abstract (emphasis added). This is consistent with the claim language, and nothing in the intrinsic records suggest that "presenting" should be construed as being once removed from actually "displaying or playing" the content-related data.

Furthermore, the Court has considered the extrinsic evidence submitted by Audible Magic and is not persuaded that it requires construing "presenting" as "causing … to be displayed." First, the dictionary definition does not used the words "causing." Moreover, as discussed above, the content-related data is "given" or "made available" when it is transmitted to the client media player, not when it is "presented" on the client media player as recited in claim 1. Accordingly, the Court rejects Audible Magic's construction.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"content-related data"** will be

given its **plain and ordinary meaning.**  The Court further construes the phrase **"presenting said content-related data on said client media player"** to mean **"displaying or playing the content-related data on the client media player."**

### C.  *"comparing said analytical representation to a collection of analytical representation of reference sampled media content"*

| Disputed Term | Audible Magic's Proposal | Blue Spike's Proposal |
| --- | --- | --- |
| "comparing said analytical representation to a collection of analytical representation of reference sampled media content" | "comparing said analytical representation to a collection of analytical representation[s] of reference sampled media content" | "Analytical representation: A digital fingerprint of a particular segment measuring acoustical/perceptual features of said segment" |

### 1.  The Parties' Position

The parties dispute whether the term "analytical representation" requires construction. Audible Magic contends that Blue Spike proposed that the entire phrase "comparing said analytical representation to a collection of analytical representation of reference sampled media content" requires construction, but only provides a construction for the terms "analytical representation." (Dkt. No. 1698 at 9.)  Audible Magic further contends that the term is already expressly defined in the claim 1 by its recitation of "said analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment." (Dkt. No. 1698 at 9.)  Audible Magic argues that Blue Spike's construction repeats this exact language as its construction, while changing the word "said" to "a particular." (Dkt. No. 1698 at 9.)  Audible Magic argues that Blue Spike's attempt to rewrite the claim is wrong because a jury would not be confused with the word "said." (Dkt. No. 1698 at 9.)  Thus, according to Audible Magic the claim language is clear and the Court need not construe this term. (Dkt. No. 1698 at 10.)

Audible Magic further argues that when Blue Spike's construction is substituted into the

claim language, it renders the term "a collection of analytical representations" superfluous and the entire claim element nonsensical. (Dkt. No. 1698 at 11.) Audible Magic argues that Blue Spike's construction does nothing more than demonstrate that the plain language of the claims is clear and unambiguous. (Dkt. No. 1698 at 11.) Audible Magic contends that the jury can easily understand the language and that there is no need to change it. (Dkt. No. 1698 at 11.)

Blue Spike responds that the parties agree that the term "analytical representation" is expressly defined in claim one. (Dkt. No. 1753 at 15.) Blue Spike contends that it has only made one modification to the definition already present in the claim language by changing "said" to "particular." (Dkt. No. 1753 at 15.) Blue Spike contends that this is a grammatical fix because the first instance of "analytical representation" by necessity implies that there is no "earlier recitation" of the term. (Dkt. No. 1753 at 15.)

Audible Magic replies that it is unclear why Blue Spike proposes any construction at all given its statement that the parties agree that the term is expressly defined in claim one. (Dkt. No. 1774 at 7.) Audible Magic further contends that Blue Spike's attempt to change "said" to "particular" is nonsensical. (Dkt. No. 1774 at 7–8.) Audible Magic contends that the use of "said" is appropriate and needs no clarification. (Dkt. No. 1774 at 8.)

### 2. Analysis

The phrase "comparing said analytical representation to a collection of analytical representation of reference sampled media content" appears in claims 1, 9, and 11 of the '308 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same meaning in each claim. The Court agrees with the parties that the claim language explicitly construes the term "analytical representation" to mean "a digital fingerprint of said segment measuring acoustical/perceptual features of said segment." Thus, the Court finds that the term does not need further construction. The Court also disagrees with Blue Spike that

"said" in this claim language should be replaced with "a particular."  As Audible Magic contends, it is well understood that the use of "said" in a claim refers to the earlier recitation of that element, not a random "particular" element, divorced from the earlier claim limitations.  Thus, the Court is not persuaded that it should redraft the claim language as Blue Spike proposes.  Accordingly, the Court finds that in light of the claim language, the term "analytical representation" does not require construction and should be given its plain and ordinary meaning.

Finally, the parties identified the entire phrase "comparing said analytical representation to a collection of analytical representation of reference sampled media content" as requiring construction.  However, the parties' arguments focused only on the term "analytical representation" discussed above.  Notwithstanding, the Court finds that, in light of the intrinsic evidence discussed above, the entire phrase should be given its plain and ordinary meaning.

### 3.  Court's Construction

The term "**analytical representation**" is explicitly construed in claim 1 and will be given its **plain and ordinary meaning**.  In light of this extrinsic evidence, the phrase "**comparing said analytical representation to a collection of analytical representation of reference sampled media content"** will be given its **plain and ordinary meaning.**

### D.  *"digital" and "digital fingerprint"*

| Disputed Term | Audible Magic's Proposal | Blue Spike's Proposal |
| --- | --- | --- |
| "digital" | Plain and ordinary meaning. | "a series of binary digits—1's and 0's." |
| "digital fingerprint" | "digital identifier" | "coded string of binary digits that uniquely identifies a signal." |

### 1.  The Parties' Position

The parties dispute whether the term "digital" requires construction.  The parties also

dispute whether "digital fingerprint" must be unique. Audible Magic argues that the term "digital" appears nowhere by itself in claim 1, and should be addressed with respect to the phrase "digital fingerprint." (Dkt. No. 1698 at 12.) Audible Magic contends that a "digital fingerprint" is an identifier for a particular media sample. (Dkt. No. 1698 at 13.) Audible Magic further contends that the only apparent dispute is over the meaning of "digital" and whether the fingerprint must be "unique." (Dkt. No. 1698 at 13.)

Regarding the term "digital," Audible Magic argues that the term has no special meaning in the '308 Patent and that its plain meaning should apply. (Dkt. No. 1698 at 13.) Audible Magic further argues that the plain meaning is not "a series of binary digits - 1's and 0's," as Blue Spike contends. (Dkt. No. 1698 at 13.) Regarding Blue Spike's contention that a digital fingerprint must be unique, Audible Magic argues that "unique" is not used in the specification of the '308 Patent. (Dkt. No. 1698 at 13.) Audible Magic further argues that the '308 Patent talks about defining relative "thresholds" of similarity to define a match, which it contends is contrary to any concept of absolute uniqueness. (Dkt. No. 1698 at 13) (citing '308 Patent at 8:55–59).

Blue Spike responds that the intrinsic record does not provide any special definition for the word "digital," and therefore a commonly accepted definition is appropriate. (Dkt. No. 1753 at 18.) Blue Spike argues that the simple definition of digital is "expressed in digits, esp. for use by a computer." (Dkt. No. 1753 at 18) (citing Dkt. No. 1753, Ex. 4, Websters II New Riverside University Dictionary (1984)). Thus, according to Blue Spike, its construction of "digital" as "a series of binary digits—1's and 0's" is entirely appropriate as it merely provides a widely accepted meaning to a common term. (Dkt. No. 1753 at 18.)

Regarding the term "digital fingerprint," Blue Spike argues that its construction is appropriate because the '308 Patent does not clearly define the term "digital fingerprint." (Dkt.

No. 1753 at 19.) Blue Spike argues that it is clear from the specification that digital fingerprints are unique. (Dkt. No. 1753 at 19.) Blue Spike contends that the '308 Patent requires a media sample to be compared to other media samples in order to "identify it and to ascertain information related to the sample." (Dkt. No. 1753 at 19) ('308 Patent at Abstract). Thus, according to Blue Spike, the specification teaches a one-to-one matching of samples, and if the digital fingerprints were not unique, then the system would be compromised by the possibility of multiple matches. (Dkt. No. 1753 at 19.) Blue Spike also cites to US. Patent Application 2009/006277, and argues that the concept of a digital fingerprint requires matching of unique binary strings. (Dkt. No. 1753 at 19.)

Finally, Blue Spike contends Audible Magic's proposed construction would unnecessarily broaden the term "digital fingerprint." (Dkt. No. 1753 at 19.) Blue Spike argues that "digital identifier" is not a term of art, and thus has no context to constrain it. (Dkt. No. 1753 at 18.) Blue Spike further argues that a "digital identifier" could determine much more than a one-to-one match, which it argues is functionality beyond the scope of the invention. (Dkt. No. 1753 at 19.)

Audible Magic replies that Blue Spike has provided no rational why "digital" should be given a separate and distinct construction from "digital fingerprint." (Dkt. No. 1774 at 9.) Audible Magic further argues that there is no need to construe "digital." (Dkt. No. 1774 at 9.) Regarding the term "digital fingerprint," Audible Magic argues that nothing in the intrinsic record that limits the system to one-to-one match or precludes multiple matches to a single reference. (Dkt. No. 1774 at 10.) Audible Magic argues that the '308 Patent specifically discloses one-to-many matching, where an unknown sample is compared to reference samples and the system "compute[s] a 'distance' between each frame and the reference sample" and then

"[i]f this distance is below a predefined threshold, a match is considered to be found." (Dkt. No. 1774 at 10) ('308 Patent at 8:47–59). Thus, according to Audible Magic, depending on the sensitivity of the "threshold," multiple "matches" could result for a single sample. (Dkt. No. 1774 at 10.) Audible Magic argues that Blue Spike's logical leap from "identifying" to an unwarranted limitation of the patent to perfect "one-to-one match" is unfounded, and that Blue Spike's construction is unsupported. (Dkt. No. 1774 at 10.)

Audible Magic also contends that the third-party patent that Blue Spike cites to has no relation to any of the patents in this case and is dated 8.5 years after the filing date of the '308 Patent. (Dkt. No. 1774 at 10.) Thus, Audible Magic contends that this extrinsic evidence should be ignored because it postdates the filing date of the '308 Patent by nearly a decade. (Dkt. No. 1774 at 10.) Finally, Audible Magic argues that Blue Spike merely cites to this patent without any attempt to qualify the patent as an authoritative source that a court could or should rely on. (Dkt. No. 1774 at 10.)

### 2. Analysis

The term "digital" does not appear by itself in any of the claims and the Court finds that digital should be construed with the term "digital fingerprint." The term "digital fingerprint" appears in claims 1, 9, 11, 13, and 15 of the '308 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that this term is used in defining the term "analytical representation." Claim 1 recites that the "analytical representation is a digital fingerprint of said segment measuring acoustical/perceptual features of said segment representation." The specification further states that "the media sample created by the sampling unit comprises a 'digital fingerprint' or 'digital signature' using conventional digital signal processing known in the art." '308 Patent at 3:55–58, *see also* 8:4–11, 10:12–18. The specification then provides an example of sampling a sound file

according to its acoustic/perceptual features over time. '308 Patent at 3:58–60. Thus, the intrinsic evidence indicates that the recited "digital fingerprint" is a digital sample that identifies a segment of media content.

Regarding the parties' dispute, the Court finds that the '308 Patent contemplates one-to-many matching and is not limited to one-to-one matching as Blue Spike contends. Specifically, the specification discusses comparing an unknown sample to reference samples and computing "a 'distance' between each frame and the reference sample." '308 Patent at 8:51–55. The specification adds that a "reference sample which has the smallest distance to any frame in the sample is considered for a match" and "[i]f this distance is below a predefined threshold, a match is considered to be found." '308 Patent at 8:56–59. Thus, the Court agrees with Audible Magic and finds that a person of ordinary skill in the art would understand that depending on the sensitivity of the "threshold," multiple "matches" could result for a single sample.

The Court further notes that this dispute does not appear to be directly related to the term "digital fingerprint," but instead relates to the "comparing step." Indeed, the specification's discussion is in the comparing context. Accordingly, to the extent that Blue Spike's proposal of "uniquely identifies" requires one-to-one matching, the Court rejects this argument. However, the Court also rejects the argument that the same "digital fingerprint" can be used for different segments of media data. In the Brief Description of the Invention section, the specification states that the "media sample or representation is compared to a database of sampled media content or representations to query and ascertain information related to *the sample*." '308 Patent at 2:53–57 (emphasis added). Thus, the recited "digital fingerprint" is used to identify a segment of media content, which is used to ascertain information related to the media content. Again, this does not exclude a query from identify multiple samples, it only requires each sample to

have its own digital fingerprint. Indeed, claim 1 recites that the "analytical representation" is compared to "a collection of analytical representation of reference sampled media content." Thus, the Court does not adopt either parties' construction. Finally, the Court has reviewed the extrinsic evidence submitted by Blue Spike and does not find it persuasive.

### 3. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes **"digital fingerprint"** to mean **"digital sample that identifies a segment of media content."**

## VI. CONCLUSION

The Court hereby orders the claim terms addressed herein construed as indicated. Summary charts are attached below as Exhibit A (agreed terms) and Exhibit B (disputed terms).

The parties are further ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual constructions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 16th day of October, 2014.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

**EXHIBIT A**

| Agreed Claim Term | Construction |
|---|---|
| "reference sampled media content" | plain and ordinary meaning |
| "segment of media content" | plain and ordinary meaning |
| "measuring acoustical/perceptual features of said segment" | "including measurements of acoustical/perceptual features of said segment" |

**EXHIBIT B**

| Disputed Claim Term | Court's Construction |
|---|---|
| "client media player" | plain and ordinary meaning |
| "content-related data" | plain and ordinary meaning |
| "presenting said content-related data on said client media player" | "displaying or playing the content-related data on the client media player." |
| "analytical representation" | plain and ordinary meaning |
| "comparing said analytical representation to a collection of analytical representation of reference sampled media content" | plain and ordinary meaning |
| "digital fingerprint" | "digital sample that identifies a segment of media content" |