# EXHIBIT 1



**ORRICK, HERRINGTON & SUTCLIFFE LLP**
THE ORRICK BUILDING
405 HOWARD STREET
SAN FRANCISCO, CALIFORNIA 94105-2669

*tel +1-415-773-5700*
*fax +1-415-773-5759*

**WWW.ORRICK.COM**

Gabriel M. Ramsey
(415) 773-5535
gramsey@orrick.com

The Honorable Robert W. Schroeder, III
U.S. District Court for the Eastern District of Texas
221 West Ferguson, Tyler, TX 75702

**Re: *Texas Instruments, Inc. v. Blue Spike, LLC.* (Case No. 6:12-cv-499) – Audible Magic's Letter Brief Requesting Leave to File *Daubert* Motion Regarding Dr. Tewfik's Report**

Dear Judge Schroeder,

The fundamentally flawed opinions of Blue Spike's infringement expert, Ahmed Tewfik, should be excluded because they are inherently unreliable. The Tewfik Report has three fundamental flaws: (1) it attempts to claim that MFCCs are the patents' "abstract," after Blue Spike has judicially admitted that MFCCs cannot be an abstract; (2) the report mixes and matches evidence regarding multiple, different accused products, presenting analysis of a single monolithic product rather than analyzing each accused product independently, and (3) the report misapplies the law in its theory of purported "joint" infringement, combining the acts of three independent parties, as purportedly constituting direct infringement.

For these reasons, the Tewfik Report must be struck. Accordingly, Audible Magic respectfully requests leave to file a *Daubert* motion to exclude Dr. Tewfik's expert opinions.

## I. The Tewfik Report Is Flawed Because It Claims MFCCs Are Abstracts, After Blue Spike Has Judicially Admitted That MFCCs Are Not Abstracts

The Tewfik Report concludes that Audible Magic's software meets the "abstract" limitation of each asserted claim "through its use of previously-known Mel Frequency Cepstral Coefficient ("MFCC") technology for audio speech recognition." As detailed in Audible Magic's motion for summary judgment of non-infringement, Blue Spike has already judicially admitted that MFCCs are not the claimed abstract. Dkt. 1957. As detailed in that motion, judicial admissions may not be contradicted by later declarations or testimony, and thus Dr. Tewfik is precluded from taking this position. *See Velasquez v. Green*, 2012 U.S. Dist. LEXIS 97597, *20-21 (E.D. Tex. 2012) (rejecting later attempts to contradict judicial admissions made in sworn testimony); *Garcia v. EHealthscreenings, LLC.*, 2014 U.S. Dist. LEXIS 15465, *10-14 (W.D. Tex. 2014) (statements made during a deposition were found to be judicial admissions; because the statements constitute a judicial admission, a subsequent affidavit trying to explain away the statements was precluded and summary judgment was granted); *see also McCarthy v. Target Corp.*, 2012 U.S. Dist. LEXIS 50561, *24-25 (N.D. Ill. 2012) (pursuant to *Daubert*, excluding plaintiff's expert report contradicting factual issues that had been judicially admitted by the plaintiff and granting summary judgment dismissing plaintiff's claim).



## II. The Tewfik Report Improperly Combines Evidence From Multiple, Different Products

The Tewfik Report "accuses the following Audible Magic products and services: SmartID, CopySense Appliance, CopySense Custom, CopySense Premier, Live TViD, Music-Speech iD, SmartSync, and RepliCheck products, solutions and technology…" Tewfik Report, p. 10. Elsewhere, the Tewfik Report says that "Blue Spike has accused three categories of Audible Magic products (Replicheck, Copysense, and ID Services)" but does not assign the items from the first list of accused products to the three categories. *Id.*

The Tewfik Report then asserts that its "infringement analysis incorporates source materials for *each* of these products." Tewfik Report p. 10 (emphasis added). However, this is simply not so. There is no mention in the report of Music-Speech iD. CopySense is treated only broadly, not distinguishing CopySense Appliance, CopySense Custom, or CopySense Premier. Replicheck is mentioned once in passing on p. 11 of the Tewfik Report; a RepliCheck screen shot is the focus of p. 25; and RepliCheck is mentioned in a footnote on p. 30. Given how often the CopySense figure is repeated starting on p. 14 of the Tewfik Report, the general impression is that CopySense is accused and other products or services are dragged along in the wake.

In general, the Tewfik Report fails entirely to analyze the application code, documentation and functionality for each of the accused products or to even separate out what that code, documentation and functionality might be. The Tewfik Report instead confounds documentation, code and functionality from multiple accused products and services, as if there were a single product, when that is not at all the case. While the core MFCC-based fingerprinting technology is common across all products, the architectural elements, application level functionality and source code beyond the core fingerprinting library are different, as each product is a discrete system. Yet the Tewfik Report fails to address each product in any coherent manner, and does not analyze each discrete product against the limitations of the asserted claims.

The legal framework for admission of expert testimony is provided by the Federal Rules of Evidence, along with *Daubert v. Merrell Dow Pharms.*., 509 U.S. 579 (1993) and its progeny. *See* Fed. R. Evid. 702, 703. In *Daubert*, the Court addressed the proper standard for admitting expert testimony and emphasized that the Court's gatekeeping obligation extends to ensuring that the "principles and methodology" used by an expert are reliable. In particular, Federal Rule of Evidence 702 requires that expert opinions be "based on sufficient facts or data" and "the product of reliable principles and methods." Fed. R. Evid. 702. Gathering together documents for completely different accused products (which the expert goes out of his way to first enumerate individually), and then combining those documents to describe a purported single accused product that does not actually exist in the real world violates both of these legal principles.



Indeed, the purpose of expert testimony under Rule 702 is to "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 591, 113 S. Ct. 2786, 2795 (1993). The Tewfik Report's approach of combining evidence for multiple different products, and presenting them as a single product that does not actually exist, is inherently unreliable, will not assist the trier of fact, but rather will only confuse them and result in prejudice. For example, where an expert did not point to any cogent underlying sources for factual assertions, and instead of particularly analyzing the accused product, combined general sources of information and made unsupported inferences from cursory review of the products, the expert's opinions were excluded under *Daubert*. *Sorkin v. Amsysco, Inc.*, 2006 U.S. Dist. LEXIS 39399, *7-9 (S.D. Tex. 2006); *see also Elder v. Tanner*, 205 F.R.D. 190, 194 (E.D. Tex. 2001) (excluding infringement opinion that did not contain sufficient underlying factual bases and analysis). It is settled that any step an expert takes in formulating his opinion "that renders the analysis unreliable . . . renders the expert's testimony inadmissible." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 670 (5th Cir. 1999). For this reason, the Tewfik Report should be struck.

**III. The Tewfik Report Misapplies The Law Regarding Purported "Joint" Infringement.**

In order for a party to be held vicariously liable, under a theory of "joint direct infringement" for the steps or components of a claim carried out or put into use by a third party, it "requir[es] control or direction" by the accused party over the acts or components of the third party. *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007). An arms-length commercial arrangement between parties, where each party performs or controls separate elements of the claim, and no single party controls the other parties' acts or components, does not constitute sufficient control or direction to constitute vicarious liability under a theory of "joint direct infringement." *Id.*[1] (No direct infringement where plaintiff "chose instead to have four different parties perform different acts within one claim."; showing some relationship between the parties was insufficient to establish that accused party "controls or directs" the activities of the other parties); *BMC Res. Inc. v. Paymentech, L.P.*, 2006 U.S. Dist. LEXIS 4961 (N.D. Tex. Feb. 9, 2006) ("No court has ever found direct infringement based on the type of arms-length business transaction presented here."); *Aristocrat Tech. v. Int'l. Game Tech.*, 709 F.3d 1348, 1362-63 (Fed. Cir. 2013) (To directly infringe a claimed method, a single party must perform "all the steps of the claimed method, either personally or through another acting under

[1] "This court acknowledges that the standard requiring control or direction for a finding of joint infringement may in some circumstances allow parties to enter into arms-length agreements to avoid infringement. Nonetheless, this concern does not outweigh concerns over expanding the rules governing direct infringement. For example, expanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme for indirect infringement. Direct infringement is a strict liability offense, but it is limited to those who practice each and every element of the claimed invention." *BMC Resources, Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007).

his direction or control."; holding that the defendant system provider did not vicariously control the user of the system, and cause the user to make take an act using the system).[2]

The Tewfik Report puts forward a theory combining the independent acts of three different parties: (1) content owners who elect to use software to create fingerprints and submit them over the Internet to a remote database at Audible Magic, (2) Audible Magic, which operates a database containing fingerprints and lookup servers, and (3) customers of Audible Magic who elect to buy and use software that creates fingerprints and sends them over the Internet to be looked up at Audible Magic's servers. Tewfik Report, p. 43.

Under the above principles of "joint direct" infringement, the Tewfik Report would have to show that there is direction and control, in the manner of an agency relationship or a contractual *requirement* that content owners or customers take acts at the direction of Audible Magic. There is no such evidence or even argument put forth in the Tewfik Report. In fact, the most that the Tewfik Report ever suggests is that Audible Magic's software is "involved," in that three independent actors (content owners, customers, Audible Magic) use software that Audible Magic happened to create: "Based on the involvement of Audible Magic's software for every limitation of '700 patent claim 1, … leads me to conclude … that it is Audible Magic's software that provides the "direction or control" necessary for its entire system." Tewfik Report p. 43. There is not even an assertion in the report that Audible Magic *requires* content owners or customers to use its software by contract or through an agency relationship.

To the contrary, the evidence that is cited shows that Audible Magic created software, and then third party content owners and customers independently acquired and used that software at their own decision and volition. *See e.g.* Tewfik Report pp. 14-15 (asserting that content owners, of their own volition, register their content with Audible Magic and define rules for that content), 14-16 (showing that end users, content providers and Audible Magic are

[2] *See also Centillion Data Systems, LLC v. Qwest Communs. Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) (No vicarious liability of provider of server functionality for acts of customers to which it provided client software: "Following our vicarious liability precedents, we conclude, as a matter of law, that [defendant] is not vicariously liable for the actions of its customers. [Defendant] in no way directs its customers to perform nor do its customers act as its agents. While [defendant] provides software and technical assistance, it is entirely the decision of the customer whether to install and operate this software on its personal computer data processing means."; No direct infringement unless a party "control[s] the system as a whole and obtain[s] benefit from it."; operating "back-end processing elements" and "supplying the software for the customer to use is not the same as using the system."); *Joao Control & Monitoring Sys. of Cal. LLC v. Sling Media Inc*., 2012 U.S. Dist. LEXIS 110907, *25 - 26 (N.D. Cal. Aug. 7, 2012) (holding that like the service provider in *Centillion*, the defendant could not be held vicariously responsible for infringing patents based on its customer's use of its software because the defendant's contractual relationship with its customers does not *obligate* customers to do anything, nor does it mandate any action by customers *on behalf of* defendant) (emphasis in original); *CIVIX-DDI, LLC v. Hotels.Com, LP*, 809 F. Supp. 2d 882, 888 (N.D. Ill. 2011) (no direct infringement by Internet service where it was alleged that Internet service obtained user input and delivered search results in response to user requests).



separate parties and do not control each other, for example contract saying "Customer has installed" software created by Audible Magic); pp. 14, 17, 27, 28, 31 (relying on figure identifying three parties, shown separately, with no control over each other and acting completely independently); 29 ("Client computers are often *out of the control* of the application developer.") (emphasis added).

Apparently recognizing this failure, the Tewfik Report attempts to play fast and loose with the law. While citing cases that state the standard for joint direct infringement, the Tewfik Report mischaracterizes that law, suggesting that it is sufficient to hold one party responsible for the wholly independent, unilateral acts of third-parties who entered into an ordinary contract to acquire, and subsequently use, the first party's software. Tewfik Report, p. 4 (incorrectly suggesting that it is enough that a software seller enters a contract and the software sold pursuant to the contract is "attributable" to the seller). The fact that a single party is the common source of the *software* is not the relevant legal question. Rather, the question is whether the source of the software *requires* third parties by contract or agency principles to use the software to meet every single element of a patent claim.

Because the Tewfik Report addresses the wrong legal question and does not even attempt to provide any evidence that Audible Magic required content owners or customers to take any particular action to meet all claim elements (*i.e.*, as contractual agents of Audible Magic), or that content owners or customers control Audible Magic or each other in that way, the Tewfik Report's "joint direct" infringement theories are inherently unreliable. For this reason, the Tewfik Report should be struck.

**IV. Conclusion**

The Tewfik Report is inherently unreliable, as it (1) attempts to accuse MFCCs as the claimed "abstract" after Blue Spike judicially admitted that MFCCs cannot be abstracts, (2) mixes and matches documentation from multiple products as if there was a single product architecture that does not actually exist, and (3) misapplies the law of "joint direct" infringement and does not even attempt to meet the legal requirements of such a theory. These approaches are unreliable as a legal and factual matter, and will only serve to confuse the jury. This Court should exercise its gatekeeping responsibilities and exclude those unreliable opinions. Accordingly, Audible Magic respectfully requests leave to file a *Daubert* challenge against the Tewfik Report.

Sincerely,

Gabriel Ramsey